ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
Carolyn Jane Siino,
                            Plaintiff,
                    -against-
NYC Human Resources Administration/
    Department of Social Services,
NYC Department of Homeless Services,
City of New York,
New York Foundation for Senior Citizens,
    Guardian Services, Inc., and
Crown House Realty Co., LLC,
                            Defendants.
--------------------------------------------------------x



 CV 14      COMPLAINT      7217

Jury Trial Demanded      BRODIE, J.

To the Honorable Judges:

1. <u>Parties</u>: Plaintiff (P) *pro se* is Carolyn Jane Siino, who is homeless so that P uses this address:

P.O. Box 170050, Ozone Park, NY 11417.  Yet, *only in instances in which time is of the essence* P uses

this address (where P is staying): c/o Sonja Kobylko, 682 Onderdonk Avenue, Ridgewood, NY 11385.

Defendants (D) are NYC Human Resources Administration (HRA)/Department of Social Services,

residing at Office of Legal Affairs, Human Resources Administration, 180 Water Street, 17th Floor,

New York, NY 10038;

NYC Department of Homeless Services (DHS), residing at Office of Legal Affairs, 33 Beaver Street,

17th Floor, New York, NY 10004;

City of New York (City), residing at Zachary Carter, Corporation Counsel, Law Department of the City

of New York, 100 Church Street, New York, NY 10007;

New York Foundation for Senior Citizens, Guardian Services, Inc. (F), residing at 11 Park Place,

New York, NY 10007; and

Crown House Realty Co., LLC (CH), residing at 175 N. Central Avenue, Valley Stream, NY 11580.

2. <u>Jurisdiction</u>: The jurisdiction of the Court is invoked pursuant to the Constitution of the United States

and Title 42 U.S.C. Section 1983 with various NYS and NYC laws.

3. <u>Notice of Claim</u>: NOC was filed 02-14-14, and the Comptroller number is 2014PI009577.

1

4. <u>Overview</u>: P *pro se* is 65 and claims to be not mentally impaired and not incapacitated, with an M.B.A. degree, not a law degree. P was 63 in a rent-stabilized studio apartment when a nonpayment of rent action was brought against P in Queens Housing Court, where HRA Adult Protective Services (APS) was brought in; City never helped P pay rent--to P knowledge, at first, due to P unemployment (although P was known to be self-employed but not making money) and, later, due to P being an individual without a child; and P became a ward in a guardianship in Queens Supreme Court. This complaint details what P believes has been an avoidable ordeal for P during that period until the present. (P omitted DHS from NOC, because P began to believe only recently that some HRA APS and F policies and practices may have followed from what now seem to P to be DHS policies and practices.) P wants the Court to determine what policies and practices are illegal and/or unconstitutional and to enjoin the appropriate parties from same when illegality and/or unconstitutionality can be found. P will try to state, nonfrivolously, against parties mainly civil rights and tort claims, and P has yet other claims to try to state.

5. <u>P and Property Owner (CH) Prior to the Nonpayment of Rent Action</u>: Around 04-18-11, P in studio apartment above building laundry began to experience labored breathing in response to what P believed to be the cause: laundry fumes. Although P wrote about same to CH three times, laundry pipes were not redesigned until early February 2012, after P had brought an HP action and finally an OSC action in Queens Housing Court. P also brought an unsuccessful action against City and CH in EDNY. Certainly, P could not determine that P had gastroenterological problems causing P labored breathing until October 2011, and P was on omeprazole, which caused P face to swell, until April 2012. So P income was adversely affected April 2011 to April 2012, and this is one cause of P nonpayment of rent beginning August 2012. P is no longer pursuing any of this time-barred matter, but P mentions these simple facts lest they are or become material to this complaint. P believes that what has been perceived about P is different from what has been actual about P, which is P way of stating that what might appear in this complaint to be tangential facts could rise to be material factors.

2

6. 11-21-12 Through 04-02-13, When HRA APS Did Not Help P Pay Rent but Had P Sign for Guardianship:

6A. HRA APS did not help P pay rent and never expressly stated why not, but P now knows why not: In an op-ed article, "Build Senior Housing With Surplus Billions," dated 10-26-14 in the NY Daily News, P learned that 998,000 NYS seniors will become 300,000 more NYS seniors by 2030 and that although NYS expects from bank settlements a surplus of $4 billion, it takes $1 billion to build 15,000 affordable housing units for seniors. So there are not enough such units presently available for NYC seniors. City cannot find affordable housing for NYC seniors, and City cannot afford to help pay rent to cover any theoretical NYC housing-needy demographic set (for example, NYC seniors and other categories).

6B. HRA APS, dealing with seniors, steered P as though P were in a hidden category of "Unemployed": As already stated of APS, P was known to be self-employed but not making money. APS never helped P pay rent, never expressly stated why not, never mentioned P business, and never enabled P in any way to become employed. Instead, APS' Julio Rivera, in a first call 11-23-12 to P, stated about a one-shot deal, which is money that might be loaned (but P, at first, assumed given) to P to pay back rent, that P must "have a way of going forward financially." During subsequent apartment visits from APS social workers, P was continually told that P was not eligible for a one-shot deal. P was so dumb concerning the facts that P was not going to get help paying rent and that the one-shot deal was not free money for P that P applied defiantly during December 2012 for the one-shot deal at which point P learned that the one-shot deal is a loan for those who are employed and, if need be, able to get a person(s) to help pay future rent.

6C. P tried to become eligible for the one-shot deal and pursued the loan diligently into April 2013: P was able to get friend, Sonja Kobylko, to fill out the forms to be the donor to help pay future rent, and she advanced $2,200, which covered rent paid by P to CH for March 2013 and April 2013 so that P owed 7 months rent for August 2012 through February 2013. Annoyingly, the Rental Assistance Unit (RAU) wrote that she was "not viable"; P went through a state administrative hearing, which P won pending the check on her viability; BEV twice checked P living standard in apartment; HRA's Compliance Unit required a pay stub and could not understand that P was an independent contractor with a no-stub check; and P got a job which lasted perhaps three weeks ending early April 2013, which means that P had to

3

abandon that expiring one-shot deal application.  October 2014, P learned on the Internet that all along the

maximum number of months for a 1 person loan is far below 7: it is 3.

6D. (Speech? Press? Religion?)  P, self-employed, had a company religion website with "Kryptos" K4 solved on it 07-27-12 through 01-28-13, and P began to contemplate a discrimination claim:

While HRA APS social workers continued to be secretive, P distrusted them: these so-called helpers were

claiming to be working *for* P, but P continues to believe that anyone who is not working *with* P is

working *against* P.  P is not paranoid, simply wise.  Concurrently, P thought that P had to begin to worry

about the future of P business, website, inventory, business books, etc.  P contemplated a discrimination

claim about to arise if P were separated from P computer on whose desktop sits P only link to build and

maintain P website: P knew that any separation from P right to practice P religion and to share

P viewpoints on the Internet would mean that P rights to freedom of speech, freedom of the press, and

freedom of religion would be violated.  "Kryptos" is the encoded statue outside the C.I.A. building.

6E.  P got no recognition or money for solving "Kryptos" K4 but tried to get non-Social Security money:

P was snubbed when P did contact a few televangelists about financing P writing endeavors, and so

P tried to make money.  P added a page by 01-28-13 to "Kryptos."  Also, P spent days on the telephone

calling various charities, but they were either requiring employment or limited by FEMA to offering only

one month's rent.  P job turned out to be temporary.  P likely would have retired around P 64th birthday

04-04-13, but HRA APS secretiveness lacked clarity for P to go forward with P decisions in the best way

for P.  Yes, in addition to P actions to challenges, P was also trusting God.

6F. (Due Process?)  P had ZERO legal representation during this period: Despite the fact that Queens

Housing Court had contacted JASA to represent P, JASA social worker told P that JASA had taken P case,

but P learned during a court appearance 12-30-12 that JASA had chosen to not represent P.

6G.  P remained in Queens Housing Court, where P was blessed or lucky:  CH lawyer, James Kasdon,

asked P in front of the court lawyer 11-21-12, "Are you on medication?"  P answered "No!" rightfully but

in a strange voice, whereupon P secretly thanked God for the idea of changing P voice to the next few

questions so that the court did contact HRA APS and JASA for P.  Nevertheless, P 12-20-12 did sign

a stipulation that by 01-31-13 P would have 6 months rent due, and P friend 02-02-13 gave P $2,200.

P believes that P had eviction notices for 02-13-13+ and 03-19-13+, each with a successful OSC.

APS was in the background, and P was known to be seeking the one-shot deal. P never had a guardian *ad litem*.

6H. <u>HRA APS pressured P to undergo an examination by a City psychiatrist</u>: P has what P jokes is

P notorious notebook by the telephone, and P will begin to mark statements written there with "NB."

NB 12-01-12 to APS social worker Kimberly Harvey reads, "I do not want an evaluation." P had to

duck the psychiatrist visits for this reason, but P also had a long-lasting toothache while P dentist was

on vacation before P underwent a root canal job with the help of P Medicaid and UFT Welfare Fund

insurance and a long-lasting out-of-order telephone. The tenant above P continually noise harassed P.

As various doctors knocked on P door and tried to make intelligible calls to P, P finally let in 12-24-12

Kimberly Harvey with City Dr. David Klein, who told P, "You are a dreamer." That being true, P also is

a go-getter and a workaholic, who just happens to remain poor. He looked around the apartment without

questioning P about P clutter (primarily for business purposes) or about P religion, despite the fact that

P told him that P hoped to get recognition for solving "Kryptos" K4 on P religion website.

6I. <u>P knew enough to seek out a therapist for legal and financial reasons, P believing self sane</u>:

P received a first call 12-17-12 from P psychotherapist Sara Schwartz, and P had to first talk 12-26-12

with psychiatrist Dr. Skolnik, two days after the visit of City Dr. David Klein. P disliked Dr. Skolnik,

because he was pretending to be P best friend and only asking whether Dr. Klein had asked what

Dr. Klein did ask. However, since Dr. Skolnik visited P website and said that he liked the look of it,

P let go the "examination" as a formality. When with Sara Schwartz for a short time, P asked to be

evaluated for "reality testing," since P wanted to rule out that P had not gone off the deep end into

fanaticism and beyond with P religiosity. When she left, she was replaced by psychotherapist Marilyn

Gerber, who later shared what Sara Schwartz had written about P, and it seemed to be what P wanted

to explore. P has a B.A. degree with psychology and philosophy majors as well as an M.B.A. degree.

At first, "Marilyn" (she's a doll), around P age, had difficulty keeping up with the many projects P had to

tackle, and P told Marilyn that P was "under stress." P used the sessions productively by forcing self to

outside accomplish many things for discussion. Trying to protect P legal and financial interests,

P believes that Marilyn admired P and believed P to be sane. This relationship lasted until 03-29-14.

