**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ **FEB 27 2020** ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
CAROLYN JANE SIINO,

                 Plaintiff,

      -against-

THE CITY OF NEW YORK,

                 Defendant.
-------------------------------------------------------X

**REPORT AND RECOMMENDATION**
**14 CV 7217 (MKB)(LB)**

**BLOOM, United States Magistrate Judge:**

Plaintiff Carolyn Jane Siino brings this *pro se* civil rights action pursuant to Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), alleging that defendant the City of New York ("the City") excluded her from participation in the City's services, programs or activities based on her perceived disability and violated the ADA's integration mandate.[1]  Pending before the Court are plaintiff's motion to amend, ECF No. 48, and defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, ECF No. 64.[2]  The Honorable Margo K. Brodie referred these motions to me for a Report and Recommendation in accordance with 28 U.S.C § 636(b)(1).  For the reasons set forth below, it is respectfully recommended that defendant's motion for summary judgment should be granted and plaintiff's motion to amend should be denied.

---

[1] The Court liberally construed plaintiff's Second Amended Complaint to allege an ADA integration mandate claim. Mem. & Order 16, Sept. 27, 2017, ECF No. 33.

[2] Plaintiff also filed a motion to supplement the record on defendant's motion for summary judgment. ECF No. 71. Defendant requested an extension of time to respond to plaintiff's motion to supplement. ECF No. 72.

1

## BACKGROUND[3]

In the Fall of 2012, Ms. Siino was 63 years old and lived alone in an apartment in Forest Hills, Queens, that she rented from Crown House Realty. Def.'s 56.1 Statement ¶ 1; Pl.'s Counterstatement ¶ 1. Ms. Siino received a pension from the City of New York[4] in the amount of $298.31 per month and food stamps in the amount of $200.00 per month. Def.'s 56.1 Statement ¶¶ 3, 9.[5] Ms. Siino was entitled to, but had not applied for, social security benefits in the amount of approximately $800 per month. Def.'s 56.1 Statement ¶ 10; Pl.'s Counterstatement ¶ 10.[6] Ms. Siino had been using credit cards to pay her rent for a substantial period of time and had accrued approximately $75,000.00 in credit card debt. Def.'s 56.1 Statement ¶ 4; Pl.'s Counterstatement ¶ 4. Ms. Siino was receiving treatment from a primary care doctor and a psychotherapist, Marilyn Gerber. Pl.'s Counterstatement ¶ 72; Pl.'s Opp'n 15; Def.'s Ex. A, ECF No. 66-1 at 1-2.

---

[3] The Court assumes familiarity with Judge Brodie's April 21, 2015, July 9, 2015, February 19, 2016, and September 27, 2017, decisions. See Siino v. N.Y.C. Human Res. Admin./Dep't of Soc. Servs., No.14 CV 7217, 2015 WL 1877654 (E.D.N.Y. Apr. 21, 2015) ("Siino I"); Siino v. City of New York, No. 14 CV 7217, 2015 WL 4210827 (E.D.N.Y. July 9, 2015) ("Siino II"); Siino v. City of New York, No. 14 CV 7217, 2016 WL 8711442 (E.D.N.Y. Feb. 19, 2016) ("Siino III"); Mem. & Order, ECF No. 33 ("Siino IV").

The facts in this section are undisputed and supported by the record unless otherwise noted. The facts are taken from Defendant's Local Rule 56.1 Statement of Material Facts Not in Dispute, ECF No. 64-1 ("Def.'s 56.1 Statement"); the exhibits attached to the Declaration of Christopher Ferreira, Apr. 26, 2019, ECF No. 66; sealed exhibits G and H attached to the Declaration of Christopher Ferreira, Oct. 17, 2018, ECF No. 60; and Plaintiff's Affidavit in Opposition to Defendant's Motion for Summary Judgment, ECF No. 68 (references to plaintiff's counterstatement to defendant's 56.1 Statement are by paragraph number and references to plaintiff's arguments and exhibits are by ECF page number) [hereinafter "Pl.'s Counterstatement" or "Pl.'s Opp'n"].

[4] Ms. Siino is a very intelligent woman. She previously worked as a teacher in the New York City public schools and received a Bachelor of Arts and a Master of Business Administration. See Def.'s 56.1 Statement ¶ 3; Pl.'s Counterstatement ¶¶ 3, 62; Def.'s Ex. H, ECF No. 60-2 at 2.

[5] Although Ms. Siino considered herself self-employed, her self-employment was "running a business loss," and she had no other regular source of income. Pl.'s Counterstatement ¶¶ 3, 9; Def.'s 56.1 Statement ¶¶ 3, 9; Def.'s Ex. A, ECF No. 66-1 at 1-2.

[6] See also Def.'s Ex. F, ECF No. 66-6 at 1 (noting that Ms. Siino began to receive $834.00 in monthly benefits after the guardian successfully applied for social security benefits on Ms. Siino's behalf).

2

On or about August 2012, Ms. Siino stopped paying her rent, which was approximately $1,100.00 per month. Def.'s 56.1 Statement ¶ 2; Pl.'s Counterstatement ¶ 2. A few months later, Ms. Siino's landlord commenced non-payment eviction proceedings against her for $3000.00 in unpaid rent. Def.'s 56.1 Statement ¶ 4; Pl.'s Counterstatement ¶ 4. In November 2012, a Queens Housing Court judge referred Ms. Siino to Adult Protective Services ("APS"), which is part of the Human Resources Administration ("HRA"), an agency of the City of New York. Def.'s 56.1 Statement ¶ 5; Pl.'s Counterstatement ¶ 5; Def.'s Ex. A, ECF No. 66-1 at 50-51; See Affirm. of Deborah Holt-Knight Supp. Def.'s Mot. Summ. J., ECF No. 66-7 ("Holt-Knight Affirm.").

## I.    APS Services Available to Plaintiff[7]

During the period of 2012-2013, the following services and interventions were considered for individuals who were referred to APS and found eligible for APS services: 1) referrals for psychiatric evaluations by HRA's Customized Assistance Services ("CAS") staff; 2) applications for payment of rental and utility arrears; 3) applications for public benefits; 4) requests for appointment of a guardian *ad litem* (hereinafter "GAL"); 5) financial management of Social

---

[7] The facts in this section are taken from the affirmation of Deborah Holt-Knight, who is the Deputy Commissioner of the New York City Human Resources Administration (HRA), Adult Protective Services (APS). Holt-Knight Affirm. ¶ 1. Ms. Holt-Knight submits the affirmation based on her "personal knowledge and upon information provided to [her] by other employees of the Human Resources Administration and contained in the records of HRA." Id. I find that the affirmation satisfies the requirements of Rule 56(c). See Fed. R. Civ. P. 56(c)(4); Searles v. First Fortis Life Ins. Co., 98 F. Supp. 2d 456, 461-62 (S.D.N.Y. 2000) ("An affiant's conclusions based on personal observations over time. . .may constitute personal knowledge, and an affiant may testify as to the contents of records she reviewed in her official capacity. The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge."). Plaintiff's responses controverting the above Holt-Knight Affirmation facts are conclusory assertions and not supported by evidence. See Pl.'s Counterstatement ¶¶ 98-105. Indeed, the APS flier that plaintiff attaches to her opposition corroborates the Holt-Knight Affirmation regarding the housing or rental assistance services available to APS clients. See Pl.'s Ex. 13, ECF No. 68 at 50 (listing APS services in the section entitled "How We Can Help").

Security benefits; 6) petitions for Article 81 Guardianship,[8] and 7) identification of alternative living arrangements.  Holt-Knight Affirm. ¶¶ 3-10.  Alternative living arrangements included "affordable housing, senior housing, single room occupancy [housing], public housing, subsidized housing, and assisted living or nursing home placements." Id. ¶ 8(b).  APS' stated goal was to ensure that clients' safety and basic needs were met "within the least restrictive environment." Id. ¶ 2.

## II.    Procedures for APS Services[9]

### A. Housing and Rental Assistance Services

Various housing options were available for clients who "voluntarily and willingly" agreed to "participate in the relocation process." Holt-Knight Affirm. ¶ 8(b).  APS "had the responsibility of applying and referring eligible clients to various types of alternative living arrangements when it had been determined that there was a need." Id. ¶ 8(a).  HRA was able to assist APS clients in "filling out" housing applications and to refer APS clients to shelter services. Id. ¶ 11. The cooperation of the APS client was "necessary" for all of HRA's housing services, however, and HRA could not compel an APS client to apply for shelter or housing if the client refused those services.  Id. ¶ 11.

With regard to applications for payment of rental arrears, APS was able to request emergency grants.[10]  Id. ¶ 5(a).  The grant application process required the cooperation of the APS client and also the client's agreement to repay the emergency grant when the client had

---

[8] Article 81 was added in 1992 to the New York Mental Hygiene Law to "establish[] a guardianship system which is appropriate to satisfy either personal or property management needs of an incapacitated person in a manner tailored to the individual needs of that person, which takes [into] account the personal wishes, preferences and desires of the person, and which affords the person the greatest amount of independence and self-determination and participation in all the decisions affecting such person's life." N.Y. Mental Hyg. Law § 81.01 (McKinney 2019).
[9]  The facts in this section are also taken from the Holt-Knight Affirmation.
[10]  This emergency grant is frequently referred to as a "one-shot deal" or an "EAA" grant.

4

income other than Social Security Insurance or Cash Assistance.   Id. ¶ 5(b).

When deemed appropriate for clients who were unable to advocate for themselves in housing Court, APS submitted requests for a GAL. Id. ¶ 7(a).   In turn, the housing court judge would appoint a GAL when there was a concern that the party was unable to advocate for herself due to a mental or physical impairment.   Id.

### B.  Other APS Services

When it was determined that an APS client needed services and "there was an indication that the client had mental health issues," APS referred the client to CAS staff, who conducted psychiatric evaluations and crisis intervention services.   Id. ¶ 4(a).   CAS conducted client home visits and provided clinical expertise and recommendations to HRA on mental health and vocational rehabilitation matters.   Id.

APS provided assistance to APS clients regarding applying for and renewing public benefits, including Social Security, Cash Assistance, Medicaid, and the Supplemental Nutrition Assistance Program ("SNAP"); however, the client's participation in applying for these benefits "would have been vital." Id. ¶ 6(a).   For APS clients who could not manage or direct the management of their benefits, APS offered clients financial management services, whereby APS was appointed as a payee to receive the Social Security or SSI benefits. Id. ¶ 9(a).   The APS payee's main duties were to use the benefits to pay for the needs of the client beneficiary.   Id.

When an APS client could not be safeguarded with less restrictive services and met the Article 81 standards, the Office of Legal Affairs (hereinafter "OLA") was able to file a petition for guardianship.   Id. ¶ 10(a).   In turn, the court could appoint a guardian vested with the power to coordinate services to protect the health and welfare of the mentally impaired person.   Id.

### III.    APS Services Made Available to Plaintiff

#### A.  Housing and Benefits Services

Subsequent to a screening call, APS caseworker Kimberly Harvey conducted an initial home visit with Ms. Siino on November 29, 2012.  Def.'s 56.1 Statement ¶¶ 7-8; Pl.'s Counterstatement ¶¶ 7-8; Def.'s Ex. A, ECF No. 66-1 at 2.  During the home visit, when Ms. Harvey asked Ms. Siino about a plan in the event of her eviction, Ms. Siino reported that she did not have a plan and, while she denied that she was suicidal at that time, she stated that, if she lost her belongings and had to live on the street, she would consider suicide. Def.'s 56.1 Statement ¶ 12; Pl.'s Counterstatement ¶ 12; Def.'s Ex. A, ECF No. 66-1 at 2.[11]

On December 24, 2012, Ms. Harvey returned to Ms. Siino's home with Dr. David Klein, a CAS psychiatrist, to conduct a psychological evaluation for case planning.  Def.'s 56.1 Statement ¶ 14; Pl.'s Counterstatement ¶ 14; Def.'s Ex. H, ECF No. 60-2 at 1.  Although Ms. Siino denied suicidal behavior and presented no significant cognitive deficits, Def.'s Ex. H, ECF No. 60-2 at 2, Dr. Klein determined that Ms. Siino nonetheless possessed poor insight and poor judgment, noting that she presented "magical thinking" about how her bills would be paid, and diagnosed her with a not-otherwise-specified psychotic disorder and schizotypal personality disorder.  Def.'s 56.1 Statement ¶ 15; Pl.'s Counterstatement ¶ 15; Def.'s Ex. H, ECF No. 60-2 at 3.[12]   Dr. Klein's report

---

[11] Ms. Siino contends that she was only joking when she stated she would consider suicide. Pl.'s Counterstatement ¶ 12.  In addition, during the same visit, Ms. Siino was offered a heavy-duty cleaning (HDC) service because the apartment appeared cluttered to Ms. Harvey, but Ms. Siino declined the cleaning.  Def.'s 56.1 Statement ¶ 13; Pl.'s Counterstatement ¶ 13; Def.'s Ex. A, ECF No. 66-1 at 2; see also Def.'s Ex. H, ECF No. 60-2 at 1 (noting that a HDC was offered and declined again on December 24, 2012).