6J. <u>HRA APS 02-19-13 began to pretend to be filling out applications for P housing while steering P into guardianship</u>:

Regarding APS social workers, Patricia Edwards-Jones (E-J) replaced 02-06-13 Kimberly Harvey. She

explained that the first one was for Assessment but that she was for Undercare. By 02-19-13, E-J was

explaining that an Article 81 guardianship was up to her director, HRA Office of Legal Affairs (OLA),

and a Supreme Court judge, while mentioning NB "2) supportive housing application - one of three

bedrooms or one room by family." NB to P also mentions "3) I cannot get psychiatrist's report" and

"4) if evict, shelter." E-J on various visits mentioned other housing (for example, NYCHA), but P was

never told whether she had followed through on such housing with applications for P. Importantly,

P believes that E-J folded an application for guardianship, which folding P thought made it easier for P to

sign the application in mid-air, and P does not remember how very long a period of time later P realized

that the content of the application was being hidden from P. NB 03-19-13 on the guardianship signing

and housing applications mentions, "To finish Art. 81, I should write to landlord to enable to release rent

info," and "Housing applications require I first have income."

6K. <u>NB has a few entries regarding P emotional distress, if not mental health, during this period</u>:

Regarding calling P friend "not viable" as the one-shot deal donor, NB 03-04-13 to E-J mentions,

"1) infuriated & mental anguish continuing." Regarding the state administrative hearing about same

before P knew that P had won that hearing, NB 03-11-13 to E-J mentions, "6) I see myself in gutter dead

in 2 weeks." P needed money. P frequently called E-J and either spoke with her or left messages to her.

7. <u>04-03-13 Through 12-09-13, When P Was in HRA APS Undercare, and P Began 06-26-13 a Limited Guardianship</u>:

7A. (Equal Protection? Speech?) <u>P visited 04-03-13 Homebase to get rent paid but was told that to get rent paid P needed a child, which put P in another hidden category of "Childless Individual"</u>:

P saw a sign in Queens Housing Court regarding getting rent paid by Homebase, a program for same.

"Unemployed," P visited Homebase, and NB 04-03-13 mentions, "visited, no DHS grants to singles."

The counselors at Homebase were not talking about P being unmarried but were talking about P being

in a hidden category of "Childless Individual." P never distinguished DHS policies and practices from

HRA APS policies and practices, because P believed HRA APS policies and practices to be DHS policies

and practices. P also believed self to be once again being told about free rent payments *ineligibility* as

P had been told about one-shot deal loan *ineligibility*. P even confused DHS with DSS (part of HRA),

because P was in Undercare of HRA APS alone, which division of HRA P tried to trust to meet P needs.

7B. (Speech? Press? Religion?)  P began to contemplate a discrimination claim because of P religion:

Now, in addition to P contemplating an adverse impact claim about to arise if P were separated from

P computer on whose desktop sits P only link to build and maintain P website, P was contemplating that

an intentional discrimination claim was about to arise with the derogatory remarks concerning

P "Kryptos" K4 website solution appearing in HRA OLA legal papers submitted to Queens Supreme

Court.  HRA and City had the burden to advance a P mental impairment claim with P being

"incapacitated," and one way they proceeded was to mock P "Kryptos" K4 website solution as indicative

of P mental impairment, but in the solution P used P spiritual gifts of tongues and interpretation of

tongues with P comments, which demonstrate P practice of religion and P religious viewpoints.

7C. (Due Process?)  P had ZERO legal representation during this period: HRA OLA submitted legal

papers to Queens Supreme Court to engineer P temporary limited guardianship 06-26-13 through

08-06-13 and P commissioned (with the  phrase "With Commission" struck through?) limited

guardianship 08-07-13 through 08-06-14 (dates?).  HRA OLA sought for P a stay of eviction with

a TRO for 60 days, which P persuaded the court should be 90 days, 06-26-13 through 09-25-13, and

F outside lawyer, Liebowitz of Liebowitz & Bock, got for F a stay of eviction with a TRO 09-26-13

through 11-25-13.  P told the court that P wanted the 90 days to job hunt.  HRA OLA represents City, and

Liebowitz & Bock represents F.  P attended only the first court session *pro se*.

7D.  HRA APS pays F for P so that F is an agent of HRA APS and City, and P is a "cash cow" for F:

Importantly, P believes that some claims against HRA APS, HRA OLA, and City are also claims against

F, and vice versa: since HRA APS pays F for P, HRA APS and/or City should be monitoring F, which

7

. `

submits reports to Queens Supreme Court and likely to other City divisions. HRA APS, HRA OLA, and City never mentioned DHS to P, but P questions what P believes to be DHS policies and practices.

7E. (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty?) <u>HRA APS and F failed to help P pay rent or to relocate P, and F breached fiduciary duty and violated guardianship and Social Security laws:</u>

The temporary limited guardianship 06-26-13 ordered P relocation, and the commissioned limited guardianship 08-07-13 stated that a shelter is not for P (prior to legal possession of P apartment 12-10-13). At first, during this period, P was in Undercare alone with HRA APS. As P packed for a possible eviction, NB 04-16-13 to E-J mentions that P would get "list of shelters with Metrocard, no wagon." This meant that no shelter would accept a shopping cart (primarily of P 18 years of notes for future prophecy books as per P religious calling). No eviction took place 04-19-13. Regarding a nearing guardianship, NB 04-24-13 to E-J mentions, "3) I will look for job then loan" and "4) I do not want guardianship, & she said 3-4 months." After P met with court evaluator, Ellen Rittberg, she called 06-24-13, and NB mentions, ". . . no signing or insanity needed for Art. 81, and I told her what I will bring up [at hearing for guardianship 06-26-13] and she said that I am not stupid." P may have been speaking of a Section 1983 action, but P was more interested in 90 days to job hunt. Early July 2013, P telephone service, which was later determined to be P telephone, was out of order for most of that month, since P had difficulty getting a repair person, the money for a telephone, the telephone, and the new telephone set up. Since P had a cable dial-up, P could not use the Internet to job hunt. P first contacted F 08-06-13, and P had first visit from F caseworker, Michael Coley (MC), 08-13-13. HRA APS and F were now working with P, and they began to threaten P person and property with a heavy-duty cleaning (HDC). Therefore, P had no choice but to abandon P job hunt, although P was continuing to build P website. NB 09-17-13 to MC before 09-25-14, the end of the 90-day stay of eviction, mentions his advising, "keep on cleaning & don't go job hunting." Near the end of September 2013, P, months after a prior call 06-10-13, called Social Security Administration (SSA) and was congratulated on P Social Security (SS) retirement—by F as representative payee—which had occurred unknown to P near the end of August 2013. As per P "capacity," P was about to retire self out of

economic necessity. Yet, P began to demand from F what became P allowance, but P suffered the first

nonpayment of a P credit card 10-09-13 and fear of utility shut-offs during October 2013 until P finally

got a measly $200 10-25-13 followed by a first credit card collection call 10-26-13. A 3-way

conversation in NB 09-25-13 with F Director, Trisha Monplaisir (TM), MC, and P mentions, "She wanted

to use my money to pay my bills, but I said I didn't want it gotten & I didn't want it spent" and

"She trapped NYFSC [F] when she said I can get an allowance from my funds, well when?" Again,

P could not trust F for claiming to be working *for* P but not *with* P and so not *for* P. Regarding the stay,

CH lawyer, James Kasdon, had filed for what P took to be P eviction on the 90th day of the stay, and

it was scheduled for 10-02-13. P tried to file OSC in Queens Housing Court but was directed to the

Supreme Court guardianship so that P OSC fizzled; however, true to P "capacity," P worked a 17-hour

run-off primary election day stint as a chairperson at the most difficult lowest ED table 10-01-13

(as right-hand to the coordinator for years), and F lawyer, Liebowitz of Liebowitz & Bock, filed the next

stay 10-08-13 without P present in court. According to guardianship law as even in the commission,

F was supposed to discuss with P, to the degree which P could understand, decisions concerning P person

and property; however, F accounting department NEVER TO DATE contacted P, and P inhouse legal

department (if it exists) NEVER TO DATE contacted P. Indeed, P distrusted F since what P perceived to

be the snatching by F of P SS retirement benefits. Moreover, it began to look to P that F was hoarding

same for F enrichment in the way of justifying its snatching of HRA APS payments on behalf of P.

F never helped P pay rent (which is a SSA representative payee requirement) or relocated P, although

F website claims that it helps at risk--of *institutionalization*, it admits, not homelessness—clients

("cash cows") with its Home Sharing Program of which P became aware after P legal possession

12-10-13. NB 09-30-13 to MC mentions, "4) hospitalization or shelter or ?"--and "7) I need business

operating expenses"---and P snapped back at MC that there was nothing wrong with P physical health and

P mental health. NB 10-04-13 to E-J mentions, "7) trying to take me in white suit when lose cool because

Mike said 'hospitalization or shelter' about eviction day against Art. 81 – going too far already & want to

go further." NB 10-04-13 mentions a prior call to E-J, "7) What's next is no $200 allowance & ruin" and

9

"12) I would prefer being in gutter [to drop dead as opposed to being unjustly institutionalized]." NB 10-09-13 E-J visit has her saying that "apt. clutter is very much improved." Regarding the next stay 09-26-13 through 11-25-13 (dates?), P had to call Queens Supreme Court to hear from Lori Lee/Laurie Lee (with P calculation), as NB mentions, "Stay extended for 60 days, but no further extension. Dec. 7 or Dec. 8." P continued to believe that the dates of the stay were 10-08-13 through 12-07-13, because P 11-04-13 and 11-25-13 calls to Liebowitz and Bock failed to yield any clarification, MC agreed with P on the dates, and when P visited Queens Supreme Court to participate with MC in the initial report of the guardianship, the two were not allowed to do so, despite mention of the 11-04-13 date in the commission. P greatest fear was that F would close P business and personal checking accounts and bother P credit cards, and P made it clear to F that P would regard same as attempted murder, because P has always been that close to P business, website, books, etc. such that P regards all these things as P children. P even contemplated but abandoned the thought of P business being a person--P child (needed for free rent payments)--in the eyes of the law, although not incorporated, because Queens Supreme Court allowed the care of some of P business assets to be added by HRA OLA to the 08-07-13 commission. A new threat to P developed regarding the theft of storage of P apartment property. NB 10-22-12 message from MC mentions, "For first time he said, '60 days from win 10-08-13'" and "He wants to discuss, 'trying to put stuff in storage that sort of thing.'" Since later during this period, E-J in two separate visits had remarked, "Why don't you give away your canned goods?" and "Why don't you give away your clothes?" and MC in one visit had remarked, "Why don't you give away your canned goods?" (remarks, at this point to P, too shocking for P NB), P filed 12-02-13 OSC in Queens Supreme Court to stop the eviction and to finally after 48 days get P dangling tooth pulled, but only the tooth part (after P arranged for the tooth extraction) survived for a dismissal in 2014. Also, P, on way to court, heard 12-02-13 Marco Gonzalez, F Housing Specialist, outside P apartment door say, "We will not be able to take everything." P feared the larceny of P property, which subsequently did take place.