[12] Dr. Klein's report also reflects that Ms. Siino said that she had scheduled an appointment with a psychiatrist and therapist at the Advance Center for Psychotherapy.  Def.'s Ex. H, ECF No. 60-2 at 2.  Ms. Siino mentioned relatives but indicated that her family was unable or unwilling to help her.  Id.

included the following recommendations: 1) referral to HRA OLA for Article 81 guardianship; 2) heavy-duty cleaning services; and 3) that Ms. Siino should be encouraged to apply for social security benefits. Def.'s 56.1 Statement ¶ 16; Pl.'s Counterstatement ¶ 16; see also Def.'s Ex. H, ECF No. 60-2 at 4 (containing Dr. Klein's clinical formulation). Based on Dr. Klein's psychiatric evaluation and Ms. Harvey's assessment, APS developed a service plan for Ms. Siino that included the goals of accessing benefits and seeking an Article 81 guardian. Def.'s 56.1 Statement ¶ 17; Pl.'s Counterstatement ¶ 17.[13]

After Ms. Harvey developed the initial service plan, Ms. Siino was reassigned to APS caseworker Patricia Edwards-Jones. Def.'s 56.1 Statement ¶ 18; Pl.'s Counterstatement ¶ 18. On February 13, 2013, Ms. Edward-Jones conducted a home visit. Def.'s 56.1 Statement ¶ 19; Pl.'s Counterstatement ¶¶ 19-25; Def.'s Ex. A, ECF No. 66-1 at 4. Ms. Edward-Jones' case notes reflect that she discussed a number of matters with Ms. Siino. Ms. Siino reported that she had obtained an order staying the eviction proceeding and that she was pursuing an Emergency Assistance for Adults ("EAA") grant. Def.'s 56.1 Statement ¶¶ 20-21; Pl.'s Counterstatement ¶¶ 20-21; Def.'s Ex. A, ECF No. 66-1 at 4. Ms. Edward-Jones explained to Ms. Siino that she likely would not be approved for an EAA grant based on receiving money from a friend without establishing a source of future income and urged plaintiff to apply for her social security benefits.[14] Def.'s 56.1 Statement ¶¶ 22-24; Pl.'s Counterstatement ¶¶ 22-24. Ms. Siino said that the books she authored and other business ventures would provide future income and she refused to apply for social security. Def.'s 56.1 Statement ¶¶ 23-24; Pl.'s Counterstatement ¶¶

---

[13] See also Def.'s Ex. A, ECF No. 66-1 at 3 (Harvey January 7, 2013, Transfer Summary) (noting that Ms. Siino needed a guardian to apply for benefits on her behalf and to assist her with relocation).
[14] See also Def.'s Ex. A, ECF No. 66-1 at 4 (noting that Ms. Siino was given a list of free attorneys who could assist her in obtaining social security benefits).

23-24; Def.'s Ex. A, ECF No. 66-1 at 4. Ms. Edward-Jones discussed various relocation options with Ms. Siino, including supportive housing and "'APS' family type housing," however, Ms. Siino refused these services and believed that the housing court would not allow her to be evicted. Def.'s 56.1 Statement ¶¶ 24-25; Pl.'s Counterstatement ¶¶ 24-25; Def.'s Ex. A, ECF No. 66-1 at 4. Ms. Edward-Jones also discussed Article 81 guardianship with Ms. Siino. Def.'s 56.1 Statement ¶ 25; Pl.'s Counterstatement ¶ 25; Def.'s Ex. A, ECF No. 66-1 at 4.

Following up on the home visit, Ms. Edward-Jones and Ms. Siino spoke on the phone on February 14 and February 19, 2013, and discussed various matters. Def.'s 56.1 Statement ¶¶ 26, 29; Pl.'s Counterstatement ¶¶ 26, 29; Def.'s Ex. A, ECF No. 66-1 at 7-8; Pl.'s Ex. 3, ECF No. 68 at 39. On February 14, 2013, Ms. Edward-Jones again encouraged Ms. Siino to apply for social security benefits to establish future income for the EAA grant, but Ms. Siino refused to apply. Def.'s 56.1 Statement ¶ 27; Def.'s Ex. A, ECF No. 66-1 at 7; Pl.'s Counterstatement ¶ 27.[15] Ms. Siino also stated that she had concerns about the housing proposals explained on February 13, 2013. Def.'s 56.1 Statement ¶ 28; Pl.'s Counterstatement ¶ 28. Ms. Siino was worried that she would not have space for her belongings and believed that the housing court judge would not allow her to be evicted; accordingly, she would not make a decision on the housing proposals. Def.'s 56.1 Statement ¶ 28; Pl.'s Counterstatement ¶ 28; Def.'s Ex. A, ECF No. 66-1 at 7. On February 19, 2013, Ms. Edward-Jones explained Article 81 guardianship, which Ms. Siino did not want to pursue because she believed that her EAA grant application would be approved. Def.'s 56.1 Statement ¶ 29; Pl.'s Counterstatement ¶ 29.

---

[15] The exhibits cited by plaintiff, containing medical records from 2014, do not support plaintiff's assertions regarding what occurred on February 14, 2013, but appear to be offered to show that "[the] City imputed to P a mental disability, which P did not have (and does not have)." See Pl.'s Counterstatement ¶ 27; Pl.'s Exs. 4-5, ECF No. 68 at 40-42.

Ms. Siino's EAA grant application was denied on or about February 26, 2013.   See Def.'s 56.1 Statement ¶ 31; Pl.'s Counterstatement ¶ 31.   Ms. Edward-Jones' case notes reflect that Ms. Siino contacted Ms. Edward-Jones multiple times regarding the EAA grant and expressed her frustration and anger that the application was denied.   Def.'s 56.1 Statement ¶¶ 31-37; Pl.'s Counterstatement ¶¶ 31-37.   Ms. Edward-Jones explained that a Mr. Louis Edouard had submitted Ms. Siino's EAA grant application to the Rental Assistance Unit, which denied the application. Def.'s 56.1 Statement ¶ 33; Pl.'s Counterstatement ¶ 33; Def.'s Ex. A, ECF No. 66-1 at 9.   Ms. Siino's application was denied because her application was not complete and did not establish Ms. Siino's ability to pay future rent.[16]   Ms. Edward-Jones explained to Ms. Siino that APS could submit another application on her behalf requesting funds to pay the rental arrears, but Ms. Siino refused to submit any additional paperwork with respect to the EAA grant and instead pursued a fair hearing appeal of the denial.   Def.'s 56.1 Statement ¶¶ 34-35; Pl.'s Counterstatement ¶¶ 34-35; Def.'s Ex. A, ECF No. 66-1 at 9-10.[17]

On March 19, 2013, Ms. Edward-Jones conducted another visit at Ms. Siino's home. Def.'s 56.1 Statement ¶ 46.[18]   Ms. Edward-Jones' case notes reflect that she discussed various

---

[16] The City's position is that the grant application was denied because Ms. Siino failed to: submit information that was requested, properly complete portions of the application, and to establish proof of income.  Def.'s 56.1 Statement ¶ 38; Def.'s Ex. A, ECF No. 66-1 at 10.  In Plaintiff's view, "[t]he sticking points were successively the viability of P friend, who would help to pay P future rent, and City not accepting P independent contractor status, which did not produce a check stub." Pl.'s Counterstatement ¶ 34.  See also Pl.'s Counterstatement ¶ 43 ("The viability of P friend's application was at issue."); Pl.'s Counterstatement ¶ 39 ("The dispute might have been over a missing check stub.").

[17] See also Def.'s Ex. A, ECF No. 66-1 at 12 (noting that on March 19, 2013, Ms. Edward-Jones again encouraged Ms. Siino to apply for social security benefits to establish future income to apply again for an EAA grant, but Ms. Siino refused).

[18] Ms. Siino appears to dispute what transpired during the visit but not that the visit occurred.  Pl.'s Counterstatement ¶¶ 46-48.

matters with Ms. Siino. Def.'s Ex. A, ECF No. 66-1 at 12.[19]  Ms. Edward-Jones discussed

plaintiff's imminent eviction, but Ms. Siino had no relocation plans in the event she was evicted.

Def.'s 56.1 Statement ¶ 46; Def.'s Ex. A, ECF No. 66-1 at 12; see also Pl. Counterstatement ¶ 46.

Applications for NYCHA, Good Will, and a Pistilli Residential Lease were taken to Ms. Siino;

however, Ms. Siino stated that "since [the application] needed source of income for application to

be processed, it was not necessary for [them] to be completed at [that] time." Def.'s 56.1

Statement ¶ 47; Def.'s Ex. A, ECF No. 66-1 at 12.  Ms. Edward-Jones explained assisted living

programs to Ms. Siino, who expressed concern about having space for her belongings in an assisted

living facility where she likely would have to share a room.  Def.'s 56.1 Statement ¶ 48; Def.'s

Ex. A, ECF No. 66-1 at 12.   To avoid Ms. Siino having no other option besides a homeless shelter

in the event of an eviction, Ms. Edward-Jones referred Ms. Siino to an assisted living facility,

Madison New York, on or about March 21, 2013.  Def.'s 56.1 Statement ¶¶ 49-50; Def.'s Ex. A,

ECF No. 66-1 at 12-13, 16, 19.[20]  Following up on the home visit, on March 23, 2013, Ms. Siino

left a message informing Ms. Edward-Jones that her eviction had been stayed until April 2, 2013,

and that Ms. Siino would continue to pursue an appeal of the EAA grant denial rather than

submitting a new EAA application as Ms. Edward-Jones had recommended.   Def.'s 56.1

Statement ¶ 52; Def.'s Ex. A, ECF No. 66-1 at 17, 22; Pl.'s Counterstatement ¶ 52.

Throughout April 2013, Ms. Siino and Ms. Edward-Jones both followed up on Ms. Siino's

application for an EAA grant, as Ms. Siino was focused on pursuing the EAA grant and preventing

---

[19] Ms. Siino does not offer evidence controverting Ms. Edward-Jones' March 29, 2013, case notes; rather, plaintiff refers to conversations held in December 2013, and offers exhibits containing handwritten notes dated December 2013.  See Pl.'s Counterstatement ¶¶ 47-48; Pl.'s Exs. 7-8, ECF No. 68 at 44-45.

[20] Madison New York's Director of Community Relations informed Ms. Edward-Jones that an opening might not be available until May 2013, which Ms. Edward-Jones relayed to plaintiff.  Def.'s Ex. A, ECF No. 66-1 at 16; Pl.'s Counterstatement ¶ 49.

her eviction. See Def.'s Ex. A, ECF No. 28-32;[21] Def.'s 56.1 Statement ¶ 65; see also Pl.'s Counterstatement ¶ 65.[22]  On multiple occasions in April 2013, more information was requested from Ms. Siino to complete the EAA grant application, as Ms. Siino failed to provide adequate information regarding a third-party guarantor and proof of income.  Def.'s 56.1 Statement ¶ 66; Pl.'s Counterstatement ¶ 66; Def.'s Ex. A, ECF No. 66-1 at 29, 30, 32.  Ms. Edward-Jones' case notes reflect that in March and April 2013, Ms. Siino continued to refuse to apply for social security benefits as recommended by Ms. Edward-Jones, refused to fill out applications for alternative housing provided by Ms. Edward-Jones, and expressed to Ms. Edward-Jones that she had no relocation plans but did not believe that the housing court Judge would allow her eviction. Def.'s 56.1 Statement ¶ 54; Pl.'s Counterstatement ¶ 54; Def.'s Ex. A, ECF No. 66-1 at 12–24.[23]

---

[21] See e.g., Def.'s Ex. A, ECF No. 66-1 at 30 ("The Client reported that the Caseworker should obtain the one shot deal and deal with OLA and she would contend with the Marshall.").