7F. (HRA APS and City Lacked Compelling State *Safety* Interest? Slavery?) P could not job hunt, but P was a slave, trying to avoid HRA APS and F theft of P property:

When HRA APS first called P 11-23-12, P urged an apartment visit by stating, "I have clutter."

10

At P guardianship hearing 06-26-13, P said that P clutter is to test the characters of visitors; however, P friend, Ann Harding, worked one day per week, opening all the mail in piles, in exchange for some of P clothes. P clutter was never the big deal that HRA OLA would make it out to be based on hearsay. Since the time of the laundry fumes, all of the following visited P apartment, easily walked through it, and made ZERO complaint against P clutter: a few of P friends, NYPD, FDNY, EMS, Department of Health and Mental Hygiene, 3 social workers, 3 successive superintendents, a stove repairman, and, most significantly, CH Building Manager, Santiago Cifuentes. Even court evaluator, Ellen Rittberg, said only that there was "dust" in the apartment. Achoo! It is true that in P studio, nine boxes in the center of the floor were an eyesore, but they contained P business inventory of books. Other bags contained P business inventory of miscellaneous items for other sales. The sofa, P desk, had a lot of papers on it. Cereal boxes, which seemed to bug some as Dr. Klein, were waiting for the mail to be shredded and disposed of in them. P had experienced the beginning stage of identity theft in the past. No one asked questions about the clutter, only made erroneous comments about it. Since P felt coerced to clean up the apartment or risk having important business papers, possibly intermingled with the mail and elsewhere, tossed out, and since cleaning up the apartment prevented P from a job hunt, P was a slave. The devised threat to P safety was not an immediate one: it was the one which would ensue from P not being relocated to other than a shelter, as per Queens Supreme Court papers, but being left to fend for self on the street, which did occur. The contradiction is that HRA APS and F can not argue both a longtime safety hazard and a future safety threat which they themselves planned for P but kept from P: the fictitious safety hazard fizzles to *the projected safety threat to P person*, which had ZERO to do with P property, only with HRA APS and F policies and practices.

7G. (HRA APS and City Lacked Compelling State *Health* Interest? Illegal Guardianship?) HRA APS, HRA OLA, and City failed to meet the burden for P guardianship, and P later built P website with writings on P understanding of eviction:

At P guardianship hearing 06-26-13, HRA OLA produced Dr. Klein as a witness, and P discredited him, but Queens Supreme Court claimed that P demonstrated merely a good cross-examination, because P, with ZERO legal representation, wanted the guardianship, primarily to buy time to job hunt. P believes

11

that without what court evaluator, Ellen Rittberg, caused P to deduce was an unnecessary psychiatric examination, there would not be the accusation of P mental impairment with the allegation of P incapacity. HRA APS, HRA OLA, and City were pushing toward *the projected health threat to P person*, which had ZERO to do with P person, only with HRA APS and F inability to convince P that P would get ZERO help with paying rent and ZERO relocation to other than a shelter, as per Queens Supreme Court papers. Yet, P believes that HRA OLA failed to meet the burden of HRA APS requirement that P be shown to not understand eviction. P website includes a rap song, "Eviction," showing that P understands eviction. "Eviction," written 09-18-13 and online 09-24-13, also showing that P understands City policies and practices known by P during this period, follows. "Eviction" by Carolyn Jane Siino:

You let me know the score:
I should have been a whore.
Since I am simply poor,
You would throw me out the door.

Almost eighteen years long,
All you did me was wrong,
Because I did stay strong . . .
To prophesy all along.

You hate the word of truth:
You prefer the uncouth.
Young women have the youth . . .
For sex after their vermouth.

"A kid," says government,
"Back rent paid," in cement.
So what is my lament?
For me only God was meant.

You can't give me money,
Since I had no honey.
It just is not funny.
Where is my Easter bunny?

At P guardianship hearing 06-26-13, HRA OLA mentioned P termination 05-18-98 as a high school mathematics teacher, implying that P had not worked since then due to P mental impairment from the termination. Instead, during the 18 years, 1995 – 2013, P researched future prophecy books and solved "Kryptos" K4, and P hopes to wisely sell many books at the right time. Truly, City cannot deny that

P already cost City hundreds of thousands of dollars to terminate P and fight P ensuing numerous

complaints served.  Institutionalization would certainly save City lots of money on any P additional

complaints served.  Institutionalization would also silence P and cover up the fact that P was getting

ZERO homeless prevention services.  P is not receiving Supplemental Security Income (SSI) or Social

Security Disability (SSD), because P SS retirement benefit is too high and other reasons.  P realizes that

unjust City policies and practices aid guardianship in being the path to unjust institutionalization.

7H.  (Equal Protection? Jeopardy?) Once in Queens Supreme Court, P also later built P website writings
on P elimination, despite having risen to yet another hidden category of "Low Income":

P website includes writings that show that P believed that P person and property were in jeopardy,

because P hidden categories became "Unemployed" and "Childless Individual" and "Low Income."  NB

11-19-13 to E-J mentions, "4) I told her how I know so many are in guardianships in shelters & she said

low income & I said little subsidized housing."  Since one purpose of P guardianship was to snatch P SS

retirement benefit, P was also in the hidden category of "Low Income."  P website writings show that

P feared destruction (by larceny or other), silencing (by P inability to build and maintain P website or

other) and elimination (by gutter or institutionalization or other).  Following is part of P first website link,

online 11-30-13, about the New Prophecy Movement.

**The Prophetess Exposes Destructive Persecution in New York City Government**

The often misled faith community has done a poor job funding the New Prophecy Movement. As a result,
The Prophetess is facing eviction due to owing much back rent. Supposedly, the government of the city
of New York devised a guardianship to help The Prophetess, at first calling her "mentally impaired"
and later dancing around "incapacitated." Remaining under the control of The Guardian From Hell, The
Prophetess is expected to survive on roughly 20% of her insufficient Social Security retirement benefit--
obviously, a way to destroy her life, this website, the publishing company, its book inventory, and
valuable notes for several future books. The plan is to destroy, silence, and eliminate. Do you want The
Prophetess to be moved to some undisclosed (even to her) place and stripped completely of her rights to
make decisions and to have access to all of this valuable property, which will be stored and possibly sold,
if not parts of it indiscriminately thrown away? Is this what has happened to tens of thousands precious
people in New York shelters from whom we have never heard one peep? PRAY: God, provide wealthy
individuals, who are willing to finance what the poor have been financing and trusting to be the fruit of
God's new thing: His produced answers. Powerful Holy Spirit, reveal both spiritual and worldly truth,
and free from evil control any of your people and property scheduled for elimination!

13

7I. <u>Marilyn sent P back to psychiatrist, and he began to play both sides of the fence:</u> During this period,

Marilyn sent P for another visit to Dr. Skolnik, and three times during the "session," he interjected to P,

"Why are you here?" P had gone to the center for P legal and financial protection, but P had told Marilyn

that P was "under stress." Although not an emergency, it was an understatement of the truth.

7J. (Larceny?) <u>HRA APS discussions of housing applications were replaced by F discussions of storage</u>
<u>preparations</u>:

P realized that with the guardianship so powerful that even F did not have to supply P with a lawyer

against HRA APS, HRA OLA, City, or F, F was not that interested in closing P bank accounts or

bothering P credit cards, acts which P had told F would be attempted murder to P.  P also realized that

neither HRA APS nor F were interested in relocating P, who had never gotten one penny from City but

only Medicaid and SNAP (food stamps).  Yet, P knew that P person and property were in jeopardy, and

of P property which had already been in storage in New Jersey (to be paid for in Long Island), NB

10-30-13 to MC mentions: "We can't be selling your storage, because that's up to you.  We would need

your authority." F needed to recognize a lot more authority from P, who believes that P was/is the owner

of P property in P apartment and anywhere else.  NB 11-19-13 to E-J mentions, "3) Guardian puts in 3

estimates, & HRA would choose middle grant."  She was referring to HRA paying the cost of moving

P apartment property, but F used F Chase account of P SS to the tune of $650.

7K. (Emotional Distress?) <u>PA has a few entries regarding P emotional distress, if not mental health,</u>
<u>during this period</u>:

NB 10-10-13 to E-J is an overview, "10) I went into court whole except for rent & look at me now."

P admits to one blot on P character, not P mental health: being a deadbeat tenant.  Chronologically, other

NB entries show P mounting emotional distress.  NB 04-16-13 to Marshall has Maggie saying of

04-19-13, "He is coming to evict," and P answering, "Then, he is coming to destroy me, because I have

no place to go and no money."  NB 07-17-13 to HRA OLA lawyer, Jessica Levie, mentions, "fervently

opposed to managing assets, paying bills, incompetent, cleaning apt., angry, enraged, disgusted."

Regarding the City psychiatrist's report, NB 08-08-13 to E-J mentions, "psychotic & schizotypal

I DISTRUST HRA & I DISLIKE HRA."  NB 10-09-13 during E-J visit mentions in garbled English:

14

. .

"I said my friends & psychotherapist, they would have already committed suicide themselves or their patients. She said stay strong." NB 10-24-13 shows entries to a few people regarding P emotional distress over attempted murder (which is what P could consider closing P bank accounts and bothering P credit cards to be), but a telephone call to P friend, Sonja Kobylko, best shows P sense of humor (no mental impairment or incapacity) despite P emotional distress, "3) I consider this to be attempted murder, because my website has automatic deductions, is very close to me, like myself or a child, & is irreplaceable after 11 yrs. work" and "5) 10-9 first cr. card was not paid & website takes cr. cards" and "7) They are trying to get me to commit suicide with $0 [P got $200 10-25-13]" and "18) I hope my tooth comes out in 1 piece so I can offer it to the kindest rich person who bails me out, my tooth fairy." Here is E-J 09-24-13 opinion of P: "1) You will always be my favorite. 2) We always have it out, and we come to an agreement. 3) Others act nice, but then they stab in the back. 4) You don't hold a grudge."