[22] The APS case notes also reflect that APS applied for a GAL for plaintiff on April 19, 2013.  Def.'s Ex. A, ECF No. 66-1 at 34, 37, 48, 50.

[23] Plaintiff does not dispute that housing alternatives and applying for social security benefits were raised with her, but she seems to dispute in what depth and how often these topics were raised.  She also seems to dispute seeing physical housing applications and the reasons why she did not want to apply for social security, but does not seem to dispute her refusals to complete the applications or to apply for social security benefits in February 2013.  See Pl.'s Counterstatement ¶¶ 25, 27, 28, 45-50, 54, 63, 65.  Further, plaintiff does not point to documentary evidence controverting her refusal, and indeed, the exhibit she provides regarding conversations with Ms. Edward-Jones in February 2013 seems to reflect that supportive housing and social security benefits were discussed with her.  See Pl.'s Ex. 3, ECF No. 68 at 39.

Ms. Siino argues that APS' "policy of insisting on client cooperation did not afford P meaningful participation in City services[.]" Pl.'s Opp'n 15. Ms. Siino further states that, because she was frustrated with APS, she "would act out as a seemingly crazy person. . .making absurd remarks in what continued to be P futile attempts to get APS to follow through with more than mere services identifications: the applications to housing and the referrals to shelter, which P needed and wanted but which were being denied to P.  APS communications to P would be so absurd that P had no choice but to respond with P own absurd communications. . .and APS made no effort to unbiasedly and accurately understand P speech."  Pl.'s Opp'n 17.  Plaintiff's argument that APS should have understood her "absurd remarks" and followed through on identified services despite her refusal to cooperate is unreasonable.  See D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations. . .but instead must offer some hard evidence showing that its version of the events is not wholly fanciful.").

After being granted multiple stays of eviction in housing court, Ms. Siino was ultimately evicted from her apartment.   Def.'s 56.1 Statement ¶¶ 20, 52, 55, 86; Pl.'s Counterstatement ¶¶ 20, 52, 55, 86.   On December 10, 2013, Ms. Edward-Jones was present at Ms. Siino's home for the scheduled eviction.   Def.'s 56.1 Statement ¶ 86; Pl.'s Counterstatement ¶ 86.   Ms. Edward-Jones gave Ms. Siino information regarding homeless shelters, directions, and transportation money.   Def.'s 56.1 Statement ¶ 87; Pl.'s Counterstatement ¶¶ 87-88.   Although, Ms. Siino stated that she would go to a shelter,[24] she in fact never went to a shelter and became homeless. Def.'s 56.1 Statement ¶ 87, 91; Pl.'s Counterstatement ¶¶ 87-91.

## B.  APS' Article 81 Guardianship Referral

Ten months before she was evicted, on February 19, 2013, Ms. Edward-Jones contacted Ms. Siino and explained Article 81 guardianship, which Ms. Siino did not want to pursue because she believed that her EAA grant would be approved. Def.'s 56.1 Statement ¶ 29; Pl.'s Counterstatement ¶ 29; Def.'s Ex. A, ECF No. 66-1 at 8.   On March 25, 2013, APS submitted a referral for a community-based Article 81 guardianship for Ms. Siino to OLA.   Def.'s 56.1 Statement ¶ 53; Pl.'s Counterstatement ¶ 53; Def.'s Ex. A, ECF No. 66-1 at 16; Def.'s Ex. B, ECF No. 66-2 at 1.[25]   This first referral was rejected by OLA by its Office Memorandum, dated April 4, 2013.   Def.'s 56.1 Statement ¶ 56; Pl.'s Counterstatement ¶ 56; Pl.'s Ex 1, ECF No. 68 at 35-37.   The referral was rejected by OLA because, *inter alia*, OLA determined it "would not be able to meet its legal burden in Court."   Pl.'s  Ex 1, ECF No. 68 at 37.   Regarding potential measures less restrictive than guardianship, the memo noted that "APS has offered assistance with relocation

---

[24] Ms. Siino states that "P had no choice but to say that P would go there[.]" Pl.'s Counterstatement ¶ 87.
[25] The APS Article 81 referral reiterates Ms. Edward-Jones' case notes surrounding Ms. Siino's refusal of assistance with relocation and refusal to apply for social security benefits.   Def. Ex. B, ECF No. 66-2, at 6-7.

which the client initially refused but the referral indicates that she said she would rethink applying for assisted living and supportive housing." Id. at 36.

On April 2, 2013, Ms. Siino told an APS housing court liaison that "the marshal will find a dead body in her [home] … because she will kill herself if she is evicted." Def.'s 56.1 Statement ¶ 57; Def.'s Ex. A, ECF No. 66-1 at 18. As a result, Ms. Edward-Jones requested another psychological evaluation of Ms. Siino on April 5, 2013. Def.'s 56.1 Statement ¶ 58; Def.'s Ex. A, ECF No. 66-1 at 25.[26] On April 11, 2013, Dr. Klein conducted another visit with Ms. Edward-Jones to Ms. Siino's home to perform another psychiatric evaluation for case planning. Def.'s 56.1 Statement ¶ 58; Def.'s Ex. G, ECF No. 60-1 at 1. The report and case notes reflect that Ms. Siino was unable to process that eviction was imminent and that her EAA grant application would not be approved due to lack of regular income; she had no relocation plan and refused to apply for social security benefits to try to qualify for an EAA grant since she anticipated the benefit amount would be small. Def.'s 56.1 Statement ¶ 63; Pl.'s Counterstatement ¶ 63; Def.'s Ex. G, ECF No. 60-1 at 2, 4; Def.'s Ex. A, ECF No. 66-1 at 27. Dr. Klein's sole recommendation was to refer Ms. Siino to OLA for an Article 81 guardianship. See Def.'s Ex. G, ECF No. 60-1 at 4; Def.'s 56.1 Statement ¶ 64; Pl.'s Counterstatement ¶ 64.

By memo dated April 23, 2013, OLA accepted APS' April 16, 2013, Article 81 referral. Def.'s 56.1 Statement ¶ 73; Pl.'s Counterstatement ¶ 63; Def.'s Ex. C, ECF No. 66-3 at 1. Based on the second referral and Dr. Klein's second evaluation, OLA found that Ms. Siino met the legal criteria for the appointment of a guardian. Def.'s Ex. C, ECF No. 66-3 at 1-3. Attached to the referral acceptance are Ms. Edward-Jones' case notes, including a case note dated April 15, 2013,

---

[26] Ms. Siino does not dispute that she made this comment to the housing court liaison, Ms. Sharise Thomas, but objects that the City did not "determin[e] the accuracy of P speech" and she "suspects" that the dates were changed on the documentation to "try to hide City steering of P[.]" Pl.'s Counterstatement ¶¶ 55-58.

stating that: "[a]t present, the client is refusing to go to assisted living, supportive housing, or shelter [] due to her impaired judgment. [S]he believes she should remain in her home as she will be rich from cracking the CIA code." Def.'s Ex. C, ECF No. 66-3 at 11.   On May 13, 2013, Ms. Edward-Jones conducted a home visit with Ms. Siino and explained the implications of the Article 81 guardianship.   Def.'s 56.1 Statement ¶ 74; Pl.'s Counterstatement ¶ 74; Def.'s Ex. A, ECF No. 66-1 at 34.   Ms. Siino said that she believed that she would be getting a high paying job and that she had seen Dr. Klein's evaluation and did not agree with the diagnosis.   Def.'s 56.1 Statement ¶ 74; Pl.'s Counterstatement ¶ 74; Def.'s Ex. A, ECF No. 66-1 at 34.

On June 26, 2013, the Honorable Lee A. Mayersohn, Justice of the Supreme Court of the State of New York, Queens County, held a hearing at which Ms. Siino testified.   Def.'s 56.1 Statement ¶ 76; Pl.'s Counterstatement ¶ 76; Def.'s Ex E, ECF No. 66-5 at 1.   Justice Mayersohn made a finding, based on clear and convincing evidence, that Ms. Siino was likely to suffer harm because she was unable to provide for her personal needs and property management.   Def.'s 56.1 Statement ¶ 76; Pl.'s Counterstatement ¶ 76; Def.'s Ex E, ECF No. 66-5 at 1-2.   On August 7, 2013, Justice Mayersohn issued a final order appointing NYFSCGS as Ms. Siino's temporary limited guardian for a period of one year, and granted NYFSCGS authority to make decisions concerning, *inter alia*: applying for benefits on her behalf;[27] managing her income and assets, defending Ms. Siino in any proceeding, including against Ms. Siino's landlord; choosing a place of abode in the community, if the eviction is not resolved;[28] arranging for medical and dental

[27] The guardian applied for social security on Ms. Siino's behalf.   The APS case notes reflect that the benefits were obtained in September 2013; Ms. Siino asserts that she did not receive her social security allowance until October 2013. Def.'s 56.1 Statement ¶ 90; Pl.'s Counterstatement ¶ 90.
[28] The Order notes that relocation to an Assisted Living Residence or Nursing Home shall be made only by notice of motion and upon Court consent.   Def.'s Ex E, ECF No. 66-5 at 6.   In addition, the Court issued an interim order granting a 90-day stay of Ms. Siino's eviction.   Def.'s 56.1 Statement ¶ 77; Pl.'s Counterstatement ¶ 77; Def.'s Ex. D, ECF No. 66-4 at 2.   Later, at a housing court hearing on October 8,

14

care, including psychiatric or psychological treatment; conducting heavy duty cleanings of Ms. Siino's apartment; making arrangements for the preservation of her belongings; and obtaining homecare services if needed.   Def.'s 56.1 Statement ¶¶ 79-81; Pl.'s Counterstatement ¶¶ 79-81; Def.'s Ex E, ECF No. 66-5 at 6-7.

Following the June 26, 2013, Article 81 hearing, Ms. Edward-Jones' case notes reflect that she conducted several mandated home visits, despite Ms. Siino's expressed frustration with APS, unwillingness to work with APS, and preference that Ms. Edward-Jones not attend any scheduled meetings with her and the guardian.   Def.'s Ex. A, ECF No. 66-1 at 36–44; Def.'s 56.1 Statement ¶ 78; Pl.'s Counterstatement ¶ 78.   On September 18, 2013, Ms. Edward-Jones conducted a joint home visit with Ms. Siino's court-appointed guardian and explained that APS would work alongside the guardian until the guardianship was certified, in approximately three months, after which APS would close Ms. Siino's APS case.   Def.'s 56.1 Statement ¶¶ 82-83; Pl.'s Counterstatement ¶¶ 82-83; Def.'s Ex. A, ECF No. 66-1 at 45.   On December 16, 2013, after the eviction, Ms. Edward-Jones administratively closed Ms. Siino's APS case. Def.'s 56.1 Statement ¶ 89; Pl.'s Counterstatement ¶ 89; Def.'s Ex. A, ECF No. 66-1 at 48.

### IV.    Plaintiff's Institutionalization

After she was evicted, on or about January 1, 2014, Ms. Siino went to Forest Hills Hospital and was admitted because of a gastrointestinal infection.   Def.'s 56.1 Statement ¶ 92; Pl.'s Counterstatement ¶ 92.   On or about January 7, 2014, Ms. Siino's guardianship caseworker

---

2013, Ms. Siino's guardian obtained an additional sixty days to relocate Ms. Siino.  See Def.'s 56.1 Statement ¶ 84; Pl.'s  Counterstatement ¶ 84.    Plaintiff argues, however, that the purpose of the October 2013 stay was "for [the] City to focus on P eviction (over P housing)." Pl.'s  Opp'n 21.  Ms. Siino attaches a series of exhibits to prove that she "was kept in the apartment an extra 60 days, because [the] City knew that [the property owner] had dirty hands from performing the building work illegally and thus could not evict P."  See Pl.'s  Opp'n 21-22; Pl.'s  Exs. 15-23, ECF No. 68 at 53-62.  I have reviewed plaintiff's exhibits relating to allegations of illegal work in her building and find they are irrelevant to plaintiff's integration mandate claim.