7L. (Emotional Distress?) PA has a few entries regarding P emotional distress, if not mental health, during this period:

During June 2013, P began to keep a progress account (PA) so that P could make progress in challenges and goals and be able to discuss same with Marilyn. The following PA entries confirm NB entries: 08-02-13 "set up phone," 08-15-13 "juggled bills," 10-08-13 "unpaid bills," 10-08-13 "60 days stay to 12/7/13," and 11-19-13 "eviction notice dated 11-18-13 [the wrong date, anyway] instead of 12-9-13 [P wrong date]." The following PA entries show P accomplishments: 07-30-13 "got Sept. storage free," 10-10-13 "finished taxes," and 12-06-13 "$250 NYFSC." The following entries show P emotional distress increasing in severity: 07-05-13 "too much ice cream," 08-08-13 "I have to stay away from all lovers of self and money," 09-09-13 "awakened thinking losing it but realized feeling grief from possible coming hurt and worked on Prophecy Syria," 09-11-13 "awakened feeling disgusted from giving good and getting evil and crumbs but vision of elevator and knowledge of need to go and get," 09-19-13 "anxiety from HDC heavy-duty cleaning, thoughts of giving up," 09-24-13 "around 7 am bathroom walk felt hurt and rage and thought lost mind and ability to feel but a stupor," 10-08-13 "ate 2nd yogurt tub [in 2 days]," 10-09-13 "thought pillow on face or drowning because sad or wondering about NYFSC next move," 10-15-13 " thought losing website would be like a mother who heard her abducted daughter

would never be seen again due to cosmetic surgery," 10-30-13 "NYFSC has afforded me zero

independence and self-determination," 11-05-13 "be farmer over pigs trampling poor slobs [slop, but P is

one of the poor slobs] in through [spelling?]," and 11-06-13 "I decided to murder evil [put tormenting

intrusive thoughts out of mind]." P did have what psychotherapist called suicidal ideations, and P knew

that suicide was one of many P possible options, but P also thought that suicide was not P priority despite

knowing that others in P boat would have carried out this act. Anyway, P is a go-getter and workaholic,

as already mentioned. Besides, P tries to focus on P religious calling.

8. <u>12-10-13 Through 01-23-14, When P Went Through a Legal Possession 12-10-13 and Three
Unwanted Institutionalizations, but P Got Two Good Psychiatric Reports and Relocated Self to
a Friend's Apartment:</u>

8A. <u>P spoke with Marshal and with F and CH representatives before being left on sidewalk:</u>

Only P knew that P had to get a chest x-ray and visit P primary care physician (PCP) the day of legal

possession 12-10-13, but when P started to talk to Marshal without getting a chance to tell him P plan,

he snapped that P had already had enough time. PCP sent P to P pulmonologist, too, who ruled out lung

cancer for mucus on the lung. After the Marshal, P spoke with Marco Gonzalez, F Housing Specialist,

who thought that he had the right with P still in the apartment to enter the apartment to snap photographs.

He wanted to know where the stuff that was worth a lot of money was, and P said: "Do you think that

I am stupid? You have to take everything." With P still in the apartment, Santiago Cifuentes,

CH Building Manager, also entered the apartment, and P said: "Do not let anyone take anything from the

apartment until the dispute regarding the property is resolved in court 12-17-13." He said nothing;

however, while P was sitting in the lobby a long time after the Marshal's 10 am entry into the apartment,

he beckoned MC aside, and when P asked MC what Mr. Cifuentes had said to him, MC said to P and also

E-J still present that P had to leave. In short, P was considered to be mentally impaired and incapacitated,

and neither gentleman spoke to P or either social worker about when P could return to P apartment.

In fact, P was expecting an eviction, but Marshal handed P a paper about a legal possession. P alone

could not readily return to the apartment, because 08-19-13 CH superintendent had threatened P person,

which incident P had reported by e-mail to CH management. Also, P was dragging two carts in slush.

8B. (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty?) <u>HRA APS and F failed to relocate P and failed to store the bulk of P apartment property</u>:

HRA APS left the picture on the day of legal possession 12-10-13, but since HRA APS continues to make payments to F for P, and since HRA APS should still be monitoring F, as already mentioned, P holds both entities--even City--liable for P claims. The following quotations from NB during this period cover the failure to relocate P and to store the bulk of P apartment property. NB 12-20-13 to E-J from Forest Hills Hospital (FHH) has E-J informing P: "They [guardian] have to have a dialogue with you and come up with a plan. Their main thing was to relocate you." Regarding assisted living, "they cannot take anyone diagnosed with any mental health issues, according to a new law by the Office of MH&H [Department of Mental Health and Hygiene]." Also, written to P, "P E-J wants me in a nursing home." NB 12-20-13 has FHH social worker, Jennifer Cutter, addressing the two housing options, "She said by visit not eligible for nursing home & assisted living would take my $1,200 income. . . ." P needed some of that money to keep P business, including the website, alive, although P computers were now in storage. NB 12-20-13 MC visiting P in FHH mentions, "Thurs. & Fri. (12/12 & 12/13) Atravia Movers packed & likely Fri. Greenpoint Storage took packed stuff in boxes" and "no Atravia bill now." It is unknown to P who packed 12-12-13 and 12-13-13, and it never appeared that any moving outfit but Avi was paid $650 12-13-13 from F Chase account for P SS. NB 12-27-13 to Marco Gonzalez from P in Sonja Kobylko apartment ("Sonja 12/26 eve, 12/27, 12/28 morn 1/15") has him speaking arrogantly to P, and NB mentions, "papers, computers, TV, NO TABLES, NO BED, some clothes, NO BATHROOM, NO KITCHEN, NO DRUGS & ORTHODICS, <u>He went by commission.</u>" The commission specifically mentioned only some of P business assets, which is all he claimed F had to take, as though F had done P a big favor and F a big injustice, by taking anything else at all. NB 12-27-13 TM mentions: "She said when I am relocated I will get furniture, & I said I was supposed to be relocated, because that was the main thing they were supposed to do for me [paraphrasing E-J 12-20-13]. She said 2 assisted living turned me down, & I said what about home sharing [which by now P had read on F website]. I told her to get my tooth [dangling since 10-17-13] extracted." Regarding P apartment property and CH, NB 12-27-13 to Stephen Wallach mentions, "threw out to rent apt." and "he has an attorney" and "have

a happy new year" and "it was a long time ago."  P from initial hospital stay bed, not F, made calls to

shut off P utilities.

8C.  (HRA APS and City Lacked Compelling State *Safety* and *Health* Interests? Neglect? Abuse?
Exploitation? Negligence? Emotional Distress? Liberty? Jeopardy? Illegal Seizure and Search? Equal
Protection? Due Process? Dignity? Section 1983 Action?) Two Forest Hills Hospital (FHH) stays for
P physical health resulted in P being duped into P person being admitted to Elmhurst Hospital Center
(EHC) Emergency Room:

Generally, while homeless on the street, P spent days in the library and nights sleeping in a chair in

McDonald's, and P discovered that homelessness substantially adversely affects a place allowed to sleep,

a place allowed to tend to bodily functions, eating, and a place allowed to wash body.  P was able to get

someone to watch out for one of P carts 12-15-13 for around 2 months so that P could be more mobile;

however, due to much indoor sitting in chairs, waiting for the 12-17-13 Queens Supreme Court motion,

P calves swelled and turned dark pink, darker than the color of slices of ham.  When P visited the court

12-17-13 to learn that the motion had been postponed to 01-14-14, P visited PCP and admitted self into

FHH 12-17-13 into 12-20-13 with cellulitis, which could have resulted in a travelling deadly blood clot.

P has chronic veinous insufficiency (CVI), and E-J and MC observed and knew of P condition.

MC watched P leave the hospital after P listened to an outreach man who could not persuade P to go to

a shelter with a cart, which the shelters would not take, because P had been told so by E-J and had called

the shelters to confirm same while in the hospital.  P calves continue to be dark brown (normal for CVI),

then *pink*, then beige (from below ankles to knees).  P spent 12-26-13 into 12-28-13 in P friend, Sonja

Kobylko's, apartment.  P again admitted self into FHH 01-01-14 5 am into 01-07-14 with e-coli, which

could have killed P had P dehydrated or sustained a fatal fall.  P was in isolation for a few days, because

FHH thought that P had a rare reaction to P initial hospital stay antibiotics, and P diarrhea would decorate

the walls, toilet, and floors due to projectiles.  At the time of P discharge, P told MC that P had to visit

two banks and PCP, and MC stalked P to P first bank, where P made a deposit and borrowed from a credit

card--the borrowing while being surrounded by police officers, EMS, and MC.  Knowing that P had two

more stops to make and would not go to a shelter, MC said, "You will have to go back to the hospital."

P never visited P business bank or PCP.  Instead, feeling that P would see the inside of the local police

18

precinct and possibly even a jail cell, P discussed walking back to the hospital but finally stepped into the

ambulance. P never went to "the" hospital (FHH), but P went to "a" hospital: Elmhurst Hospital Center

(EHC). P second cart had never left P sight until P was admitted to EHC Emergency Room. NB

01-07-14 describes the search after the seizure, "EHC kept emptied pockets & bag & wagon but I kept

rest of bag" after mentioning, "P.O. Romano & Blast, EMS Sabarese 2 others, M. Coley." NB 01-07-14

also mentions, "read in rights book patient's wishes treatment above guardian's wishes"; instead, EHCER

and EHC generally were following only MC wishes, as P would later learn. City, F, and EHCER chose to

profile P erroneously—and with an erroneous profile in the first place.

8D. (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty? Jeopardy? Illegal
Guardianship? Illegal Seizure? Equal Protection? Due Process? Dignity? Section 1983 Action?)
<u>One Elmhurst Hospital Center (EHC) Emergency Room stay escalated into P person being held in EHC</u>
<u>Psychiatric Ward 01-08-13 through 01-15-13, and EHC psychiatrist and P psychiatrist both claimed that</u>
<u>P has no mental impairment:</u>

While in ER, another inmate threatened to throw hot soup at P, while a male transvestite pranced in front

of P for entertainment. NB 01-08-14 mentions, "10:10 am nurse Michelle ink on blouse when blood

pressure." Later, when P pressured her about paying for a new blouse (since it was the only one P had),

NB mentions her excited utterance about what MC had told her about P, "nurse Michelle re guardian

found wondering on street in cold." This was a lie, since P had told MC about P plan, which MC aborted.