15

arrived at Forest Hills Hospital to meet with her and assist with her discharge.  Def.'s 56.1 Statement ¶ 93; Pl.'s Counterstatement ¶ 93.  The case notes reflect that Ms. Siino refused to tell the guardian caseworker where she was staying and said that she "preferred to have the guardianship [sic] worry." Def.'s 56.1 Statement ¶ 94; Pl.'s Counterstatement ¶ 94; Def.'s Ex. F, ECF No. 66-6 at 2. The guardian caseworker informed Ms. Siino that, if she refused to go to a shelter or tell the caseworker whether she had some other place to stay, he would have no choice but to call 911 and have her hospitalized. Def.'s 56.1 Statement ¶ 95; Pl.'s Counterstatement ¶ 95; Def.'s Ex. F, ECF No. 66-6 at 2.  Because of Ms. Siino's refusal to cooperate and the danger posed by the extreme winter temperatures, the guardian had Ms. Siino hospitalized at Elmhurst Hospital.  Def.'s 56.1 Statement ¶ 96; Pl.'s Counterstatement ¶ 96.  Ms. Siino was hospitalized from approximately January 7 to January 15, 2014. Def.'s 56.1 Statement ¶ 96; Pl.'s Counterstatement ¶ 96.  Ms. Siino's guardianship ended sometime in November 2015.  Def.'s 56.1 Statement ¶ 97; Pl.'s Counterstatement ¶ 97.

## PROCEDURAL HISTORY

Ms. Siino originally filed this action against multiple defendants, namely New York City Human Resources Administration/Department of Social Services (HRA), New York City Department of Homeless Services (DHS), City of New York, New York Foundation for Senior Citizens, Guardian Services, Inc. (NYFSCGS), and Crown House Realty Co., LLC ("Crown House"), alleging various federal and state law claims.  Compl., ECF No. 1; Siino I, 2015 WL 1877654, at *1.[29]  The claims against the City agencies, HRA and DHS, were dismissed because they were not suable entities.  Siino I, 2015 WL 1877654, at *2.  Ms. Siino's claims against NYFSCGS, her court-appointed guardian, and Crown House, her landlord, were dismissed

---

[29] The Clerk of Court is directed to send plaintiff the attached copies of all unreported cases cited herein.

16

because the allegations in the complaint did not satisfy Section 1983's state action requirement; in other words, these defendants were not "acting under color of state law." Id. at *6.  In addition, Judge Brodie held that "[t]o the extent that Plaintiff seeks review of state court decisions and orders relating to her guardianship proceedings, federal court review of those decisions and orders would be barred by the Rooker–Feldman doctrine...This Court may not consider Plaintiff's challenges to past New York state proceedings related to her guardianship proceedings, and thus any such claim is dismissed for lack of jurisdiction." Id. at *4.[30]  However, as she was proceeding *pro se*, Ms. Siino was given the opportunity to amend her complaint. Id. at *7.

Plaintiff's amended complaint named the City of New York ("the City"), NYFSCGS, and Crown House, and "substantially repeat[ed]" the allegations in her original complaint. Siino II, 2015 WL 4210827, at *1. The City was dismissed because the amended complaint's allegations did not meet the minimum pleading requirements for a Monell claim. Siino II, 2015 WL 4210827, at *4 (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694–95 (1978)).  The claims against NYFSCGS and Crown House were dismissed because the amended allegations still failed to establish state action under Section 1983. Siino II, 2015 WL 4210827, at *5-6.[31]

After the Clerk of Court closed this case on July 10, 2015, Ms. Sino moved for relief from the judgment and for leave to file a second amended complaint. Siino III, 2016 WL 8711442, at *1; ECF Nos. 13-15. Judge Brodie substantially denied Ms. Siino's requests, which asked the Court to vacate the judgment and reconsider all of Ms. Siino's claims, but granted Ms. Siino

---

[30] Judge Brodie further held that "[t]o the extent Plaintiff seeks to vacate decisions entered by the state courts concerning. . .her eviction, or seeks declaratory judgment regarding the constitutionality of the state court proceedings, this Court cannot grant such relief." Siino I, 2015 WL 1877654, at *3.  Judge Brodie also declined to exercise supplemental jurisdiction over Ms. Siino's remaining state law claims. Id. at *7.
[31] Judge Brodie again declined to exercise supplemental jurisdiction over any state law claims. Siino II, 2015 WL 4210827, at *6.

permission to file a second amended complaint to plead a Fair Housing Act ("FHA") disability discrimination claim and replead due process or statutory claims concerning her Medicaid benefits. Siino III, 2016 WL 8711442, at *1, 10-14.[32]  Ms. Siino filed her Second Amended Complaint ("SAC") on June 14, 2016, against the City, NYFSCGS and Crown House.   ECF No. 17.

On April 12, 2017, while the City's motion to dismiss the SAC was still pending, Ms. Sino requested a preliminary injunction and temporary restraining order to enjoin the City from "pursuing, interrogating [and] attempting to get self-incriminating information from ... plaintiff in an exhibition of discriminatory purpose." Ct. Order, Apr. 12, 2017, ECF No. 32 (quoting Pl.'s Mem. Supp. Order to Show Cause 1, ECF No. 31-1).  Ms. Siino alleged that an APS worker named Mrs. Wynter came to the apartment where Ms. Siino had been staying as "a legal occupant" with two other women since January 15, 2014, in an "attempt to harm [Ms. Siino] with harassment, coercion. illegally evicting. effecting an illegal search of property, institutionalization, jeopardizing legal standing in EDNY, gaining an advantage to discredit/impeach at a possible EDNY or other court trial, and anything else which the Court may read into these papers[.]" Pl.'s Mem., ECF No. 31-1 at 1-2.   Because Ms. Siino failed to demonstrate a likelihood of success on the merits or make a showing of irreparable harm, Judge DeArcy Hall denied Ms. Siino's request. ECF No. 32.

On September 27, 2017, Judge Brodie granted in part and denied in part the City's motion to dismiss the SAC.  Siino IV at 2.   The SAC repeated many of the allegations from the original

---

[32] Because the Court's July 9, 2015, decision did not address whether Ms. Siino's allegations were sufficient to state a claim pursuant to the FHA, the Court proceeded to review that question and also Ms. Siino's request for leave to assert a claim that the City discriminated against her based on her mental illness.  Siino III, 2016 WL 8711442, at *11. Judge Brodie liberally construed the Amended Complaint to allege discrimination claims based on plaintiff's religion and status as a single person.  Id. Judge Brodie concluded, however, that Ms. Siino failed to state a claim for family status or religious discrimination under the FHA. Id. at *11-12.

and amended complaints; the Court did not reconsider the claims that were already dismissed, but addressed and dismissed Ms. Siino's Section 1983 claims against the City, alleging violations of the Medicaid Act and the procedural due process clause of the Fourteenth Amendment. Id. at 2, 3 n.3, 10. Based on Ms. Siino's citation to Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 592 (1999) and the allegations that the City perceived her as disabled and "obtained erroneous mental health diagnoses for the purpose of placing her under guardianship, and failed to assist her in locating rental or housing assistance, which exposed her to the risk of institutionalization," Siino IV at 16 (citing SAC ¶¶ 45, 55, 62, 66), Judge Brodie liberally construed the SAC to assert a claim for injunctive relief under the ADA's integration mandate, Siino IV at 16 n.4, 9 n.9, 21. See also id. at 20 ("although not clearly articulated, Plaintiff alleges that the City denied her housing or rental assistance services, or at least discouraged her from obtaining housing or rental assistance services, and instead forced her toward guardianship, homelessness and subjected her to one week of institutionalization and a continuing risk of institutionalization.") (citing SAC ¶¶ 32-34). Judge Brodie concluded that while plaintiff "appears to allege a risk of institutionalization based on the City's failure to provide her with housing or rental assistance or failure to make those services accessible," plaintiff's SAC did not sufficiently allege "the scope of services the City provided to her as a disabled individual and whether she was denied or prevented from accessing *those* services, and, as a result, it is unclear whether the City has satisfied its obligation to Plaintiff under the integration mandate." Siino IV at 20-21 (emphasis in original).

Having dismissed all claims in the SAC except the ADA integration mandate claim against the City, Judge Brodie referred this matter to me to oversee limited discovery. Siino IV at 21-22. Judge Brodie directed that the parties conduct discovery regarding: "(1) the City's process or procedures for making its existing housing or rental assistance services accessible to individuals

with mental disabilities or individuals who are perceived to be disabled; (2) information provided to Plaintiff about the existing housing or rental assistance services available to individuals with mental disabilities; and (3) actions taken by Plaintiff to apply for housing or rental assistance and the outcome of any application." Id. at 21-22. The City was granted leave to move to dismiss the case if, after such limited discovery, the City could show that it complied with the integration mandate as to Ms. Siino. Id. at 22.

As directed, I oversaw discovery between plaintiff and the City on the sole remaining claim against the City regarding the ADA integration mandate. I held an initial conference on October 26, 2017, and ordered the City to produce to Ms. Siino copies of documents regarding what services Ms. Siino received and what services were available to her in 2012-2013, and further instructed that defendant's production should include whatever records existed concerning Ms. Siino during this time period from any City agency. ECF No. 36. After the City produced these documents, I directed the parties to proceed with limited discovery as set forth in Judge Brodie's September 27, 2017, decision, and to complete such discovery by March 1, 2018. ECF No. 38 at 1.[33] Then, on April 3, 2018, Ms. Siino sought leave to file a third amended complaint. ECF No. 43. I denied the request without prejudice as Ms. Siino did not file a proposed amended complaint for the Court's consideration. ECF No. 45. On May 24, 2018, Ms. Siino filed another motion to amend, this time attaching a proposed third amended complaint accompanied by two exhibits. ECF Nos. 48-1, 48-2 (hereinafter the "TAC"). The parties were granted three extensions of time to complete limited discovery, which closed on May 31, 2018. See ECF Nos. 41, 45, 47.

Upon completion of limited discovery, the City filed a pre-motion conference (PMC) request in anticipation of moving for summary judgment as well as its opposition to Ms. Siino's

---

[33] I also encouraged the parties to discuss settlement. ECF No. 38.

motion to amend. ECF No. 50.   After its proposed briefing schedule was approved and its two

motions for extension of time were granted, the City ultimately filed its first motion for summary

judgment on October 17, 2018.   See ECF Nos. 53-56.   On March 29, 2019, Judge Brodie denied

the City's motion for summary judgment, ECF No. 58, without prejudice because the City failed

to serve Ms. Siino with the required Local Civil Rule 56.2 notice for *pro se* litigants opposing a

motion for summary judgment.   See Local Civ. R. 56.2; Electronic Order 3/29/2019 (citing Irby

v. N.Y. City Transit Auth., 262 F.3d 412, 414 (2d Cir. 2001)).   Judge Brodie ordered the City to

comply with Local Civil Rule 56.2 and further directed the City to respond to Ms. Siino's motion

to amend, ECF No. 48, in its revised motion for summary judgment.   Electronic Order 3/29/2019.

The City filed its revised motion for summary judgment on April 26, 2019, ECF No. 64,[34]

which Judge Brodie referred to me for a Report and Recommendation, Electronic Order 5/02/2019.

After Ms. Siino filed her opposition, ECF No. 68, and the City filed its reply, ECF No. 70, on

January 29, 2020, Ms. Siino requested leave to "supplement the record on defendant's pending

motion for summary judgment," ECF No. 71.   Defendant requested an extension of time to

respond to plaintiff's motion to supplement "should the court deem a response necessary."   ECF

No. 72.