P tried to enact. P asked to speak to a psychiatrist in an effort to get free of ER, and P spoke over the

counter for maybe two minutes to psychiatrist Ellen Lam. P also called a patients' advocacy office for

expedited discharge, but nurse Michelle came with a wheelchair and gave P the choice of being injected

or cooperating to go upstairs to a psychiatric ward. P reluctantly cooperated. The following NB entries

describe P interaction with P psychiatrist upstairs, Sumerta Manchandani. NB 01-09-14 mentions,

". . . meds I declined, 'do you think that you have some special powers' I said I have spiritual gifts but

I can't make locked doors come unlocked, she said must observe for a couple of days. . . ." NB 01-10-14

mentions, "I asked, 'Do you think I'm crazy?' & she nodded her head sideways" NB 01-13-14 mentions,

"Dr. Manchandani said P[sychiatric] ER diagnosed <u>psychosis with paranoia against guardian</u>, but <u>she</u>

<u>does not believe that she needs to diagnose me a few more days</u>." NB 01-14-14 mentions,

19

"She said I have a mood disorder, not bipolar, because I change topics rapidly.  I said I have

a complicated life.  She said doesn't everyone.  I said not like me.  I said my psychotherapist had the same

problem of following me at first, but now she knows what court date is coming up.  I asked if I am

mentally impaired, & she said not at all."  NB 01-14-14 mentions the postponement to "2/11 9:30" of the

motion later dismissed, because P would have had to be escorted to the court in a sweatsuit, not P clothes,

and the diarrhea was flaring up again anyway.  NB 01-15-14 mentions of discharge day, "7:08 - 7:12 am

signed & dated papers from first day."  P went by ambulette to Sonja Kobylko's apartment, where P read

that night that F had someone at EHC Psychiatric Ward add to the discharge papers another appointment

with Dr. Skolnik.  P and Marilyn instead got P an appointment 01-23-14 with Dr. Daniel Khaimov, who

diagnosed P with an unspecified episodic mood disorder.  P began to realize that such a watered down

mood disorder--and possibly any mood disorder at all--is code between psychiatrists for what Marilyn

later told P of Dr. Khaimov's diagnosis, "He said to Marilyn, 'There's nothing wrong with her.'"  This

was the main reason why P stopped seeing Marilyn 03-29-14, although the diagnosis had kept the door

open for P to choose continued psychotherapy.  P, not F, relocated P to Sonja Kobylko's apartment

01-15-14 to present.

8E.  (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty? Jeopardy? Illegal
Guardianship? Equal Protection? Dignity? Section 1983 Action?) At Elmhurst Hospital Center (EHC)
Psychiatric Ward, talks between social worker and P produced a precise summary of several important
facts, and after discharge, P began to fear a new institutionalization:

Social worker, James Egielski (JE), in EHC Psychiatric Ward had many insightful discussions with P.

01-10-14 mentions, "'Give me an address, & I will discharge you.'  He understood challenges that I need

freedom & control of my own money plus guardian failed to relocate me & is trying to get Elmhurst

Hosp. Ctr. to keep me here to miss the court date.  I think it was obvious that guardian couldn't get me

declared mentally impaired in any way."  01-13-14 has P talking with JE, "It [the guardianship] was

an experiment, & you see what a failure it is: they were supposed to relocate me and they never did," and

JE responds, "Gotcha!"  NB 01-13-14 mentions, "He said the longer I stay the harder to get out.  I said

city does not have places to live & people are backed up here [P met two such] & in shelters & God

20

knows where." NB 01-15-14 mentions, "This Michael Coley has some nerve: he refuses to sign the papers" "That's because I'm not mentally impaired" "Then he added, 'they put the burden on us.'" "I said, 'Well, do you think I am mentally impaired or not?'" "He said, 'You're not.'" "But someone spoke to the psychiatrist. Was it Trishna?" "He said, '[Shellion ("Shelley")] Cooper'" "I said, 'They thought I'd get declared crazy!'" "He said, 'We won.' He showed discharge papers, saying 'mood disorder.' He said, 'That's nothing.'" NB 01-16-14 mentions: "James Egielski called Sonja. He said that I have to keep an appt. tomorrow [the one made for Dr. Skolnik] or an ambulette will pick me up & bring me back to Elmhurst." P still suffers from a continuing fear that P will yet be institutionalized, because P has ZERO legal representation to protect P--from City and F, and history repeats itself. Yet, P hopes that there is more to the history here, namely, that P is known by F to be not mentally impaired.

8F. (Emotional Distress?) <u>PA has a few entries regarding P emotional distress, if not mental health, a few days after the day of legal possession 12-10-13</u>:

P was surprisingly capable of the following, according to PA entries: PA 12-12-12 mentions, "bought Tracfone minutes, set up despisenotprophesyings@gmail.com" and PA 12-13-13 mentions, "Post & News & O'Reilly [but P could not get P story attention]." In contrast, PA 12-21-13 mentions, "very tired & low spirited & thinking suicide because of negativity & hopelessness" and "thinking worsened CVI irreparable, grappling with eviction & no lung cancer & street & loss of belongings & CVI."

9. <u>01-24-14 to Present, When P Has Been Trapped in an Illegal and Unconstitutional Guardianship</u>:

9A. (Speech? Press? Religion? Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Larceny? Illegal Guardianship? Equal Protection? Due Process? Dignity? Section 1983 Action?) <u>P finally visited storage bin 02-06-14, and P spent 2014 trying to determine how P lost bulk of P apartment property</u>:

P has rarely visited P storage bin, because P, without P own apartment or room, cannot use most of what remains of P apartment property. The bin itself is smaller than a bus shelter. Although P business inventory of nine boxes of books--the eyesore in P studio--is there, 40% of the books have destroyed covers due to the move and piling. P has not found 33 years of business books, checks and deposit slips, any office supplies at all, many business books especially an expensive concordance and atlas, bags of books needed to be read before P can write and sell, and bags of P prior litigation for a future book.

21

Inventory for P miscellaneous sales is missing.  Gone is all furniture and the equivalent of a walk-in

closet of clothes, much in lawn bags.  P had expensive suits and tall pants and countless blouses for all

seasons.  Out are anything of which anyone might think: sheets, irons, tissues, dishes, tools, bulbs,

toothpaste. . . .  P lost P teaching license and mausoleum shelf deed.  P had many of these things in

abundance.  P wears the same outfit every day, day after day--one for colder weather, and one for

warmer weather--and no one wants a description of P underclothes, which P cannot afford to replace and

which must be mail ordered.  P understanding is that P was/is the owner of all P property and that only in

very limited circumstances was F allowed to abandon P property.  According to CH lawyer, James

Kasdon, using a letter sent to him--which letter should also have been sent to P--F outside lawyer,

Liebowitz of Liebowitz & Bock, wrote to regard anything not taken to be "deemed abandoned."

P willfully abandoned nothing: P was a tenant who went through a legal possession.  P holds F and CH

responsible for larceny.  Moreover, F used P $650 instead of HRA $650 to move mainly P shoe boxes and

P junk mail, although P is missing new leather boots and new expensive sneakers.  P limited guardianship

required that P be present and point out what needed to be taken, and P correctly stated to take everything.

HRA, City, and F have been responsible for *all* of P property.

9B.  (Speech? Press? Religion? Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Larceny?
Illegal Guardianship? Equal Protection? Due Process? Dignity? Section 1983 Action?) <u>P cannot build and
maintain website, and P website pages are no longer high up on Google</u>:

P cannot engage in religious practice and religious viewpoints, promote books 40% destroyed, and

especially complain on the Internet against D.

9C.  (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty? Illegal Guardianship?
Equal Protection? Due Process? Dignity? Section 1983 Action?) <u>P saw the gutter and institutionalization,
and P feels that as long as P lacks high income and a lawyer, P will always be in a guardianship</u>:

F renewed guardianship for six months beginning 08-07-14, and P has never received Queens Supreme

Court papers regarding same from Liebowitz.  The renewal was to "stabilize situation" of P.  The

possibilities are: status quo (rot in emotional distress), institutionalization, and death (by suicide?).  By

leaving behind P bed clothes and housecoats, F aborted aim was (is?) institutionalization, not P success.

22

9D. (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty? Dignity? Section 1983 Action?) F spent 2014 failing to meet P needs, causing P emotional distress, but for providing P monthly allowance:

HRA and City lacked compelling state *safety* and *health* interests in the sense that F, their paid agent, continued to fail to meet P needs but for providing P monthly allowance, $250 for most of 2014. Regarding the monthly allowance and emotional distress, NB 05-02-14 mentions, when MC stood up P waiting for him so that P made a second call regarding same, "Shelley Cooper (SC) said, 'Wait a little longer' & I said 'It's been 1 hr. 22 mins., lying bitch.'" It turned out that the train derailment, which caused buses to crowd Queens Boulevard, had not delayed MC, but his father's death delayed him; yet, SC taunted P as though she did not know what was delaying him, causing P to get a cold from waiting outside for him for hours. (P was also enjoying jabbing SC for adding the Dr. Skolnik appointment to P EHC Psychiatric Ward discharge papers, and SC understood that P would often joke with her.) NB 06-28-14 mentions SC saying to P, "Court order sought to get pension." It took F almost a year more after getting P SS to get P pension, and what happened as a result is F failed to pay P old New Jersey storage (billed to Long Island), which P had been paying correctly for a long time, for a few months. NB 07-02-14 mentions, "I gave 1) copy of 7/1/14 NJ storage bill of $259.23 for guardian to pay late [due 07-01-14] & 2) copy of Chase 6/25/14 printout of NY storage prepaid through 6/23/14 to 9/12/14." Nevertheless, to this day, F continues to pay P Brooklyn storage two months ahead, and F finally paid P New Jersey storage correctly, including increase since September, for November (so that F never paid the requested increase for September and October). When P realized that P was not getting SNAP (food stamps) during early July 2014 due to not having received a renewal application for same, P visited SNAP 07-09-14 and proceeded to get $15/month--$16/month after P arranged a subsequent state administrative hearing. Not until November 2014 did F add $75 for food to P monthly allowance (having added $100 a few months earlier when F got P pension) so that P now gets a $425 monthly allowance, but P food costs more than $75 per month. P has been eating in a total of three local soup kitchens since July 2014--and at one time, P walked two miles per day five days per week to two of them. With only two soup kitchens open, P now walks one mile per day to one soup kitchen weekdays and one soup kitchen

Saturdays for only six meals per week. Since P had no boots for 2013, due to the larceny, P informed

F 10-30-14 of P need for boots for 2014. NB 10-30-14 reads, "6) Special request for boots, clothes, etc."

Only after P met MC 11-07-14 for the monthly allowance did SC put in a special request. It will take six

to eight weeks for P to receive the money. P is walking in the season's first snowstorm, today 11-26-14,

without boots. Generally, P was and could have been handling P finances much better than F. P cannot

add more lest there be repercussions, as there were after P filed 05-13-14 a motion against F.