Plaintiff's motion to supplement the record, ECF No. 71, is granted.   However, for the

reasons discussed below, I respectfully recommend that defendant's motion for summary

judgment, ECF No. 64, should be granted, and plaintiff's motion to amend, ECF No. 48, should be

denied.[35]

---

[34] This time, defendant served Ms. Siino with the requisite notice regarding summary judgment pursuant
to Local Civil Rule 56.2. See Decl. of Service, ECF No. 65.
[35] Accordingly, defendant's request, ECF No. 72, for an extension of time to file a response to plaintiff's
motion, ECF No. 71, is denied as unnecessary.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

A grant of summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(a).  A fact is material if it is one that "might affect the outcome of the suit under the governing law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.") A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986).  Accordingly, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" because there is no "'genuine dispute as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 322-23.

The moving party bears the burden of identifying for the court the basis for its motion and the portions of the record which show the lack of a genuine dispute as to the material facts.   Id. at 323.  "Where, as here, the burden of persuasion at trial would be on the non-moving party. . .the party moving for summary judgment may satisfy his burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).  In turn, the Court must

"determine whether the legal theory of the motion is sound" and also "ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." Jackson v. Fed. Exp., 766 F.3d 189, 194 (2d Cir. 2014) (explaining that "[i]n doing so, the court may rely on other evidence in the record even if uncited."). Where the movant shows a prima facie entitlement to summary judgment, "the burden shifts to the non[-]movant to point to record evidence creating a genuine issue of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006); see also Jackson, 766 F.3d at 195 n.3 ("[W]hen a defendant-movant submits an evidentiary proffer sufficient to defeat a claim, a plaintiff who bears the burden of proof cannot win without proffering evidence sufficient to allow a trier of fact to find in its favor on each fact material to its claim(s).") (citing Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004)).[36]

"[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts[.]" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)); Anderson, 477 U.S. at 252 (noting that "the mere existence of a scintilla

---

[36] Under this Court's local rules, the movant must file a statement, in numbered paragraphs, "of the material facts as to which the moving party contends there is no genuine issue to be tried," Local Civ. R. 56.1(a), and the opposing party must file a correspondingly numbered statement responding separately to each paragraph, Local Civ. R. 56.1(b). The statements by the movant and opponent must be followed by citation to admissible evidence. Local Civ. R. 56.1(d); Fed. R. Civ. P. 56(c); see also M.V.B. Collision, Inc. v. Allstate Ins. Co., 728 F. Supp. 2d 205, 209 (E.D.N.Y. 2010) (explaining that the district court is "not obligated to engage in the time-consuming, cumbersome process of formally striking [inadmissible] evidence in a line-by-line fashion," rather the court may "simply disregard the allegations that are not properly supported."). The movant's statements may be deemed admitted unless specifically controverted in a correspondingly numbered paragraph by the opposing party. Local Civ. R. 56.1(c). But see Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules . . .while a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements, it may in its discretion opt to 'conduct an assiduous review of the record[.]'") (citations omitted); see also DeRienzo v. Metro. Transp. Auth., 237 F. App'x 642, 646-47 (2d Cir. 2007) (summary order) (explaining that Giannullo v. City of New York, 322 F.3d 139 (2d Cir. 2003) did not overrule the holdings in Holtz).

of evidence in support of the plaintiff's position" is "insufficient" to defeat a defendant's summary judgment motion).    Conclusory assertions, conjecture, or speculation do not create a genuine dispute of fact and are insufficient to defeat a properly supported motion for summary judgment. Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012) ("A court cannot credit a plaintiff's merely speculative or conclusory assertions.").    If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute of material fact.    Matsushita Elec. Indus. Co., 475 U.S. at 587.    The Court's role in deciding a summary judgment motion is "not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000).

Here, because plaintiff is proceeding *pro se*, the Court affords her "special solicitude," Jackson, 766 F.3d at 195 (citing Ruotolo v. IRS, 28 F.3d 6, 8 (2d Cir.1994)), and reads her pleadings "liberally and interpret[s] them to raise the strongest arguments that they suggest," Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (citations omitted). Notwithstanding the foregoing, the Court's application of this more lenient standard, "does not relieve plaintiff of [her] duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen, 351 F.3d at 50.

## DISCUSSION

### I.    Title II of the Americans with Disabilities Act

Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

24

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.   Under this provision, plaintiff has the burden of proving "(1) that she is a

qualified individual with a disability; (2) that she was excluded from participation in a public

entity's services, programs or activities or was otherwise discriminated against by a public entity;

and (3) that such exclusion or discrimination was due to her disability."   Davis v. Shah, 821 F.3d

231, 259–60 (2d Cir. 2016) (citation omitted).   One way plaintiff may establish such unlawful

discrimination is by proving that the public entity violated the ADA's "integration mandate"

regulations.   Frank v. Sachem Sch. Dist., 84 F. Supp. 3d 172, 185 (E.D.N.Y. 2015), aff'd, 633 F.

App'x 14 (2d Cir. 2016); see generally Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999).

The term "public entity" is defined to include any local government, as well as any

department, agency, or other instrumentality of a local government.   42 U.S.C. § 12131(1).   The

term "disability" is defined to include an individual who has "a physical or mental impairment that

substantially limits one or more major life activities[,]" has "a record of such an impairment[,]" or

is "regarded as having such an impairment[.]" 42 U.S.C. § 12102(1).   The term "qualified

individual with a disability" is defined as "an individual with a disability who, with or without

reasonable modifications to rules, policies, or practices, the removal of architectural,

communication, or transportation barriers, or the provision of auxiliary aids and services, meets

the essential eligibility requirements for the receipt of services or the participation in programs or

activities provided by a public entity."   42 U.S.C. § 12131(2).

Here, defendant does not dispute that the City of New York and its agencies are covered

entities under the ADA.   Plaintiff's position is that, although defendant regarded her as mentally

disabled, she is not and was not mentally disabled.   See, e.g., Pl.'s   Counterstatement ¶ 106.

Defendant does not dispute that plaintiff satisfies the statute's disability definition, either based on

25

an actual or a perceived mental impairment.  See Def.'s Mem. Supp. Mot. For Summ. J. 13, ECF

No. 64-2 (hereinafter "Def.'s  Br.").[37]  The parties do dispute, however, whether plaintiff was a

qualified individual who met the eligibility requirements for certain services or programs.

Moreover, defendant argues that the City did not violate the integration mandate or otherwise

discriminate against plaintiff based on her disability.  See generally Def.'s Br.; Def.'s Reply.

Mem. Supp. Mot. For Summ. J., ECF No. 70 (hereinafter "Def.'s Reply").

## II.    The Integration Mandate

The Department of Justice (DOJ) promulgated regulations implementing Title II's

prohibition against discrimination by public entities, including the "integration mandate"

regulation, 28 C.F.R. § 35.130(d), which states that "[a] public entity shall administer services,

programs, and activities in the most integrated setting appropriate to the needs of qualified

individuals with disabilities."  See generally 28 C.F.R. pt. 35.  In the seminal case Olmstead v.

L.C. ex rel. Zimring, the Supreme Court upheld the integration mandate regulation[38] and affirmed

that "'unjustified isolation' of disabled individuals in institutionalized care facilities constitutes

discrimination on the basis of disability under the ADA."  Davis, 821 F.3d at 262 (quoting

Olmstead, 527 U.S. at 596–97).[39]  In a corollary to this conclusion, the Supreme Court held that

---

[37] The distinction is largely irrelevant to the legal conclusions in this case.  It is worth noting, however, that although a public entity generally must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," a public entity is not required to make such reasonable modifications for an individual who only meets the definition of disability under the "regarded as" prong.  28 C.F.R. § 35.130(b)(7); see also ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3557 (codified at 42 U.S.C. § 12201(h)) (effective Jan. 1, 2009).

[38] But see Olmstead, 527 U.S. at 592 (noting that the question of the regulations' validity, as opposed to their "proper construction and enforcement," was not before the Court).

[39] Two key principles underlie the Olmstead Court's decision that unjustified segregation of disabled persons constitutes unlawful discrimination: 1) "[i]nstitutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and 2) "institutional confinement severely diminishes individuals' everyday life activities." 527 U.S. at 583.

public entities are required to provide community-based treatment for persons with disabilities when 1) "the [public entity's] treatment professionals determine that such placement is appropriate," 2) "the affected persons do not oppose such treatment," and 3) "the placement can be reasonably accommodated, taking into account the resources available to the [public entity] and the needs of others with [similar] disabilities." Olmstead, 527 U.S. at 607; see also Davis, 821 F.3d at 262.

The Second Circuit has further held that a plaintiff may state a claim for disability discrimination under the integration mandate "by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons." Davis, 821 F.3d at 263. Adopting the DOJ's administrative guidance on the integration mandate, the Circuit concluded that "a plaintiff 'need not wait until the harm of institutionalization or segregation occurs or is imminent,'" as a plaintiff establishes a "sufficient risk of institutionalization" to state an integration mandate violation "if a public entity's failure to provide community services . . . will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." Id. at 262–63 (quoting U.S. Dep't of Justice, Statement of the DOJ on Enforcement of the Integration Mandate of Title II of the ADA and *Olmstead v. L.C.,* Q.6 (June 22, 2011)), PDF available at www.ada.gov/olmstead/q&a_olmstead.htm) [hereinafter "DOJ Statement"].

Elaborating on the prohibition of "unjustified isolation" announced in Olmstead, the DOJ further explained that:

"[t]he ADA's integration mandate is implicated where a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities. More specifically, a public entity may violate the ADA's integration mandate when it: (1) directly or indirectly operates facilities and or/programs that segregate individuals with disabilities; (2) finances the segregation of individuals with disabilities in private facilities; and/or (3) through its planning, service system design, funding choices, or service implementation practices, promotes or relies upon the segregation of individuals with disabilities in private facilities or

27

programs." DOJ Statement at 3 (Q&A No. 2) (citations omitted).

The integration mandate's prescription that public entities provide services "in the most integrated setting appropriate to the needs of qualified individuals" means "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." Davis, 821 F.3d at 262 (citing Olmstead, 527 U.S. at 592 (quoting 28 C.F.R. pt. 35, App. A, p. 450 (1998))).[40]

### III.    Plaintiff's Integration Mandate Claims

Here, liberally construed, Ms. Siino contends that APS violated the integration mandate by steering her toward guardianship and institutionalization rather than helping her to pursue another appropriate community placement.    See Pl.'s Opp'n, Sections I–VII.[41]    Ms. Siino calls defendant's conduct "The Referral Institutionalization Plan" or TRIP, a plan which she alleges was intended to place Ms. Siino under guardianship or in an institutional setting, and not to relocate her to another appropriate setting.    See Pl.'s Opp'n 13-22.    Ms. Siino describes the TRIP plan in various ways, but Ms. Siino seems to argue that: she was steered toward only pursuing the EAA

---

[40] DOJ guidance further elaborates on the definition of integrated settings:

Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community, like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible. Evidence-based practices that provide scattered-site housing with supportive services are examples of integrated settings. By contrast, segregated settings often have qualities of an institutional nature. Segregated settings include, but are not limited to:(1) congregate settings populated exclusively or primarily with individuals with disabilities;(2) congregate settings characterized by regimentation in daily activities, lack of privacy or autonomy, policies limiting visitors, or limits on individuals' ability to engage freely in community activities and to manage their own activities of daily living; or (3) settings that provide for daytime activities primarily with other individuals with disabilities. DOJ Statement at 3 (Q&A No. 1).