9E. (Speech? Press? Religion? Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty?
Illegal Guardianship? Equal Protection? Due Process? Dignity? Section 1983 Action?) F illegal
guardianship, F failure to relocate P, F leaving P on sidewalk, F wrecking P business, F larceny, and
F cause of P emotional distress were just a few reasons for P to file OSC motions 03-04-14 and 05-13-14
in Queens Supreme Court to get rid of F:

P cannot get rid of F, because P does not have a high enough income and a lawyer, although Queens

Supreme Court cites a housing concern and a financial management concern. After the day of legal

possession 12-10-13, F decided to finally offer P early February 2014 a home sharing deal, but as soon as

P asked and was told that it would be with a home-owning ward, P having heard one such yelling while

P spent P nights in McDonald's, P wanted no part of the deal. P believes that F continues to profile

P erroneously and with an erroneous profile of P. F negligently failed to inform P that P choice would

later reduce P SNAP benefits, because P does not pay rent, although P does render services not counted

in the SNAP formula. HRA offers SNAP. Anyway, regarding F relocation or helping P pay rent, it was

not until P filed 05-13-14 OSC, which later became P Motion to Reargue when P mentioned that F is

illegally, according to SS law, a representative payee of P: instead of spending P SS retirement benefit on

P rent and utilities, F is hoarding it for the purpose of getting HRA APS payments for P guardianship.

P even cited the Amendment XIV advantage violation. Guardianship is such big business in Queens

Supreme Court that court evaluator, Ellen Rittberg, had told P 03-18-14 that Mental Health Legal

Services cannot help P due to a conflict of interest, but MHLS chose to work for the court instead.

As a result of the 05-13-14 OSC, F began to prepay P Brooklyn storage two months (to negate

F criminality under SS law, by showing spending on P, not hoarding for F), and F went for P pension.

9F.  (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty? Dignity? Section 1983
Action?) Many of HRA and F wrongdoings against P continue with P stay in Sonja Kobylko's apartment
with Mama:

P has never revealed to F what is P wondrous stay in Sonja Kobylko's apartment, because F does not

have enough money in F Chase account of P SS to relocate P, and P is most interested in preserving

P business and website with what money P does receive from same; besides, P has plenty of practice

juggling in P emotional distress, a few suicidal ideations with a plan and a hope for P better future.  Most

entries regarding P "home" life are PA entries.  PA 01-19-14 mentions Mama, 87, informing P, after

P friendship with her daughter over 45 years, that "This is not a hotel."  She wanted P to forever after,

daily, no day off, wash dishes with some living room vacuuming.  P sleeps on sofa with pillows removed,

futon style, and has 7/8 of a chair for clothes and bags [and Mama's pillow protecting one wooden arm of

her art deco chair] and three storage containers for bags.  The dishes amount to nine plus each of pots,

plates, side plates, tablespoons, small spoons, serving spoons, knives, forks, containers, and more, and

anyone can get the picture that Mama, a narcissist, requires three restaurant meals per day made by Sonja,

the narcissistic feed (devotee).  Mama mainly stays in bed, and Sonja can hardly do her basic chores for

Mama, not Sonja, with her obesity, bad back, hernia, etc.  P also began to buy food for them 01-29-14,

because P had leftover food stamps, which P used until July 2014 to get the reimbursement from Sonja to

help to pay some of P bills.  In the snow without shoes, P had to go out 02-03-14, because PA mentions,

"Sonja's Mom demanded I buy water & baby wipes although the snow endangered my health &

safety. . . ."  P was not allowed to bring in additional clothes, if P could find any for the winter in storage,

and PA 02-25-14 mentions, "I returned from storage, and Sonja's mother greeted me at the door with

a raised forefinger and demanded to know what I brought in. . . ."  Mama threatened to call the police on

P several times, including 02/27, 05/10, 05/16, and 06/16 of which P has made notations in PA.  These

threats were very much emotionally distressing P for months, because P would think of P unjust

institutionalization in EHC Psychiatric Ward and fear a repeat of same.  By March, P had no choice in the

light of these threats to mothersit Mama, who fears being left alone, when Sonja had to go out.  At one

point, P estimated that P does $950 service per month without pay for washing dishes, grocery shopping,

mothersitting, and anything else thinkable, for example, plunging the toilet. PA 03-15-14 mentions,
"Sonja said her mother wrote 02-02-14 that I said I was going to put poison in her food," and PA
07-22-14 mentions, "She [Mama] threatened to sware in court I threatened to poison her." In fact, before
mid-year, Sonja claimed that Mama had lost 40 lbs. before P came and gained 15 lbs. since P came:
P buys what Mama can chew and cooks macaroni into what Mama with delight calls "Mush." NB
03-19-14 mentions in detail the worst display of Mama's temper, with Mama running back and forth
between the kitchen and the living room, because P was sitting in the living room, writing in NB, hoping
that Mama would go back to her bed: ". . . I looked up to see Mama saying to ask Sonja before making
call, pointing finger, threatening her power here, saying Sonja is too good. Then, she returned to look at
what is going on to use her power. This was after she threatened Peter [the landlady's cop son] coming
here. My eyes almost teared up & my hand shook & my stomach trembled. . . . I have to pray to God to
help me now. . . . I thought of knifing myself then her. . . ." Obviously, P was so emotionally distressed
that P wrote that P would kill self and then Mama, an impossibility. Also, P knows that Mama has no
power, but Mama was referring to when she was younger.   PA 04-04-14 again mentions, "She said again
she has the power and one phone call is all it takes." and "They lock the door [to the bedrooms] on me."
P should mention that Sonja 03-29-14 called P psychotherapist, Marilyn Gerber, and claimed that her
mother believes P to be "very depressed, suicidal, and homicidal" so that Marilyn thinks that Sonja is
"too far gone" and that 04-06-14 P answered the telephone to be told by a detective that Mama had made
a harassment complaint against P (probably on P birthday 04-04-14), but he believed P to be the home
health attendant, and Mama got wind of P answering the telephone so that P has not been able to answer it
since. PA 04-12-14 mentions Mama referring to herself as "shoe leather." PA 04-23-14 mentions,
"I prayed to God that either he gives me honor & money, or I have to give him my dead body." P had no
intention of committing suicide, but P sought peace. PA 04-28-14 mentions, "I prayed for another flood,"
and 04-30-14 produced 5" of rain in some neighborhoods with the living room filling up buckets--and it
never rained near P "futon" or "7/8 chair." PA 05-22-14 mentions Mama saying, "I will take steps" and
"You are the most selfish person I ever met" and "She was baited by Sonja's badmouthing me. . . ."

26

Meek Sonja began to be another narcissist, "the" narcissist's protégé. PA 05-29-14 mentions, "Sonja &
Mama hid big knives in bedroom for fear of others visiting." P first stood up to Mama, saying that
P would bill Mama for services, and a few days later, PA 06-14-14 mentions, "Mama said, I have
a criminal mind, I was not in Elmhurst for nothing." PA 06-23-14 summarizes, "no other clothes to allow
in, limited phone use, no address [to receive mail or make mail orders], no computers [to build and
maintain website or job hunt]." PA 06-24-14 mentions, "Mama yelled about my accusing Sonja [when
she visited P] of stealing a spoon years ago." P is Sonja's friend, but Mama is Sonja's confidant. Finally,
PA 07-03-14 reads, "This day I am forsaking the two evildoers." PA 07-05-14 mentions, ". . . 94 degrees
dishes & the thermometer taken away. . . ." P never used a fan or air conditioner while washing dishes.
The last straw came 07-12-14, and PA mentions: "I heard her [Sonja] tell Mama that I charge $1,000/hr.
for advice. Mama called me evil." However, P, thinking friend a slanderer, took action, "I went to casino
at night." P got away for a vacation, until before supper the next day, and most of the dishes were waiting
for P. Later, P began to make threats. PA 09-22-14 mentions, "I said $950 services & so murder, too,
since I will go into street & die < wk with blood clot to heart, lung, or brain." Sonja continued to assert
herself against P, although P was trying to get her to assert against Mama. PA 10-08-14 mentions,
"She said, 'As long as you are living under our roof, you have to do as you are told.'" PA 10-11-14
summarizes: "So Sonja slanders me to Mama when I am not there & then raises voice to further falsely
accuse me of being evil, while Mama helps sitting around staring at me. No family. No friends. No
money. Steered [by guardian] for nervous breakdown or mania or depression & possible suicide or both
by starvation & thirst, while fully sane & cognizant." PA 11-21-14 to P mentions Mama saying of Sonja,
"Sonja not too swift or something like that due to headphones & listening to radio." While this is a factor
in P having to say the same thing to Sonja day after day as though she does not get it, P knows that Sonja
has been abused, made to be Mama's slave, most of her life and that Sonja rarely leaves the apartment.
At one point, P made a lot of progress with the two by pointing out that instead of discussing P, they have
their own problems to solve, and money with them, but much moreso with P, is their main problem--after
the seemingly abnormal love that they have for each other. The other daughter does not call or visit.

27

9G.  P has tried, in the midst of a double portion of wrongdoing to P life, to make money and to accomplish feats which P hopes will eventually bring P money:

P cannot do anything outside of this complaint about P hidden category of "Childless Individual," but

P has tried to do something about P hidden categories of "Unemployed" and "Low Income."  P visited

Catholic churches and even the Archdiocese in Manhattan 04-14-14, but the churches were busy counting

money from Sunday mass the day before, and the Catholic Charities said that they could help P but that

they would not since P has a guardian.  P jokes that P has a red phone to God.  P tried to visit lawyers, but

P did not have an appointment.  Incredibly, P managed to write in the library the manuscript to a second

prophecy book; otherwise, P has taught self to solve Sudoku puzzles, especially when it gets heated up in

the apartment, which is sometimes a cold flat in the other sense of temperature.  After the manuscript,

P was surprised at self at being able to write 08-13-14 Op-Ed to New York newspapers.  Most hilariously,

P made money doing jury duty 10-29-14 and 10-30-14.  P needed $8 and found it on the sidewalk

10-31-14 as a treat, not trick.  P also came into over $40 during November 2014 from being in a class

action suit over P television, which is in storage, and P gets to watch no TV.  The only thing which P has

not yet done and may not do is visit the D.A. about the larceny.

9H.  (Neglect? Abuse? Exploitation? Negligence? Emotional Distress? Liberty? Jeopardy? Equal
Protection? Due Process? Dignity? Section 1983 Action?) P learned 10-23-14 at DHS website that P is
"Uncategorized," which is why P had to be steered to become "A Ward" in a guardianship:

A Matrix on a DHS website page contains four categories, none of which can accommodate P situation

and P needs: "Family with Children Evicted in Past 12 months," "Disabled Household," "Employed

Household (where P learned that the one-shot loan deal for 1 person is 3 months)," and "Veteran."