[41] Sections VIII–XII appear to address plaintiff's motion to amend and will be discussed separately as part of that motion.

grant,[42] her eviction defense, and guardianship,[43] rather than applying for social security benefits and supportive housing (or another housing option in an integrated setting); that APS delayed in finding an appropriate placement; and APS did not provide her the opportunity to make an informed choice regarding her housing.  Id.[44]  Ms. Siino argues that this led to an increased risk of institutionalization and ultimately her actual institutionalization when she was hospitalized. Id.[45]

---

[42] Ms. Siino's theory appears to be that the City steered her toward guardianship and futile housing solutions, which ultimately led to homelessness, institutionalization, and housing insecurity, and away from pursuing appropriate permanent housing alternatives.  However, to the extent that Ms. Siino argues that the denial of the EAA grant placed her at an increased risk of institutionalization, her integration mandate fails as a matter of law.  Olmstead did not hold that the ADA requires public entities to provide new programs or to "provide a certain level of benefits to individuals with disabilities," but public entities "must adhere to the ADA's nondiscrimination requirement" in the provision of the services and programs they do provide.  527 U.S. at 603 n.14, 612–13 (Kennedy, J., concurring) (explaining that exposure to "more onerous treatment" or exclusion from programs by reason of disability without adequate justification is prohibited).  Ms. Siino does not show or even argue that the EAA grant was denied on the basis of her disability.  She effectively acknowledges that the EAA grant was denied because her application was deemed incomplete and inadequate.  In other words, Ms. Siino did not establish that she was eligible for the grant, denied the grant by reason of her disability, or was exposed to more onerous treatment in applying for the grant.  To the contrary, the record reflects that HRA and APS tried to help Ms. Siino to secure the grant.  Cf. Davis, 821 F.3d at 263-64 (concluding that plaintiffs were entitled to summary judgment on their integration mandate claim where the public entity did not dispute that that it 1) denied services to certain disabled person on the basis of their disability 2) with the effect of placing them at substantial risk of institutionalization).  See also Edelson v. Chapel Haven, Inc., No. 15 CV 1862, 2017 WL 810274, at *10 (D. Conn. Mar. 1, 2017) ("plaintiffs who have invoked Olmstead to. . .seek additional funding to remain in a preferred residence have been unsuccessful.").

[43] Ms. Siino has withdrawn her allegation that she was deceived into signing an "irrevocable agreement for guardianship," as she later discovered that the form she signed was a release for personal health information. See Pl.'s Counterstatement ¶ 53; Pl.'s Opp'n 13.  Moreover, Ms. Siino does not dispute that "[o]n May 13, 2013, Ms. Edward-Jones had a home visit with Plaintiff and reported that the procedure and implications of the Article 81 guardianship . . .were carefully explained to the Plaintiff." Def.'s 56.1 Statement ¶ 74; Pl.'s Counterstatement. ¶ 74.

[44] Plaintiff's motion to supplement the record states that "[i]n short, P believes that APS practices seem to be overtly legal but are covertly corrupt: witness 'offers of assistance' instead of 'types of assistance' such that what might have been offered is substituted for what was actually provided." ECF No. 71 at 2.

[45] Ms. Siino seems to argue secondarily that Ms. Edward-Jones' actions or omissions in December 2013 led to her institutionalization in hospital settings because Ms. Edward-Jones did not provide a formal referral to a homeless shelter and then gave Ms. Siino conflicting advice over the phone about whether to go to an intake shelter or pursue another housing placement.  Pl.'s Opp'n 23-24.  The record reflects that, upon her eviction, on December 10, 2013, Ms. Siino did not go to the intake shelter because she made a choice not to, not because she was dissuaded from going by the City or because the City provided

29

The City argues that Ms. Siino cannot prevail on her integration mandate claim because 1) the City only offered Ms. Siino community-based services;[46] 2) Ms. Siino was never excluded from or otherwise discriminated against in the administration of City services or programs on the basis of her disability; 3) APS properly determined that a community-based guardianship was a necessary and appropriate service for Ms. Siino; 4) Ms. Siino's claims are barred by the Rooker-Feldman doctrine; 5) Ms. Siino is neither currently institutionalized nor at risk of

---

insufficient assistance, and Ms. Siino states that she later went to Northwell Health (NH) hospital for treatment of her cellulitis. Pl.'s Counterstatement ¶ 87. Moreover, Ms. Siino makes various inconsistent statements about the December 20, 2013, phone call with Ms. Edward-Jones after her APS case was closed. See Pl.'s Counterstatements ¶ 48, 89; Pl.'s Opp'n 23-24. Ms. Siino states that, after speaking with Ms. Edward-Jones on December 20, 2013, she spoke to Jennifer Cutter, a social worker at NH, who discouraged her from pursuing placement at a nursing home or assisted living facility. Pl.'s Opp'n 23-24. Last, Ms. Siino's subsequent hospitalization at Elmhurst Hospital was unrelated to any contact with Ms. Edward-Jones and was based on her interactions with the guardian. Cf. Woods v. Tompkins Cty., No. 5:16 CV 0007, 2019 WL 1409979, at *10 (N.D.N.Y. Mar. 28, 2019) ("Defendant cannot be held responsible under Title II for actions of private actors themselves unless discrimination by those private actors is the result of the state's policies. . . The refusal of service for Plaintiff that she claims puts her at risk of institutionalization results from decisions by the private personal aide agencies based on interactions with Plaintiff, and were not caused by any discriminatory methods of administration on the part of Defendant."); Harvey v. Chemung Cty., No. 11 CV 6563T, 2012 WL 729714, at *6 (W.D.N.Y. Mar. 6, 2012) (plaintiff's claims that rights were violated by defendants acting in accordance with their authority as guardian were beyond the court's review). Even assuming arguendo that Ms. Siino's handwritten notes are admissible, I conclude that no rational juror could find an integration mandate violation based on Ms. Edward-Jones's actions on December 10 and 20, 2013. See also M.K. ex rel. Mrs. K. v. Sergi, 554 F. Supp. 2d 175, 191 (D. Conn. 2008) (finding that plaintiff failed to state a cognizable ADA claim based on transfer from Protective Services to Voluntary Services).

Also, to the extent that Ms. Siino argues that contacts with APS worker Ms. Wynter in 2017 increased her risk of institutionalization, Pl.'s Counterstatement ¶¶ 112-113, Pl.'s Opp'n 24-25, 30-31, no rational juror could find an integration mandate violation based on the facts plaintiff proffers. At least a year and a half after the alleged incident with Ms. Wynter, Ms. Siino was still residing in the same apartment in Ridgewood, Queens. See Pl.'s Exs. 27- 28, ECF No. 68 at 67-70. Her exhibits show that any threats of eviction stemmed if anything from the fact that Ms. Siino was not on the apartment lease and was accused of being dangerous to another person, or because the landlord wanted to sell the property. See Pl.'s Opp'n 24-25, Pl.'s Exs. 27- 28, ECF No. 68 at 67-70.

[46] To the extent that the City argues that it is not liable under the ADA because it exclusively offered community-based services and never intended that Ms. Siino become institutionalized, this does not end the Court's inquiry. DOJ guidance is clear that Olmstead applies to persons at serious risk of institutionalization or segregation and a plaintiff could establish an Olmstead violation based on risk of institutionalization if the public entity's "failure to provide community services. . .will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." DOJ Statement at 5 (Q&A No. 6).

institutionalization; 6) any increased risk of institutionalization was caused by Ms. Siino's own volitional conduct or refusals; 7) Ms. Siino is not entitled to the monetary damages that she seeks;[47] and 8) Ms. Siino's unsupported assertions do not create a genuine dispute of material fact.[48] See generally Def.'s Br.; Def.'s Reply.

In essence, Olmstead provides that public entities are required to provide community-based services or placement for a person with disabilities when: 1) the entity's treatment professionals determine that such services or placement is appropriate; 2) the affected person does not oppose the services or placement, and 3) the services or placement can be reasonably accommodated. See DOJ Statement at 2 (citing Olmstead, 527 U.S. at 607); Disability Rights New York v. New York State, No. 17 CV 6965, 2019 WL 2497907, at *20 n.15 (E.D.N.Y. June 14, 2019) (citing Olmstead, 527 U.S. at 607).   Ms. Siino fails to meet the requirements to establish an integration mandate claim.

Having conducted an assiduous review of the record, I conclude that defendant's motion for summary judgment should be granted on plaintiff's integration mandate claim. The City's evidence demonstrates that they created a service plan for Ms. Siino based on individualized clinical and psychiatric assessments and that Ms. Siino opposed the alternative housing, benefits, and services that were presented and explained to her.   There is no genuine issue of material fact regarding whether Ms. Siino was denied a more appropriate placement or service, to which she was unopposed, and for which she was qualified or eligible.

## A. Appropriateness of APS' Service Plan

---

[47] Judge Brodie liberally construed plaintiff's SAC to seek injunctive relief. See Siino IV at 16 n.4, 9 n.9, 21.
[48] I have reviewed plaintiff's counterstatement and her exhibits and have considered the assertions proffered to the extent that they are supported by the record.

In cases like Ms. Siino's where plaintiffs claim that they were not afforded the most appropriate housing placement or housing placement procedures, courts examine whether a professional judgment has been rendered on the question of what services are appropriate and whether the plaintiff is receiving services in the most integrated setting appropriate to their needs. See Disability Advocates, Inc. v. Paterson, 598 F. Supp. 2d 289, 292 (E.D.N.Y. 2009) (alleging integration mandate violation because adult home residents were qualified for supportive housing and were not receiving services in the "most integrated setting appropriate for their needs"); Messier v. Southbury Training Sch., 562 F. Supp. 2d 294, 298 (D. Conn. 2008) (alleging violation of integration mandate based on failure "to make sufficient efforts to place class members into integrated settings in the community"); Jenkins v. New York City Dep't of Homeless Servs., 643 F. Supp. 2d 507, 516 (S.D.N.Y. 2009), aff'd in part, 391 F. App'x 81 (2d Cir. 2010) (challenging decision to place plaintiff in mental health shelter instead of general population shelter); Syville v. City of New York, 18 Civ. 1183, 2018 Lexis 78614 (S.D.N.Y. May 8, 2018) (same); M.K. ex rel. Mrs. K. v. Sergi, 554 F. Supp. 2d 175, 198–99 (D. Conn. 2008) (granting defendants summary judgment where plaintiff's placements were made pursuant to court orders and entity's treatment professionals' recommendations).[49]

A person with disabilities may establish an integration mandate violation where the public entity fails to assess what services are appropriate and whether the person is in the most integrated setting appropriate to their needs--a practice that leads to unjustified segregation. See Messier,

---

[49] Courts tend to engage in a slightly different analysis where plaintiffs allege that a cut or denial of home-based personal support services causes an increased risk of institutionalization. See Woods, 2019 WL 1409979, at *8-11; Edelson, 2017 WL 810274, at *9-10. The analysis also appears to be different when plaintiffs' theory is based on a denial of a reasonable accommodation. See, e.g., Schine by Short v. New York State Office for People With Developmental Disabilities, No. 15 CV 5870, 2019 WL 2177004, at *7-11 (E.D.N.Y. May 20, 2019); see also Disability Rights, 2019 WL 2497907, at *22 (discussing reasonable accommodation line of cases and inapplicability to integration mandate claims).

562 F. Supp. 2d at 325-42 (discussing public entity's "statutory duty to consider the appropriateness of community placement" and entity's unlawful practice of failing to make individualized community placement decisions unless requested); see also State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut, 706 F. Supp. 2d 266, 275-78 (D. Conn. 2010)  A plaintiff may also establish an integration mandate violation where the public entity refuses to consider a person with disabilities for community placement or services on the basis of the severity of disability or type of disability.  See Davis, 821 F.3d at 260 (finding integration mandate violation where necessary medical services were denied to disabled individuals on the basis of their medical conditions); Messier, 562 F. Supp. 2d at 322-23 (citing Messier v. Southbury Training School, No. 94 CV 1706, 1999 WL 20910 at *10 (D. Conn. Jan. 5, 1999)) (refusing to consider disabled persons for community placement on the basis of the severity of disability is an ADA violation).  But, where the public entity's health professionals have performed an individualized evaluation of what the plaintiff's service needs are and whether they can be served in a more integrated setting, under Olmstead, courts generally defer to those professional judgments regarding what setting or services are most appropriate.  See Jenkins, 643 F. Supp. 2d at 515-16 ("'The State generally may rely on the reasonable assessments of its own professionals in determining whether an individual meets the eligibility requirements' of a specific program . . . .'Courts normally should defer to the reasonable medical judgments of public health officials[.]'") (quoting Olmstead, 527 U.S. at 601-02).  This is so because courts should not substitute their untrained judgment for that of trained medical professionals who have diagnosed the plaintiff.  See Jenkins, 643 F. Supp. 2d at 516; Messier, 562 F. Supp. at 326 ("The court must do what it can to give effect to this statutory preference for integration, while keeping in mind that it must defer to the judgment of the defendants' medical and mental health professionals in

33

determining whether community placement is appropriate for individual class members."). However, plaintiffs may indeed create a dispute of material fact about the appropriateness of their placement or services by providing alternative medical assessments.  See DOJ Statement at 4 (Q&A No. 4) ("People with disabilities can also present their own independent evidence of the appropriateness of an integrated setting . . .This evidence may come from their own treatment providers, from community-based organizations that provide services to people with disabilities outside of institutional settings, or from any other relevant source."); see, e.g., Disability Advocates, Inc., 598 F. Supp. 2d at 293 (creating genuine dispute based on extensive expert testimony regarding whether adult home residents were qualified for supportive housing).