Surrounding the Matrix is a large white border, with no page name or date appearing upon printout.

When P was in the large white border, that is, "Uncategorized (overtly and actually by DHS and those

following DHS policies and practices, as opposed to hidden but hypothesized by P, before P became

'A Ward')," P was omitted by DHS policies and practices from getting P needs met.  P maintains that

P is "A Ward" in a guardianship, engineered by HRA OLA, to hide the fact that P is separate but not

equal (before and after becoming "A Ward")  to those getting what is part of the website page name:

28

"Family-Eviction-Prevent-Support." Indeed, City does not always meet the needs of an individual

(once upon a time, a family of one under The Fair Housing Act): after all, P, eventually categorized as

"A Ward" in a guardianship, is separate but not equal to families and even other individuals. The court

has reviewed P track record since 11-23-11 and has seen the privileges of the customs of HRA APS,

HRA OLA, City, even DHS and agent F going to them and not to P.

10. P *Pro Se* Will Attempt to Make Statements of Claims:

10A. P Section 1983 claim against HRA APS, HRA OLA, City (and DHS to the extent that P believes
that the others were following DHS policies and practices) overview:

Queens Supreme Court in its response to P 03-04-14 OSC named its concerns for P to be housing and

financial management (actually, all along P need for M-O-N-E-Y) as does SS law, which requires

a representative payee to pay for a ward's housing (rent) and utilities. F is not only the representative

payee; F is also the agent for HRA APS and City, as per HRA OLA commission. P has been through four

self-categorizations: "Unemployed," "Childless Individual," "Low Income," and "Uncategorized."

Finally, as "A Ward," it was P who relocated self. All along, Queens Supreme Court wanted P, stated in

its signed writings of temporary and one-year guardianship, that P be relocated and not sheltered,

respectively. P is currently in a six-month guardianship beginning 08-07-14 with no papers regarding it.

10A1. Section 1983 claim regarding the unjust violation of P freedom of speech, freedom of the press,
religious practice and religious viewpoints, and due process rights:

The four self-classifications of P do not match any of those on the DHS Matrix. P homelessness was

never rationally addressed. Instead, P was left on the sidewalk--saw the gutter--and institutionalized.

"The Calvary" marched through P apartment and made no safety or health complaints against P, but

threats of the actual legal possession put P very life in jeopardy, and P has three-tone calves. Additionally,

P health was profiled erroneously, and P has an erroneous profile. P tooth dangled, P fell bootless in

snow a few times, and P got a cold. P, Pentecostal, lost the access to P website needed to engage in

P religious practice and P expression of religious viewpoints, P book inventory is 40% destroyed, and

P website is no longer ranked high on Google. After HRA OLA commission implied P "Kryptos" K4

solution is an indication of P mental impairment, HRA APS continues to pay F to keep P silent.

10A2.  Section 1983 claim regarding the unjust violation of P seizure and search, liberty, and due process rights:

P felt threatened and was tricked by MC and authorities into a seizure and search, which led to stays in EHC Psychiatric ER and EHC Psychiatric Ward.  P was not wandering on the street: P had a plan, and P expressed it to MC.  P had to visit P business bank and PCP; instead, P had diarrhea after hospitalization from e-coli so that P missed P 12-02-14 OSC motion hearing 01-14-14.  After being behind closed doors for nine days, without benefit of notice and hearing--and a lawyer ever--P still fears institutionalization.  P had visited P friend and could have done so again, P remaining at P friend 01-15-14 to present, all by P self-relocation.  P was supposed to be relocated by HRA APS or agent F, not institutionalized.  P stayed out all night one summer night at a casino, and P sees no difference in P staying out on a brisk, sunny winter afternoon with a sweater, winter coat, hat, and gloves.  P is a ward, the one who flew over the cuckoo's nest (as per the movie by that name), and the patients in EHC made more sense to P than the classifications, including "A Ward," and means employed against P to accomplish anything damaging to P instead of that prescribed by Queens Supreme Court limited and actual guardianship papers.

10A3.  Section 1983 claim regarding the unjust violation of P dignity right: Dignity is an unenumerated right of an individual.  It does not require an individual to be employed, be with a child, have a high income, or fit into any category at all.  P suspects that noncitizens have dignity, and knows that even the dead have dignity in a court of law no less.  P was a slave up against a heavy-duty cleaning (HDC) to prevent P loss of 18 years of research for future books, a baglady to prevent same, a victim of larceny which failed to effect same, and a psychiatric emergency room and psychiatric ward patient which failed to effect same.  Nevertheless, The Prophetess produced a handwritten manuscript and is producing this complaint, today 12-01-14, in complicated, tedious, half-hour spurts (as P has been for more than a month) on a Ridgewood, Queens, library branch of the Queensboro Library computer.  Liebowitz told P in court that P doesn't know it, but P is a ward for P protection.  Carol, who sometimes eats at the two soup kitchens P still attends, gave P 11-28-14 a book entitled *100 Verses & Prayers for Successful Leaders* and

told P 11-29-14, "You *are* a leader!" Label a leader "psychotic" and "schizotypal," and it will be a lot

easier to silence and eliminate the leader; however, P learned from the judgment of P City and CH

complaint that (in P words) "a label alone does not a qualified individual with a disability make."

P eight-day examination in EHC Psychiatric Ward is more credible than P brief encounter with City's

Dr. David Klein. In America, a common housecat is afforded more dignity and protection than P has

experienced as "A Ward." Interestingly, no one profiles let alone erroneously profiles a housecat.

10A4. Section 1983 claim regarding the unjust violation of P equal protection and freedom of speech
rights:

It was 08-23-14, 5:15 pm, when it finally dawned on four-categorized P regarding the "Childless

Individual" classification that P childlessness is P symbolic speech. Is P less admirable than a woman or

a man who has a child by whatever means? Although P is childless due to and an expression of

P religious dictates, practices, and viewpoints, other women do not have children for a variety of

nonreligious reasons, and what right becomes available to all women cannot be deprived from all men.

For an individual to have a child or not have a child has no relationship to affordable housing or rent

subsidies, much less Queens Supreme Court written directives. This complaint (not a class action) is first

to prevent the robbery, murder, and destruction of additional vulnerable individuals. P damages and

P emotional distress are evident, as P continues to be the one to try to stabilize the situation of P.

10B. P intentional infliction of severe emotional distress (IIED) and/or negligent infliction of severe
emotional distress (NIED) claim against HRA APS, HRA OLA, City (and DHS to the extent that
P believes that the others were following DHS policies and practices) and F overview:

P had two initial goals: to save P 18 years of research for future books and to job hunt to pay P rent.

P tried to make money to pay P rent through P business and other means before P got what turned out

to be a temporary job during March 2013 into early April 2013. Since this temporary job ended without

becoming a lasting, full-time job, P had to abandon P one-shot loan deal application to pay P back rent.

P signed without reading a paper for a guardianship for P two initial goals, and P was going to get time

to job hunt, but P broken telephone and HRA APS and F threats of a heavy-duty cleaning (HDC) turned P

into a slave with P forced to clean up P apartment, which P very much did accomplish as per E-J, instead

of in any way enabling P to pursue P goal to job hunt. Since neither HRA APS nor F communicated with P their goals for P and how they would go about achieving same, and since neither HRA APS nor F had categorized P, P categorized self as "Unemployed" and "Childless Individual" before P guardianship, "Low Income" during the early stage of P guardianship, and "Uncategorized" recently of P guardianship, the guardianship itself categorizing P as "A Ward." In addition to P two initial goals, P had little trust that either HRA APS or F or both would relocate P, but P had to be openminded about same. P was especially appalled that P had to have a child to get help paying P rent, and P heard this said to P at Homebase as a DHS policy and practice, which P believed over time to be the policy and practice of HRA APS and F, too. P knew that P was neither mentally impaired nor incapacitated when P signed the paper for a guardianship. Regarding P relocation but not to a shelter ordered by temporary and actual Queens Supreme Court guardianship papers, respectively, P endurance of the lack of clear and complete communication between HRA APS and P and the lack of any communication at all between F accounting and legal departments (and outside lawfirm) and P were the underlying causes of P severe emotional distress, there being additional causes. From the start of P relationship with HRA APS, into HRA APS and F, and then into F alone, P has been continually and continues to be severely emotionally distressed.

10B1. <u>HRA APS and HRA OLA effected an illegal guardianship actually against P</u>: HRA APS never intended to provide P homelessness prevention services, and P learned that P did not fit into any DHS website homeless prevention categories so that P self-categorized as "Uncategorized," which is why, P contends, HRA APS and HRA OLA had to categorize P as "A Ward" in a guardianship. P regards neither the profiling erroneously nor P lasting erroneous profile as legal. P knows that HRA APS should not have been in the picture, because P did understand eviction. Moreover, P had gotten a temporary job and was viable and educated to get another job to justify homeless prevention services for P employment. The only reason P was involuntarily examined by a City psychiatrist is to enable HRA APS to "help" P, which HRA APS could not do while simultaneously threatening HDC when P wanted to job hunt and expressed P wish. Even the future threat of P loss of P apartment property due to some *projected* safety and health threats were not actual situations complained of by prior visiting City authorities or others.

10B2.  P guardianship with F is unconstitutional: P wonders when F would ever have begun giving P

monthly allowance had P not demanded same.  F hoards P SS retirement benefit and part of P pension in

P Chase account without spending any money toward P rent and utilities, a requirement of SS law.

Additionally, F violates Amendment XIV for privileges.  Dr. Daniel Khaimov filled out SS form and

claimed that P is capacitated.  Queens Supreme Court refused to change P guardian or get rid of

P guardian due, in part, to P housing.  However, City in no way cares to help P pay rent, while P income

is too low.  Yet, F continues to get paid by HRA APS to "help" P.

10B3.  HRA APS and F have been severely emotionally distressing P in several ways for a long time:

Both HRA APS and F have failed to either help P pay rent or relocate P, benefits afforded to

classifications other than that of P: "A Ward."  P has been misdiagnosed as "psychotic" and "schizotypal"

with emotional and financial detriment to P, who has not gotten financial help due to guardianship.

F caused a larceny of P apartment property so that P wears the same outfit and lacks confidence that

P would keep a job if P were to be given one, not to mention how P feels as though P looks like a nut to

those who daily see P in the same outfit.  To save P business, P lives hand to mouth and has been walking

miles to eat.  F has not to date paid P storage bills correctly.  P business inventory has been destroyed, and

P business books are missing.  P teaching license and mausoleum shelf deed are missing.  Since P was

illegally and unconstitutionally institutionalized, P fears new institutionalization.  P stay with a friend and

her mother give P a double portion of severe emotional distress.  P feels that P faces additional real threats

of homelessness, starvation and thirst, complete financial ruin, and business collapse, which cause P to

have suicidal ideations, which P fights by overworking.  Yesterday, 12-02-14, P saw F caseworker, MC,

who told P that F will get around to processing special request for P boots when the pile of such special

requests gets sufficiently big, and MC laughed when P told him to think of P when he wears his boots.