Here, defendant has provided Dr. Klein's two case planning evaluations that determined that pursuing Article 81 guardianship and accessing benefits was the appropriate service plan for Ms. Siino.  Ms. Siino has not provided any evidence from her treating professionals, for example Marilyn Gerber or her primary care physician,[50] or from any health professional for that matter, that another service plan was more appropriate or that Ms. Siino should have been placed in another setting.[51]   Accordingly, the Court should defer to Dr. Klein's professional judgment.

**B. Ms. Sino's Refusal of Other Services**

Even assuming that the service plan that APS implemented (pursuing guardianship and

---

[50] Indeed, defendant's evidence suggests that Gerber believed pursuing guardianship for Ms. Siino was appropriate. See Def.'s Ex. A, ECF No. 66-1 at 33.

[51] The form signed by a Dr. Khaimov, dated February 6, 2014, based on a January 23, 2014, assessment, and the 2014 Elmhurst Hospital discharge form do not raise a genuine dispute as to whether Dr. Klein's earlier recommendations in 2013 to pursue guardianship were clinically appropriate.  See Pl.'s Opp'n 25-26, Pl.'s Ex. 4, ECF No. 68 at 40-41, Pl.'s Ex. 5, ECF No. 68 at 42. Cf. M.K. ex rel. Mrs. K., 554 F. Supp. 2d at 199-200 (granting summary judgment even where plaintiff provided expert report disputing how long plaintiff should have stayed at a particular placement).  Instead, the 2014 form signed by Dr. Khaimov is akin to a challenge of the state court's 2013 guardianship decision, which would be barred under Rooker-Feldman doctrine.  Cf. Harvey, 2012 WL 729714, at *6 (finding that plaintiff's claims were "inextricably intertwined" with the state court's guardianship ruling).

accessing benefits) was not the most appropriate for Ms. Siino's health needs, APS still is entitled to summary judgment based on Ms. Siino's refusal of the other services offered to her.   To establish a prima facie case under the theory that the City wrongfully steered her toward guardianship rather than appropriate housing placements, Ms. Siino would need to show that she was placed or offered services in a more restrictive setting, even though 1) a determination was made that her particular needs could be met in a more integrated setting, 2) she consented to reside in a more integrated setting, and 3) the public entity can reasonably accommodate the placement in a more integrated setting.   See Disability Rights New York, 2019 WL 2497907, at *20-21 (discussing the first two elements of "appropriateness of an integrated placement" and "consent" where plaintiff alleged that the public entity failed to implement its placement transition plan within a reasonable timeframe and such failure resulted in an inappropriate placement) (citations omitted); Joseph S. v. Hogan, 561 F. Supp. 2d 280, 289-93 (E.D.N.Y. 2008) ("A failure to provide placement in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible violates the ADA's integration mandate.") (quotation marks omitted) (quoting Messier, 1999 WL 20910, at *9); Disability Advocates, Inc., 598 F. Supp. 2d at 335 ("Olmstead explicitly provides that states must assess and place individuals with disabilities in more integrated settings if it would be appropriate to the needs of the individuals and the individuals do not oppose the placement.") (citing Olmstead 527 U.S. at 605–06); see also Mental Disability Law Clinic v. Hogan, No. 06 CV 6320, 2008 WL 4104460, at *14-16 (E.D.N.Y. Aug. 28, 2008).

A defendant may rebut a prima facie case, however, by showing that the public entity offered appropriate community placements to qualified individuals and the plaintiff declined the placement.   See Messier, 562 F. Supp. 2d at 323; Disability Advocates, Inc. v. Paterson, 653 F.

Supp. 2d 184, 259–60 (E.D.N.Y. 2009), vacated sub nom. Disability Advocates, Inc. v. New York

Coal. for Quality Assisted Living, Inc., 675 F.3d 149 (2d Cir. 2012)[52] ("As the Supreme Court

explained in Olmstead, the ADA does not impose accommodations on individuals who do not

want them, and accordingly it does not force individuals who oppose moving to a more integrated

setting to do so.") (quoting Olmstead, 527 U.S. at 602 ("Nor is there any federal requirement that

community-based treatment be imposed on patients who do not desire it.") citing 28 C.F.R. §

35.130(e)(1) ("[P]ersons with disabilities must be provided the option of declining to accept a

particular accommodation.")); see also DOJ Statement at 4 (Q&A No. 5) ("Individuals must be

provided the opportunity to make an informed decision.").

Ms. Siino appears to argue that defendant steered her toward guardianship, when she

should have been provided, either instead or concurrently, with more information and assistance

to pursue a supportive housing placement, and that APS' failure to properly advise and assist her

resulted in her eventual homelessness and having to choose between two far-less integrated

settings: a homeless shelter or hospitalization.   See Pl.'s Counterstatement ¶¶ 19, 24-25.   For the

sake of argument, I will assume that a scattered-site supportive housing placement would have

been as integrated a setting as Ms. Siino's apartment,[53] and that APS had determined that

supportive housing was an appropriate community placement for Ms. Siino, given that it was

identified as a housing alternative that she should consider.   See e.g., Def.'s 56.1 Statement ¶ 25.

However, the City has provided sufficient evidence to establish that it identified supportive

---

[52] But see United States v. New York, No. 13 CV 4165, 2014 WL 1028982, at *1 (E.D.N.Y. Mar. 17, 2014) (noting that the Second Circuit vacated the Court's decision in Disability Advocates, Inc. v. Paterson on standing grounds but did not question the findings of fact or conclusions of law).

[53] See DOJ Statement at 3 (Q&A No. 1) ("Evidence-based practices that provide scattered-site housing with supportive services are examples of integrated settings."); Disability Advocates, Inc., 653 F. Supp. 2d at 216, 223 (explaining how scattered-site supportive housing "provides 'maximum opportunities' for integration").

housing as an alternative for Ms. Siino and encouraged her to consider it, but that Ms. Siino declined to pursue the supportive housing application process.    See Def.'s Ex. A, ECF No. 66-1 at 4; Def.'s Ex. C, ECF No. 66-3 at 11.    Ms. Siino has failed to create a genuine dispute of material fact regarding her refusal to pursue supportive housing or whether defendant gave her information so that she could make an informed choice.

While certain entities may have earned a reputation for discouraging individuals with disabilities from pursuing placements in community settings and denying them an informed choice, the record here does not reflect that this was the case for Ms. Siino.    Cf. Disability Advocates, 598 F. Supp. 2d at 299-300 (noting that even defendants' expert conceded that residents were not adequately informed of alternative housing options); Disability Advocates, 653 F. Supp. 2d at 260-68 (finding that adult home residents expressed preference for living in more integrated settings, were offered little to no choice regarding whether to move to an adult home, and were generally unaware of other housing options).    Notably, Ms. Siino does not dispute that APS raised supportive housing with her as an option.    See, e.g., Pl.'s Opp'n 13 ("When E-J 02-13-13 first visited P, E-J was already selling P on guardianship, by mentioning it in addition to supportive housing."); see also Def.'s 56.1 Statement ¶¶ 25, 28; Pl.'s Counterstatement ¶¶ 19, 24, 28; Pl.'s Ex. 3 (referencing Ms. Edward-Jones and supportive housing on "2/19/13").    While she asserts that she misunderstood what supportive housing was, which she understood as "a type of apartment sharing," or "meant 'supported housing,' which P later learned would have to be 'subsidized housing,'" Pl.'s Counterstatement ¶ 25, Pl.'s Opp'n 14, she does not deny that she refused to pursue a supportive housing application.[54]

---

[54] In addition, Ms. Siino simultaneously argues that she was not eligible for supportive housing based on her income and fails to identify any reasonable accommodation that she would have needed to pursue a

Defendant has come forward with sufficient evidence that APS conducted at least two case planning evaluations, relied on those professional judgments to create and implement a service plan, Ms. Siino did not consent to an alternative housing placement, and Ms. Siino declined various offers of APS' assistance.   Further, plaintiff's hospitalizations after her eviction were either a result of Ms. Siino's own volitional conduct or her interactions with her private guardian. Plaintiff has failed to controvert this evidence and has not shown that the City excluded her from any program for which she was eligible or otherwise discriminated against her by reason of her disability.   Accordingly, plaintiff cannot prevail on her integration mandate claim as a matter of law and defendant's motion for summary judgment should be granted.

## MOTION TO AMEND[55]

Ms. Siino's TAC repeats most of the allegations from her prior complaints; however, she seeks to add new allegations based on information obtained during discovery regarding her integration mandate claim and also regarding her 2017 request for a temporary restraining order.[56] Plaintiff explains that she seeks to bring three additional claims that she believes strengthen and better illustrate her existing integration mandate claim: 1) a Section 1983 claim, 2) a fraudulent concealment claim, and 3) a FHA disparate impact claim.   See ECF. No. 48.   Ms. Siino seeks $40,000,000 in damages and unspecified injunctive relief.   ECF No. 48-1 at 51.

Based on information received from the City during discovery and her analysis of DHS statistics, Ms. Siino alleges that DHS has a policy of excluding "65+ mentally disabled alone

---

placement there.  Pl.'s Counterstatement ¶ 100; see also Pl.'s Opp'n 28-29. Cf. Schine, 2019 WL 2177004, at *7 (seeking reallocation of funding as accommodation to enable application to alternative housing placement).  Further, APS urged her repeatedly to apply for social security benefits to secure additional income, but she refused.

[55] The facts alleged in the TAC are accepted as true for purposes of plaintiff's motion to amend.

[56] To the extent that plaintiff seeks to add a personal injury claim based on a 2016 trip-and-fall incident, for which she states she already has a pending case in Queens Supreme Court, the Court should decline to exercise supplemental jurisdiction over this state law claim. See ECF No. 48-1 at 36.

wards," in other words, single adults over the age of 65 who are under guardianship and have a record of mental illness, from homeless shelters.   ECF No. 48-1 at 38-40, ECF No. 48-2 (TAC Exs. 1-2); see also Pl. Opp'n 24.

Attached to the complaint are what appear to be the guardian's case notes regarding Ms. Siino's discharge from Forest Hills hospital on December 20, 2013.[57]   The case notes reflect the following.   The guardian caseworker was told by a social worker and supervisor at the hospital that Ms. Siino would not be accepted at a shelter because the shelter does not accept individuals under guardianship.   ECF No. 48-2 at 2-3.   The guardian advised the hospital supervisor that a referral application should be completed anyway, but "the client refused to go to a shelter which then ruled out the process for having the client placed."   ECF No. 48-2 at 3.   The guardian caseworker called outreach services from Common Ground to speak with Ms. Siino regarding the shelter, but despite the Common Ground case manager's best efforts, Ms. Siino again refused to go to the shelter.   Id.   After the guardian caseworker encouraged Ms. Siino to go to the shelter for her safety, they parted ways. Id.

Ms. Siino alleges being harmed by the alleged exclusion policy on three specific dates: "1) P experienced Homebase turning away P (04-03-13), 2) P experienced being given an intake shelter address only on P legal possession day (12-10-13), 3) P representative, MC, experienced no relocation success for P, as P learned from December 2017 City limited discovery papers (12-20-13)[.]"   ECF No. 48-1 at 40.   Moreover, Ms. Siino "believes that the DHS shelter exclusion policy will harm P for the remainder of P life, because the policy discriminates against wards,

___

[57] Plaintiff alleges that, after her eviction on December 10, 2013, she voluntarily admitted herself at Forest Hills Hospital twice: first on December 17, 2013, and then on January 1, 2014, for cellulitis and chronic diarrhea.   ECF No. 48-1 at 19-20.

based on a City fear that P alone is dangerous to self and others--and HRA APS record of P diagnoses of P being psychotic and schizotypal will outlive P"[58] and "[a]ccordingly, P distrusts City and avoids seeking any rental assistance or housing assistance from City." ECF No. 48-1 at 41-42. Ms. Siino alleges that she "has severe emotional distress from suffering P past ordeal, repeatedly regurgitating P same in EDNY, and finding P life to be an ongoing ordeal." ECF No. 48-1 at 42.[59] Yet, Ms. Siino also acknowledges in the TAC that: 1) she was not under guardianship in April 2013; 2) she was 64 years old in in December 2013; and 3) she was not aware of the exclusion policy when she refused to go to the shelter in December 2013.[60] ECF No. 48-1 at 40. Further, she alleges that, after her discharge from Elmhurst Hospital, plaintiff began living with a friend from January 15, 2014, to present. ECF No. 48-1 at 22-23.

Defendant argues that any further amendment is futile because the TAC's allegations "fail to state any viable claims." Def.'s Br. 25.[61]

## DISCUSSION

Under Rule 15(a)(2), the Court should "freely give" leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Here, although the Court accepts all of plaintiff's well-pleaded

---

[58] Ms. Siino appears to offer the 2017 allegations concerning APS worker Ms. Wynter to show that she continues to be at a high risk of institutionalization and explain why she fears institutionalization. See Pl.'s Opp'n 24-25, 30; ECF No. 48-1 at 41. Ms. Siino offers documents to show that, after her contacts with Ms. Wynter, she received eviction threats from the landlord of the apartment where she has been staying with two women in Ridgewood, Queens, since her discharge from Elmhurst Hospital. Pl.'s Opp'n 11, 67-70. However, as discussed *supra*, the evidence offered does not support an integration mandate claim. See n.45.

[59] Ms. Siino's states in her opposition papers that "P admits that P did not actually visit any shelter, and P has been afraid to do so lest P APS record be the source of P new [] psychiatric ward admission." Pl.'s Opp'n 26.

[60] See ECF No. 48-1 at 41 ("P did not know what was occurring among the social workers" but "[i]n hindsight, P believes that a shelter...would have aided P to find...a suitable job and a suitable residence[.]").

[61] Defendant states that "DHS has no policy that categorically excludes wards from single adult shelters and DHS makes admissions on an individual basis." Def.'s Br. 31. Accepting plaintiff's allegations as true, the Court does not credit defendant's statement as a fact.

allegations as true and draws all reasonable inferences in plaintiff's favor, amendment would nonetheless be futile as plaintiff lacks constitutional standing to bring the federal claims she proposes to add to the case.[62]

The party invoking the jurisdiction of a federal court bears the burden of establishing its standing to sue; however, "courts may raise the issue [of standing] *sua sponte*[.]"[63] Keepers, Inc. v. City of Milford, 807 F.3d 24, 39 (2d Cir. 2015) (citation omitted); see also Warth v. Seldin, 422 U.S. 490, 498 (1975) (explaining that the issue of Art. III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit.").[64]

Standing under the ADA and FHA is not subject to traditional prudential limitations and extends as broadly as Article III permits. Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581, 600 (2d Cir. 2016); Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp., 388 F. Supp. 3d 145, 161-62 (E.D.N.Y. 2019) (citations omitted); Pinckney v. Carroll, No. 18 Civ. 12198, 2019 WL 6619484, at *3 (S.D.N.Y. Dec. 4, 2019). The FHA confers standing on any "aggrieved person," defined in the statute to include "any person who – (1) claims to have been injured by a

---

[62] Because Ms. Siino lacks standing to bring her new claims, I will not address the TAC's rehashing of allegations regarding claims that have already been dismissed in Judge Brodie's prior decisions. See New York Coal. for Quality Assisted Living, Inc., 675 F.3d at 162 ("If a plaintiff lacks standing, the federal 'courts have no business deciding [the case], or expounding the law in the course of doing so.'") (quoting Daimler Chrysler Corp. v. Cuno, 547 U.S. 332, 340–41 (2006). However, in the event that the Court determines that plaintiff has standing to bring her federal claims, I would recommend, in the alternative, that the motion to amend be denied as futile because plaintiff's conclusory allegations would not survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See generally Def.'s Br. 25-34.

[63] Despite not raising standing as a ground for dismissal, the City's argument on the merits asserts that Ms. Siino "never had any intention or interest to enter the shelter system, and that she never actually applied for, or attempted admission to, shelter." Def.'s Br. 28.

[64] Although a court may raise standing *sua sponte*, it is nonetheless a "good practice" for courts to give the party whose standing is questioned an opportunity to be heard and to develop the record as to why the claims should not be dismissed for lack of standing. In re Indu Craft, Inc., 630 F. App'x 27, 28-29 (2d Cir. 2015) (summary order) (citations omitted). Ms. Siino can set forth her argument regarding standing in any objections to this Report.

discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." Winfield v. City of New York, No. 15 Civ. 5236, 2016 WL 6208564, at *3 (S.D.N.Y. Oct. 24, 2016) (citing 42 U.S.C. § 3602(i)).

"[T]he 'irreducible constitutional minimum' of standing consists of three elements." Fortune Soc'y, 388 F. Supp. 3d at 161 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "To establish Article III standing, 'a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Mhany Mgmt., Inc., 819 F.3d at 600 (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180–81 (2000)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (citations omitted). A "concrete" injury must "actually exist," i.e., be "real," and not "abstract." Id. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." Washington v. United States Dep't of Hous. & Urban Dev., No. 16 CV 3948, 2019 WL 5694102, at *9 (E.D.N.Y. July 29, 2019) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014)).

The plaintiff must "clearly...allege facts" that demonstrate each of standing's three elements. Weisenberg v. Town Bd. of Shelter Island, 404 F. Supp. 3d 720, 726 (E.D.N.Y. 2019) (quoting Spokeo, Inc., 136 S. Ct. at 1547) (alterations in original). Requiring that these elements be shown "ensure[s], among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." Mhany Mgmt., Inc, 819 F.3d at 603 (quoting Friends of the Earth, Inc, 528 U.S. at 191). "Plaintiffs 'must demonstrate standing for

42

each claim and form of relief sought.'" Washington, 2019 WL 5694102, at *11 (quoting Carver v. City of New York, 621 F.3d 221, 225 (2d Cir. 2010).

Being forced into homelessness can constitute a concrete injury. See Lopez v. New York City Dep't of Homeless Servs., No. 17 Civ. 3014, 2019 WL 3531955, at *3 (S.D.N.Y. Aug. 2, 2019), report and recommendation adopted, 2019 WL 4593611 (S.D.N.Y. Sept. 23, 2019). However, there must be some "causal nexus" between the wrong plaintiff alleges and the harm caused to her, and here, Ms. Siino does not clearly allege what harm is "fairly traceable" to the defendant's alleged exclusion policy. See, e.g., Lopez, 2019 WL 3531955, at *3-4 (noting that plaintiff does not allege any specific economic injuries such as expenditures for alternative housing or medical costs based on being denied transgender-specific housing).   Plaintiff alleges that she uncovered that DHS had a policy of excluding "65+ mentally disabled alone wards" from homeless shelters, yet, plaintiff does not allege that she ever went to a homeless shelter and was excluded.[65]

Plaintiff's allegation that she would have benefited from a shelter referral is only in hindsight, as the record and pleadings demonstrate that Ms. Siino repeatedly refused to go to the shelter.   Plaintiff was given instructions and transportation money to go to an intake shelter on December 10, 2013, but she chose not to go.   The case notes attached to the TAC show that plaintiff was urged to go to a homeless shelter on December 20, 2013, and she refused to go. Indeed, plaintiff alleges that she was not aware of the conversations between her guardian and the hospital social workers on December 20, 2013, about the alleged exclusion policy.   She does not allege emotional distress or economic injury specifically due to the shelter exclusion policy, and the Court does not discern an intangible injury to a legally protected interest from her pleadings.

---

[65] In April 2013, when Ms. Siino went to Homebase, she was seeking rental assistance (not shelter), was not yet homeless, and was not yet under guardianship.

See ECF No. 48-1 at 42 (TAC ¶ 66).

Moreover, allegations of fear or anxiety of future harm alone are insufficient to establish an injury in fact where the threat creating the fear or anxiety is not "sufficiently imminent." Residents & Families United to Save Our Adult Homes v. Zucker, No. 16 CV 1683, 2018 WL 1175152, at *5 (E.D.N.Y. Mar. 6, 2018), appeal withdrawn, No. 18-1078, 2018 WL 3454963 (2d Cir. July 9, 2018) (citations omitted). Further to establish standing for injunctive relief, plaintiff must separately show that "there is a risk of continuing or future harm; past exposure to illegal conduct is insufficient[.]" Pinckney, 2019 WL 6619484, at *4 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). Here, plaintiff does not allege that she is currently homeless, at risk of imminent eviction, under guardianship, or has pending guardianship proceedings. Plaintiff has been living with a friend since January 2014. Plaintiff's guardianship ended in 2015. Plaintiff states that she has never visited a shelter and she avoids seeking housing assistance from the City. Plaintiff's fear that she will be harmed by this shelter policy in the future is conjectural and any risk of harm to Ms. Siino from an alleged policy that excludes seniors under guardianship from homeless shelters is not imminent. Cf. Zucker, 2018 WL 1175152, at *5 (finding no injury in fact where plaintiffs failed to allege any actual or imminent harm based on fear that they might not be re-admitted to their adult homes if they choose to leave because of a regulation limiting admission of additional residents with serious mental illness); Pinckney, 2019 WL 6619484, at *5 ("Plaintiff's potential harm rests on a 'speculative chain of possibilities,' which is insufficient to confer standing.") (citing Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410 (2013)).

Similarly, plaintiff has not established how her alleged injuries are redressable--since plaintiff does not establish a causal nexus between the policy and past harms, or explain what injunctive relief she desires and how it would benefit her, as she is not currently under guardianship

44

and she states that she avoids seeking City housing assistance.  Cf. Winfield, 2016 WL 6208564, at *4 (finding standing to exist where, although plaintiffs had not yet applied to any developments under the challenged policy's purview, the policy restricted plaintiffs' "ability to compete for housing on an equal basis" and plaintiffs intended to continue to apply to affordable housing developments).[66]

To the extent that the TAC alleges state law claims, even if plaintiff would be granted permission to amend, the Court should decline to exercise supplemental jurisdiction over the state law claims. See 28 U.S.C. § 1367(c)(3); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003)) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)); see also New York Mercantile Exch., Inc. v. Intercontinental Exchange, Inc., 497 F.3d 109, 119 (2d Cir. 2007) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.") (citation omitted).

As plaintiff does not have standing to bring her newly proposed § 1983 and FHA claims, the Court should deny plaintiff's motion to file a third amended complaint.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that defendant's motion for summary judgment should be granted, plaintiff's motion to amend should be denied, and this case should be dismissed.[67]

---

[66] Indeed, Ms. Siino attaches to her opposition a May 24, 2017, letter, in which she states that, if she is evicted from the Ridgewood, Queens, apartment where she is staying, "[she] will move with zero APS help, since [she] do[es] not like APS." Pl.'s Ex. 28, ECF No. 68 at 70.
[67] The Clerk of Court is directed to send plaintiff a copy of this Report by overnight mail.

45

## FILING OF OBJECTIONS TO REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Such objections shall be filed with the Clerk of the Court.   Any request for an extension of time to file objections must be made within the fourteen-day period.   Failure to file a timely objection to this Report generally waives any further judicial review.   Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42, 46 (2d Cir. 2002); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); see also Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

/S/ Judge Lois Bloom

Dated: February 27, 2020
      Brooklyn, New York

LOIS BLOOM
United States Magistrate Judge

46