Working on this complaint, P recalled that MC lied to land P in EHC Psychiatric ER and EHC Psychiatric

Ward.  So when P went 12-02-14 to P personal bank (the one where police and EMS and MC 01-07-14

publicly humiliated P), and a teller made an error, P loudly yelled and abused the teller.  Then, P spoke to

the woman who said, "Maybe they are trying to help you" 01-07-14 and finally told her that P needs

money others get from City, not help from such abominable people (D) and City policies and practices. Without the guardianship and with the control of P SS retirement benefit and pension, P knows that P could get help from non-City sources. Truly, P feels trapped in a guardianship which reminds P of EHC Psychiatric Ward with its two locked doors, and P feels vulnerable to a horrible fate lest P so little as get a cold to disable P. Hence P has thoughts that P will be murdered by those who abuse power with oppressive policies and practices or that P will have to avoid unbearable emotional pain by lying down to die in a secret place. Yet, P tries to be a fighter, as this complaint demonstrates.

10B4. <u>P believes that P actually is and/or feels like a victim of double jeopardy so that it is an unconstitutional option for City to connect guardianships with impending evictions, what with the risk of failure to relocate being so great:</u>

P endured continuing threats of eviction, and under guardianship, P two Queens Supreme Court orders of stays of eviction from 06-26-13 through 09-25-13 and from 09-26-13 through 11-25-13 put P in jeopardy of life or limb. P actually suffered threats in P life by cellulitis with a possible blood clot and by e-coli with possible dehydration or fatal fall. When P signed the paper for a guardianship, P knew that P was not mentally impaired and not incapacitated. When P attended P guardianship hearing, P knew that P did so to job hunt and that P would not otherwise have enough SS income to simultaneously pay rent and P business expenses to keep the business and its website alive. P believes that P was suckered into being an accomplice and chose to join F in the criminal act of not using P SS retirement benefit to pay for P housing. P has paid for P religious calling by being in a seemingly inescapable guardianship which is not only threatening to P safety and health but is also a cruel and unusual punishment. P is not paranoid or overly imaginative, but P wants the court to consider P, with ZERO legal representation, being owned in person and property to P severe emotional distress by, of all entities, another court, as P believes self to be "A Ward" of that court. P prefers to be owned by God, if anyone. It appears to P that the entire scheme of using guardianships with impending evictions can cause many to become mentally impaired, and P fights for those unjustly and unnecessarily institutionalized (like two P met in EHC Psychiatric Ward) and those already dead along with potential victims of unjust and unnecessary fates, especially those 10, 20, and 30 years older than P.

10C.  P larceny, conversion, and negligence claims against F and CH overview: The day of legal

possession was 12-10-13.  Regarding P apartment property, P believes that P is the owner and that

P never transferred, forfeited, abandoned, or otherwise gave away P property and especially not P papers,

including any rights to same.  At no time has anyone taken any inventory--although P has a mental

inventory, possibly some receipts, and witnesses--of P apartment property inventory.  Also, at no time has

anyone taken any inventory of the property with which P left apartment, no item of which belonged to CH.

After P left CH, P spent a few days roughly four blocks away mainly in the library, McDonald's, Rite Aid,

and Barnes & Noble.  P did not soon return to CH, because it was difficult for P to do so, P being

encumbered with two carts, some bags above one of the carts; P had been threatened during the first stay

of eviction with a TRO by the superintendent; and P was of the understanding that F would store what

P believed would be 90% of P apartment property.  Instead, P feels that F moved more like 10% of

P apartment property, consisting much of shoe boxes and junk mail.  While in FHH, P deduced from MC

that the days when P apartment property disappeared were the packing days of 12-12-13 and 12-13-13.

When P wrote to CH lawyer, James Kasdon, P learned from a letter he had received from F lawyer,

Liebowitz of Liebowitz & Bock--a copy of which P should have received but did not until Mr. Kasdon

sent one to P--that the F visiting days of 12-10-13 and 12-12-13 constitute another tale of  when

P apartment property could have disappeared.  Yet, when P called 12-27-13 Stephen Wallach of CH,

he claimed that P apartment property had been thrown out.  So P concluded that P apartment property

could have disappeared on a series of days 12-10-13 through 12-26-13 (and possibly thereafter).  P is

relying on the content of the Liebowitz letter to Kasdon, which informed Kasdon that anything left behind

would be "deemed abandoned."  P knows that in Queens Supreme Court Liebowitz boasted that 80 boxes

had been moved into storage, but P is missing all furniture and the equivalent of a walk-in closet and

many other items, and P took pictures of P storage which P believes are indicative of a tampering with

P receipts, which is thus indicative of an attempted concealment of what was not moved to storage.  Also,

P did find some receipts in storage.  F Housing Specialist, Marco Gonzalez, had told P that F did not have

to take but such commissioned as P business computers and inventory, which books are 40% destroyed.

Since P has ZERO legal representation and is embroiled in the larger City scheme of having been robbed, silenced, and almost murdered by physical illnesses--not to mention that P was institutionalized--P has not visited any police precinct or Queens D.A. for fear of repercussions. This is not to say that P will never visit same. However, P has CH in the complaint with the hope of getting sufficient clarification, which clarification P suspects will be superior to any that law enforcement could/would supply. Recently, P wrote to CH lawyer, James Kasdon, asking for settlement in the amount of $27,500, but P, expectedly, has not to date (12-05-14) received a response from CH lawyer or CH.

10C1.  P has a larceny claim against F and CH: F, as per the Liebowitz letter, committed larceny against P by depriving and withholding from P what was P apartment property (although P had left a note stating that P would allow the ceiling fan, sofa, chair, and two small items of furniture near the door to not be moved, because P did not want to pay for same to be stored) and giving same to CH. CH has committed larceny against P, as per its taking P apartment property from P in agreement with F and throwing out P apartment property before a mere 17 days had elapsed after legal possession. The Liebowitz letter to Kasdon reads as a summation of what likely was a telephone conversation of Liebowitz for F with CH. P had spoken 12-10-13 with Building Manager, Santiago Cifuentes, to not allow P apartment property to be moved until after the court hearing 12-17-13 on same, but that hearing was conveniently postponed to 01-14-14.

10C2.  P has a conversion claim against F and CH: P considers only self to be the owner of P apartment property at all times.  F job for P was to pack, move, and store *all* of same. CH job for P was to store in the apartment for a reasonable time or to store elsewhere for a reasonable time *all or that remainder which reasonably appeared to be valuable* of same. Intent to interfere with P apartment property is shown by the Liebowitz to Kasdon letter; the storage evidence of a sabotaged receipt container and a legal document carelessly packed; the actual property stored, for example, P would not be needing the missing bed clothes and housecoats in the setting of an institution; and the CH "throwout." Both F and CH took control of the disposition of P apartment property so that P lost 90% of the *valuable* part of P apartment property and thereby sustained damages by P loss of the value and use of P apartment property.

36

10C3.  P has a negligence claim against F and CH: F had a fiduciary duty to P.  P 12-02-13 OSC motion
was over F failure to communicate to P 11-25-13 or 11-26-13, which P thought would be 12-07-13 or
12-08-13.  F and CH were supposed to exercise reasonable care in overseeing the packing, moving, and
storing by F and others of all of P apartment property.  CH was supposed to exercise reasonable care in
the storing by CH of the valuable remainder of P apartment property.  While it is true that much of
P clothing was in a closet in lawn trash bags, CH still had the responsibility of looking inside those bags.
In fact, P believes that CH had the responsibility to inspect P apartment property before allowing anyone
else near it.  A failure to take inventory does not excuse F and CH, but it accuses both.  F lawyer referred
to P remaining apartment valuables as "deemed abandoned," and Stephen Wallach spoke of CH
independently throwing out same.  P loss of the items is in value, replacement, and use, and some items'
use was for P to make future money.  P lost 40% of P business inventory of books.  Also, P lost the
12 days (which P thought P had) to sell some furniture and other items, although P spoke 12-10-13 to
both F Housing Specialist, Marco Gonzalez, and CH Building Manager, Santiago Cifuentes, about
P apartment property.  P has pain and suffering and wears one outfit for an entire season.

11. The following remedies are separated into 11A. for claims 10A., 10B., and 10C. and into 11B. for
injunctive and/or declaratory relief, as the court deems just and proper.

11A.  Claims:

| | |
|---|---:|
| For claim 10A. against HRA APS, HRA OLA, and City and possibly DHS: | $ 5,000,000 |
| For claim 10B. against HRA APS, HRA OLA, and City, and possibly DHS: | $ 5,000,000 |
| For claim 10B. against F: | $ 5,000,000 |
| For claim 10C1. against F: | $    50,000 |
| For claim 10C1. against CH: | $    50,000 |
| For claim 10C2. against F: | $    50,000 |
| For claim 10C2. against CH: | $    50,000 |
| For claim 10C3. against F: | $  100,000 |
| For claim 10C3. against CH: | $  100,000 |

37

11B. Injunctive and/or declaratory relief, as the court deems just and proper:

1. City should not be threatening to perform or performing a heavy-duty cleaning (HDC) where there has not been the additional investigation reduced to a writing of FDNY, NYC Department of Health and Mental Hygiene, or another appropriate intervening division of government.

2. City should not be searching anyone or transporting anyone for admission to any confining mental setting, unless that individual is causing a disturbance, because that individual is a ward (or an individual subject to erroneous profiling which might profile erroneously and thus unjustly confine the individual) without the additional examination reduced to a writing of two independent psychiatrists, followed in a reasonable time period by notice and hearing.

3. City should not be searching anyone or transporting anyone for admission to any confining mental setting, because that individual refuses to give that person's destination, without clarifying to where the individual with be transported and why, even during what others deem to be inclement weather.

4. City should not be interfering in impending evictions and home losses nor connecting impending evictions with guardianships, unless there is necessarily a just relocation of that individual to a non-shelter housing setting (in lieu of that individual's rent or home expenses being paid) and that individual's inventoried property is stored or secured in its entirety.

Respectfully submitted,

Carolyn Jane Siino

Dated: December 8, 2014

Carolyn Jane Siino, *Pro Se*
718-366-9034 (for now)
646-659-3213 (possibly)

FILED
CLERK

2014 DEC -8  PM 2: 39

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK