UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

CAROLYN JANE SIINO,

                              Plaintiff,                    **<u>MEMORANDUM & ORDER</u>**
                                                           14-CV-7217 (MKB) (LB)

              v.

CITY OF NEW YORK,

                              Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Carolyn Jane Siino, proceeding *pro se*, commenced the above-captioned action

on December 8, 2014.  (Compl., Docket Entry No. 1.)  Plaintiff's only remaining claim in this

action is a claim against Defendant the City of New York, which the Court has liberally

construe to allege a claim under Title II of the Americans with Disabilities Act of 1990, 42

U.S.C. § 12101 *et seq.* (the "ADA"), for Defendant's failure to comply with the ADA's

integration mandate.[1]  (*See* Second Am. Compl. ("SAC"), Docket Entry No. 17; Mem. & Order

---

[1] By Memorandum and Order dated April 21, 2015, the Court dismissed the Complaint and granted Plaintiff leave to file an amended complaint within thirty days.  (Mem. & Order dated Apr. 21, 2015, Docket Entry No. 8.)  On May 19, 2015, Plaintiff filed an Amended Complaint, (Am. Compl., Docket Entry No. 9), which the Court dismissed for failure to state a claim, (Mem. & Order dated July 9, 2015 (the "July 9, 2015 Decision"), Docket Entry No. 12).  By Memorandum and Order dated February 19, 2016, the Court denied Plaintiff's motion for reconsideration of the July 9, 2015 Decision and dismissed Plaintiff's Fair Housing Act ("FHA") claims, considered for the first time.  (Pl. Mot. for Recons., Docket Entry No. 15; Mem. & Order dated Feb. 19, 2016 (the "Feb. 19, 2016 Decision"), Docket Entry No. 16.)  In addition, the Court granted Plaintiff's motion to reopen the case and granted Plaintiff leave to file a second amended complaint.  (Feb. 19, 2016 Decision; Pl. Mot. to Reopen Case, Docket Entry No. 14.)
        On June 14, 2016, Plaintiff filed a Second Amended Complaint ("SAC").  (SAC, Docket Entry No. 17.)  On December 21, 2016, Defendant moved to dismiss the SAC.  (Def. Mot. to Dismiss, Docket Entry No. 27; Def. Mem. in Supp. of Def. Mot. to Dismiss, Docket Entry No. 28.)  While the motion to dismiss was pending, Plaintiff filed a motion for a temporary

dated Sept. 27, 2017, Docket Entry No. 33.) Plaintiff's claim arises in connection with the

provision of services to Plaintiff by Adult Protective Services ("APS"), a division of the Human

Resources Administration (the "HRA") Office of Special Services, while Plaintiff was facing

eviction for non-payment of rent. (*See generally* SAC.)

On May 24, 2018, Plaintiff moved to amend the SAC.[2] (Pl. Mot. to Amend ("Pl. Mot."),

Docket Entry No. 48.) On April 26, 2019, Defendant moved for summary judgment.[3] (Def.

Second Mot. for Summ. J. ("Def. Mot."), Docket Entry No. 64; Def. Mem. in Supp. of Def. Mot.

("Def. Mem."), Docket Entry No. 64-2.) Plaintiff opposed the motion.[4] (Pl. Opp'n to Def. Mot.

("Pl. Opp'n"), Docket Entry No. 68.) On May 2, 2019, the Court referred Defendant's motion to

Magistrate Judge Lois Bloom for a report and recommendation. (Order dated May 2, 2019.) By

report and recommendation dated February 27, 2020, Judge Bloom recommended that the Court

---

restraining order ("TRO") and preliminary injunction, which District Judge LaShann DeArcy
Hall denied. (Pl. Mot. for TRO & Prelim. Inj., Docket Entry No. 31; Order dated Apr. 12, 2017,
Docket Entry No. 32.) By Memorandum and Order dated September 27, 2017, the Court granted
Defendant's motion to dismiss as to Plaintiff's claims pursuant to 28 U.S.C. § 1983, denied the
motion as to Plaintiff's claim under the Americans with Disabilities Act (the "ADA"), and
referred the case to Magistrate Judge Lois Bloom to supervise limited discovery regarding what
services Plaintiff received and what services she was entitled to receive in light of the ADA's
integration mandate. (Mem. & Order dated Sept. 27, 2017, Docket Entry No. 33.)

[2] Plaintiff previously moved to amend the SAC. (Pl. First Mot. to Amend, Docket Entry
No. 43.) By Order dated April 9, 2018, Judge Bloom denied Plaintiff's request because Plaintiff
had failed to submit a proposed third amended complaint. (Order dated Apr. 9, 2018, Docket
Entry No. 45.)

[3] Defendant previously moved for summary judgment, on October 17, 2018. (Def. First
Mot. for Summ. J., Docket Entry No. 58; Def. Mem. in Supp. of Def. First Mot. for Summ. J.,
Docket Entry No. 58-2.) By Order dated March 29, 2019, the Court denied Defendant's motion
without prejudice for failure to comply with Local Civil Rule 56.2. (Order dated Mar. 29, 2019.)

[4] On January 29, 2020, Plaintiff moved to supplement the record. (Pl. Mot. to Suppl. the
Record, Docket Entry No. 71.) Defendant requested an extension of time to respond to
Plaintiff's motion. (Def. Req. for Extension of Time, Docket Entry No. 72.) In light of
Plaintiff's *pro se* status, the Court grants Plaintiff's motion to supplement the record.

grant Defendant's motion for summary judgment and deny Plaintiff's motion to amend the SAC (the "R&R"). (R&R, Docket Entry No. 74.)

For the reasons set forth below, the Court adopts the R&R, grants Defendant's motion for summary judgment, and denies Plaintiff's motion to amend the SAC.

## I. Background

The Court assumes familiarity with the underlying facts as detailed extensively in the R&R, as well as the Court's previous decisions in this case,[5] and provides only a brief summary of the pertinent facts.

Plaintiff was referred to APS in fall of 2013 by the judge presiding over her eviction proceeding in Queens Housing Court. (APS Case File 51, annexed to Decl. of Christopher Ferreira ("Ferreira Decl.") as Ex. A, Docket Entry No. 66-1.)[6] On November 29, 2012, Kimberly Harvey, an APS caseworker, conducted a home visit with Plaintiff. (Def. Statement of Material Facts Pursuant to Local R. 56.1 ("Def. 56.1") ¶ 8, Docket Entry No. 64-1; Pl. Resp. to Def. 56.1 ¶ 8, Docket Entry No. 68.) Harvey discussed with Plaintiff her current source of income, a monthly pension, as well as the possibility of applying for social security benefits, which Plaintiff told Harvey she was entitled to but did not think would cover her expenses. (Def. 56.1 ¶¶ 9–10; Pl. Resp. to 56.1 ¶¶ 9–10 (disputing only the amount of social security benefits discussed).) Harvey reported that Plaintiff told her she was planning to find a job and that she "wrote books on prophecy and solving the debt crisis that she believed would make her money."

---

[5] (*See* Mem. & Order dated Apr. 21, 2015; July 9, 2015 Decision; Feb. 19, 2019 Decision; Mem. & Order dated Sept. 27, 2017.)

[6] Because the APS Case File is not consecutively paginated, the Court refers to the page numbers assigned by the Electronic Case Filing ("ECF") system.

(Def. 56.1 ¶¶ 11–12; Pl. Resp. to Def. 56.1 ¶¶ 11–12.)  Plaintiff reported that she did not have a plan for if she were evicted, and that if she "lost her belonging[s] and had to live on the street she would consider suicide."  (Def. 56.1 ¶ 12; Pl. Resp. to 56.1 ¶ 12 (stating that Plaintiff does not dispute that she made this statement but that "since the street seemed unlikely to [Plaintiff], what with City attention, [Plaintiff] was only joking").)  Harvey offered to arrange for a heavy-duty cleaning of Plaintiff's apartment, but Plaintiff declined the offer.  (Def. 56.1 ¶ 13; Pl. Resp. to 56.1 ¶ 13 (disputing that Plaintiff's home was cluttered, but not disputing that cleaning services were offered and refused).)

On December 24, 2012, Dr. David Klein, M.D., accompanied Harvey to Plaintiff's home.  (Def. 56.1 ¶ 14; Pl. Resp. to Def. 56.1 ¶ 14.)  Dr. Klein, a psychiatrist for the HRA's Customized Assistance Services, conducted a psychological evaluation of Plaintiff, and determined that she had "poor insight, poor judgment, [and] magical thinking, and diagnosed her with a not-otherwise-specified psychotic disorder and schizotypal personality disorder."  (Def. 56.1 ¶¶ 14–15; Pl. Resp. to Def. 56.1 ¶¶ 14–15.)  Concluding that an Article 81 guardian "need[ed] to be appointed," Dr. Klein "recommended that Plaintiff be referred to the Office of Legal Affairs ('OLA') for guardianship, that a heavy duty-cleaning be performed in Plaintiff's apartment, and that she be encouraged to apply for her social security benefits."  (Def. 56.1 ¶ 16; Pl. Resp. to Def. 56.1 ¶ 16.)

In a case transfer summary dated January 7, 2013, Harvey wrote that Plaintiff was "mentally impaired," with "poor judgment," and "not capable of relocating on her own," and that she "need[ed] [an Article] 81 guardian to apply for benefits on her behalf and assist her with relocating."  (APS Case File 3.)  Harvey reported Plaintiff had been evaluated by Dr. Klein, and that the goals of APS's service plan for her were "[a]ccessing benefits" and pursuing Article 81

guardianship. (*Id.*) Plaintiff's case was reassigned to another APS caseworker, Patricia Edwards-Jones. (Def. 56.1 ¶ 18; Pl. Resp. to Def. 56.1 ¶ 18.)

On February 13, 2013, Edwards-Jones met with Plaintiff in her home, and Plaintiff informed Edwards-Jones that she was planning to apply for an Emergency Assistance for Adults ("EAA") grant. (Def. 56.1 ¶¶ 19, 21; Pl. Resp. to Def. 56.1 ¶¶ 19, 21.) Plaintiff told Edwards-Jones she would use the $2200 given to her by a friend to "establish future income," and Edwards-Jones explained that that money "would not be considered future income and that [Plaintiff] would likely not be approved for an EAA grant without . . . establish[ing] a source of future income." (Def. 56.1 ¶¶ 21–22; Pl. Resp. to Def. 56.1 ¶¶ 21–22 (stating that Plaintiff "understood and got a part-time job, which was supposed to a lead to a full-time job, but . . . did not").) Edwards-Jones "urged Plaintiff to apply for her Social Security benefits, but Plaintiff refused." (Def. 56.1 ¶ 24; Pl. Resp. to Def. 56.1 ¶ 24 (stating that Plaintiff "was not going to go for [Social Security] benefits without further mention of supportive or other suitable housing . . . especially given that [Plaintiff's housing court] case would continue for almost five months," by which time she would be eligible for increased benefits).)

Edwards-Jones reported that she "discussed relocation plans with Plaintiff," who said she had none and "believed that the court would not allow her to be evicted." (Def. 56.1 ¶ 24.) Plaintiff contends that "APS never told [Plaintiff] of any relocation plans that [Defendant] had for [Plaintiff]." (Pl. Resp. to Def. 56.1 ¶ 24.) Edwards-Jones also reported that she discussed various options with Plaintiff, including "supportive housing, 'APS' family type housing,' and Article 81 guardianship," all of which Plaintiff "refused," although Edwards-Jones "encouraged Plaintiff to consider them further." (Def. 56.1 ¶ 25.) Plaintiff contends that these options were only "mentioned," and not "discuss[ed]." (Pl. Resp. to Def. 56.1 ¶ 25.) During a conversation

the following day, Plaintiff told Edwards-Jones that "she had concerns about the housing proposals [Edwards-Jones had] explained to her" and "was worried that she would have nowhere to put her things," and that "[b]ecause of these concerns, . . . she would not make a decision on the matter." (Def. 56.1 ¶ 28; Pl. Resp. to Def. 56.1 ¶ 28.)

In late February of 2013, Plaintiff's EAA grant application was denied, and, after declining APS's offer to submit another application on her behalf, Plaintiff requested "a fair-hearing to challenge the denial of her EAA grant application." (Def. 56.1 ¶¶ 31, 34–35; Pl. Resp. to Def. 56.1 ¶ 31, 34–35.) Edwards-Jones learned that Plaintiff's application had been denied "because Plaintiff failed to submit information that was requested, . . . did not properly complete the portions of the application, and . . . failed to establish proof of income." (Def. 56.1 ¶ 38; Pl. Resp. to Def. 56.1 ¶ 38 (stating that Plaintiff "does not know whether this statement is true or false").)

During a home visit on March 19, 2013, Plaintiff again "expressed 'deep concern' about having room for all her belongings in an assisted living facility." (Def. 56.1 ¶ 48; Pl. Resp. to Def. 56.1 ¶ 48.) According to Edwards-Jones, "she explained assisted living programs to Plaintiff, and the benefits of assisted living as opposed to entering the shelter system," but "Plaintiff refused to complete the applications presented to her." (Def. 56.1 ¶ 48.) Plaintiff disputes that she ever "saw any assisted living applications," and further states that "knew" she was "not mentally disabled" and thus "believed" she was "ineligible for assisted living." (Pl. Resp. to Def. 56.1 ¶ 48.) On March 21, 2013, Edwards-Jones contacted an assisted living facility to inquire about an "emergency referral" she had made on Plaintiff's behalf, and learned that "an opening might not be available until May 2013." (Def. 56.1 ¶ 50; Pl. Resp. to Def. 56.1 ¶ 50.)

Throughout March and April of 2013, Edwards-Jones reported that Plaintiff "continued to refuse to apply for social security benefits" or "fill out applications for alternative housing provided by Edwards-Jones." (Def. 56.1 ¶ 54.) Plaintiff asserts that "[t]hroughout April 2013, [she] was not offered any relocation plan or shelter services," (Pl. Resp. to Def. 56.1 ¶ 65), and that Edwards-Jones "mentioned [Plaintiff] applying for [Social Security benefits] only once or twice," (id. ¶ 27).

On March 25, 2013, APS submitted an Article 81 referral form, prepared on March 22, 2013, to OLA. (Def. 56.1 ¶ 53; Pl. Resp. to Def. 56.1 ¶ 53; Art. 81 Referral to OLA, annexed to Ferreira Decl. as Ex. B, Docket Entry No. 66-2.) The form explicitly indicated that the referral was for a "community" Article 81 guardianship, rather than an "institutional" Article 81 guardianship. (Art. 81 Referral to OLA 1.)[7] On April 5, 2013, OLA notified Edwards-Jones that it was rejecting the Article 81 guardianship application because "there [was] no nexus between [Plaintiff's] risk and her functional limitations." (APS Case File 25.) Edwards-Jones discussed the rejection with her supervisor, and they "decided that based on [Plaintiff's] apparent florid condition and seemingly suicidal plans to resolve eviction[,] another psychiatric evaluation should be done." (Id.) On April 11, 2013, Dr. Klein conducted a second psychiatric evaluation of Plaintiff, based on which he "strongly recommended that APS submit an application for Article 81 guardianship on Plaintiff's behalf."[8] (Def. 56.1 ¶ 61; Pl. Resp. to Def. 56.1 ¶ 61.) On

---

[7] Because the Article 81 Referral to OLA is not consecutively paginated, the Court refers to the page numbers assigned by the Electronic Case Filing ("ECF") system.

[8] On April 7, 2013, Edwards-Jones spoke with Dr. Marilyn Gerber, Plaintiff's psychotherapist, who "expressed concern regarding [Plaintiff's] ability to care for [her]self." (APS Case File 33.) Dr. Gerber said Plaintiff "would need someone to guide her" and "to oversee her every day [sic] activities." (Id.) Dr. Gerber reported that she had seen an "increase[]" in psychotic behavior" in her weekly sessions with Plaintiff, and that Plaintiff had "refused to see

April 16, 2013, Edwards-Jones submitted a second application for Article 81 guardianship to OLA, which OLA accepted on April 23, 2013. (Def. 56.1 ¶¶ 71, 73; Pl. Resp. to Def. 56.1 ¶¶ 71, 73.)

In its approval memo, OLA noted that Plaintiff was facing imminent eviction and that, "[d]ue to her functional limitations," she "lack[ed] insight into the risk of eviction and spoke about [it] in what [Dr. Klein] described as a 'thought disordered manner.'" (OLA Memo 2–3, annexed to Ferreira Decl. as Ex. C, Docket Entry No. 66-3.) Plaintiff had not "been able to address the threat of eviction because of her delusional belief that an EAA grant [was] pending and the eviction [would] be resolved," and "refuse[d] to apply for Social Security because she believe[d] the amount she [would] receive[] would be too small." (*Id.* at 3.) The memo further noted that Plaintiff was "unable to say what she would do if she were evicted other than making threats of suicide," and that she had "refused all offers of assistance with relocation by APS." (*Id.*) The memo also referenced Plaintiff's mental health diagnoses, and noted that Dr. Klein's evaluation indicated that she "suffers from paranoia" and "often mentioned her 'powers of prophecy.'" (*Id.*)

OLA concluded that Plaintiff met the legal criteria for appointment of a guardian because "[a]s a result of functional limitations," she was "likely to suffer harm because" she was "<u>unable</u> to provide for . . . personal needs" and "property management," and was "<u>unable</u> to adequately understand and appreciate the nature and consequences of such inability to address the risk." (*Id.* at 2.) OLA further concluded that there were no "available lesser restrictive measures that

---

the [p]sychiatrist . . . after medication was recommended." (*Id.*) Plaintiff contends that the psychiatrist "never recommended medication, only rubber-stamped what [Plaintiff] told him occurred with Dr. Klein, so that [Plaintiff] distrusted and disliked [him]," and that she "believes that much of [Edwards-Jones's] reporting is fabricated." (Pl. Resp. to 56.1 ¶ 72.)

[could] stabilize this case," and that there was "sufficient **present risk** to [Plaintiff] as a result of . . . her functional limitations." (*Id.*)

On July 26, 2013, a judge in the New York Supreme Court, Queens County, appointed the New York Foundation for Senior Citizens, Guardian Services, Inc. as Temporary Personal Needs and Property Management Guardian for Plaintiff, to "marshall[] income and assets," "apply[] for . . . benefits," "protect[] [Plaintiff's] rights with regard to her apartment, or . . . relocate[] her to a suitable residence," and "assur[e] that [Plaintiff] [was] current with all medical and dental treatments." (State Ct. Order dated June 26, 2013, annexed to Ferreira Decl. as Ex. D, Docket Entry No. 66-4.) On August 7, 2013, the state court "issued a final Order and Judgment Appointing a Guardian of the Personal Needs and Property Management in Plaintiff's Article 81 proceeding." (Def. 56.1 ¶ 79; Pl. Resp. to Def. 56.1 ¶ 79.)

On September 18, 2013, Edwards-Jones conducted a home visit, "during which Plaintiff's court appointed [guardianship caseworker, Michael Coley] was present," and explained to Plaintiff that "APS would be working alongside [Coley] until the guardianship was certified . . . after which Plaintiff's APS case would be closed." (Def. 56.1 ¶¶ 82–83; Pl. Resp. to Def. 56.1 ¶¶ 82–83; APS Case File 45.) During an October home visit, Plaintiff told Edwards-Jones that Coley had "obtained an additional [sixty] days to relocate Plaintiff," and further reported that she was "upset that [Coley] had applied for Social Security benefits on her behalf without telling her." (Def. 56.1 ¶¶ 84–85; Pl. Resp. to Def. 56.1 ¶¶ 84–85.)

On December 10, 2013, Plaintiff was evicted. (Def. 56.1 ¶ 86; Pl. Resp. to Def. 56.1 ¶ 86.) Edwards-Jones was present, along with Coley. (APS Case File 47.) Plaintiff reported she would be going to a shelter, but did not actually do so. (Def. 56.1 ¶¶ 87, 91; Pl. Resp. to Def. 56.1 ¶ 87 (stating that Plaintiff had no choice but to say she would go to a shelter); *id.* ¶ 91.)

Edwards-Jones closed Plaintiff's APS case on December 16, 2013.  (APS Case File 48.)

In early January of 2014, Plaintiff "checked herself into Forest Hills Hospital because of a gastrointestinal infection."  (Def. 56.1 ¶ 92; Pl. Resp. to Def. 56.1 ¶ 92.)  Coley met Plaintiff at the hospital to assist with her discharge on January 7, 2014, and asked where she was staying.  (Def. 56.1 ¶ 93; Pl. Resp. to Def. 56.1 ¶ 92.)  Plaintiff refused to say and stated that she "preferred to have the guardianship worry."  (Def. 56.1 ¶ 94; Pl. Resp. to Def. 56.1 ¶ 94 (stating that Plaintiff "does not know whether this statement is true or false").)  When Plaintiff refused to tell Coley that she would go to a shelter or had somewhere else to stay, "because of the danger presented to her by the extreme temperatures, [Coley] had her hospitalized at Elmhurst hospital from approximately January 7, 2014 to January 15, 2014."  (Def. 56.1 ¶¶ 95–96; Pl. Resp. to Def. 56.1 ¶¶ 95–96.)

Plaintiff's guardianship was terminated in November of 2015, (SAC ¶ 48), nearly a year after she commenced this action, (Compl.).

## II. Report and recommendation

Judge Bloom recommended that the Court grant Defendant's summary judgment motion and deny Plaintiff's motion to amend.  (R&R 1.)

After an "assiduous review of the record," Judge Bloom concluded that the "evidence demonstrates that [Defendant] created a service plan for [Plaintiff] based on individualized clinical and psychiatric assessments and that [Plaintiff] opposed the alternative housing, benefits, and services that were presented and explained to her."  (*Id.* at 31.)  Judge Bloom also found that "[P]laintiff's hospitalizations after her eviction were either a result of [her] own volitional conduct or her interactions with her private guardian," and that Plaintiff "had not shown that [Defendant] excluded her from any program for which she was eligible or otherwise

discriminated against her by reason of her disability." (*Id.* at 38.) Because "[t]here is no genuine issue of material fact regarding whether [Plaintiff] was denied a more appropriate placement or service, to which she was unopposed, and for which she was qualified or eligible," Judge Bloom found that Plaintiff could not prevail on her integration mandate claim. (*Id.* at 31.)

As to Plaintiff's motion to amend, Judge Bloom found that, accepting the allegations in the proposed Third Amended Complaint ("TAC") as true and drawing all reasonable inferences in Plaintiff's favor, "amendment would nonetheless be futile as [P]laintiff lacks constitutional standing to bring the federal claims she proposes to add to the case." (*Id.* at 40–41.) Judge Bloom further recommended that, "[t]o the extent that the TAC alleges state law claims, even if [P]laintiff would be granted permission to amend, the Court should decline to exercise supplemental jurisdiction over the state law claims." (*Id.* at 45.)

## III. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1 (E.D.N.Y. Nov. 24, 2015). The clear error standard also applies when a party makes only

conclusory or general objections. *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016) (holding that "general objection[s] [are] insufficient to obtain de novo review by [a] district court" (citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations."); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))).

### ii. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The court must "'constru[e] the evidence in the light most favorable to the non-moving party' and 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (first quoting *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 118 (2d Cir. 2001); and then quoting *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not

sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b.   Objections to the R&R

Plaintiff objects to Judge Bloom's finding that "[t]here is no genuine issue of material fact regarding whether [Plaintiff] was denied a more appropriate placement or service, to which she was unopposed, and for which she was qualified or eligible." (Pl. Obj. ¶ 2 (quoting R&R 31).) Plaintiff argues that Defendant (1) "never fully complied with the Court's request for all Citywide documents regarding [Plaintiff] for 2012–2013," (2) "never mentioned the one HRA application which [Plaintiff] did fill out," and (3) "never fully discovered [Defendant's] speech and actions taken regarding said HRA application." (*Id.*) Plaintiff further states that after she reviewed the R&R, "while surfing the Internet," she "discovered . . . new evidence: City HRA web pages containing benefits never mentioned, offered, or given to [Plaintiff]."[9] (*Id.*) Based on this "new evidence," Plaintiff asserts that when she met with "the City HRA employee," who was "speaking and acting according to City HRA policy," the HRA employee "never mention[ed], offer[ed], or [gave] crucial benefits for which [Plaintiff] believes [Plaintiff] was eligible." (*Id.* ¶ 3.) When Plaintiff informed the HRA employee that she was an APS client, "he pointed to APS next door, but . . . deliberately left the assessment and undercare [sic] of services and programs [to provide Plaintiff] with . . . crucial benefits entirely up to APS." (*Id.*) Plaintiff

---

[9] Plaintiff attaches to her objections a blank HRA "Request to Pay Rent Arrears in Excess of Cash Assistance Maximum Shelter Allowance" form, handwritten notes, a print-out of the HRA's webpage for "Cash Assistance" services, and information about "Cash Assistance Additional Allowances." (*See* Pl. Obj.)

argues that as a result of the HRA employee's actions, she "was deprived of the services and programs which would have led to the benefits." (*Id.* ¶ 2.) Specifically, Plaintiff appears to argue that she was deprived of "storage and [a] homeless shelter." (*Id.* ¶ 13.) Plaintiff contends that "if the Court concludes that [Plaintiff] is . . . regarded as mentally disabled and having a history of a mental disability under [the] ADA, then the Court should reconsider, given the information [Plaintiff] has discussed, whether [Plaintiff] also has [shown] a violation of the integration mandate." (*Id.* ¶ 12.)

As to Judge Bloom's finding that Plaintiff lacks standing to bring her proposed amended claims, Plaintiff states she "learned from [the] R&R that [she] should show standing by stating injuries 'up to snuff,'" and alleges that she has suffered economic injuries due to storage bills she has had to pay since December 13, 2013, the costs of replacing books destroyed in storage, and credit card debt and interest. (*Id.* ¶ 11.) Plaintiff also states that she has "mental anguish, but . . . just tackles [her] challenges," and that she "has tried to express that [Plaintiff's allegations] seem[] to . . . best fit a [section] 1983 action, whether a [*Monell*] or a stigma-plus as Plaintiff was misdiagnosed and institutionalized, and . . . leaves any such construing of such a claim to the Court." (*Id.*)

### c. ADA claim

Defendant argues that the Court should grant its motion for summary judgment because (1) "Plaintiff was never denied any benefit or services to which she was entitled," (2) "APS conducted an assessment of Plaintiff and created a management plan based on her needs and circumstances," (3) "any failure by Plaintiff to receive alternative services was largely the result of her own volitional conduct and her decision not to avail herself of those services offered to her by APS," including "supportive housing and shelter services," and (4) Defendant "did not seek to

institutionalize Plaintiff and had no role in her hospitalization," and "sought only to help Plaintiff remain in the community." (Def. Mem. 1–2.) Defendant further argues that in addition to not being currently institutionalized, Plaintiff cannot show that she "is currently at risk of institutionalization." (*Id.* at 2.) Finally, Defendant argues that "Plaintiff is not entitled to the relief requested because she cannot pursue punitive damages against a municipal entity under the ADA and because she has failed to show any intentional discrimination on the part of [Defendant], or its agents, and employees." (*Id.*)

Liberally construed, Plaintiff argues that Defendant violated the integration mandate by steering her toward guardianship, rather than helping her secure benefits and an appropriate housing option in the community, increasing her risk of institutionalization and ultimately resulting in her actual institutionalization when she was hospitalized. (*See generally* Pl. Opp'n.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 41 U.S.C. § 12132. To state a valid ADA claim under Title II, "a plaintiff must establish '(1) that she is a qualified individual with a disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability.'" *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)).

The integration mandate, one of the ADA's implementing regulations, requires public entities to "administer services, programs, and activities in the most integrated setting appropriate" to meet the needs of people with disabilities. 28 C.F.R § 35.130(d); *Davis*, 821

F.3d at 260 & n.18 (considering the integration mandate in the context of a disparate treatment claim); *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005) (considering the integration mandate in the context of a reasonable accommodation claim). A state fulfills its obligation under the integration mandate by administering its services in the "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Davis*, 821 F.3d at 262 (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 592 (1999)). The Second Circuit has clarified that its prior decisions holding "that the ADA does not bar unequal treatment of different disabilities, so long as disabled individuals are not denied services provided to the able-bodied on the basis of their disabilities," *Davis*, 821 F.3d at 260, do not limit integration mandate claims, because "*Olmstead* unquestionably holds that the 'unjustified institutional isolation of persons with disabilities' is, in an[d] of itself, a prohibited 'form of discrimination,'" *id.* at 260–61 (quoting *Olmstead*, 527 U.S. at 600). Failure to comply with the integration mandate is therefore "discrimination on the basis of disability under the ADA." *Id.* at 262 ("In *Olmstead*, the Supreme Court interpreted the integration mandate to mean that the 'unjustified isolation' of disabled individuals in institutionalized care facilitates constitutes discrimination on the basis of disability under the ADA."); *Schine by Short v. N.Y.S. Office for People with Developmental Disabilities*, No. 15-CV-5870, 2017 WL 1232530, at *3 (E.D.N.Y. Mar. 31, 2017) (explaining that violation of the integration mandate is "one form of discrimination by reason of disability" (alteration and citation omitted)). The United States Department of Justice ("DOJ") has issued interpretive guidance on the integration mandate, stating that:

> The ADA's integration mandate is implicated where a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities. More

> specifically, a public entity may violate the ADA's
> integration mandate when it: (1) directly or indirectly
> operates facilities and or/programs that segregate individuals
> with disabilities; (2) finances the segregation of individuals
> with disabilities in private facilities; and/or (3) through its
> planning, service system design, funding choices, or service
> implementation practices, promotes or relies upon the
> segregation of individuals with disabilities in private
> facilities or programs.

U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration

Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.*, at Q2 (last

updated Feb. 25, 2020), www.ada.gov/olmstead/q&a_olmstead.htm (last visited Apr. 3, 2020);

*Davis*, 821 F.3d at 263 ("Because the integration mandate is a creature of the [DOJ's] own

regulations, DOJ's interpretation of that provision is controlling unless plainly erroneous or

inconsistent with the regulations." (alteration in original) (citations and internal quotations marks

omitted)).

The integration mandate has been applied broadly to include a range of public social

services. *See, e.g.*, *Schine by Short*, 2017 WL 1232530, at *3 (finding for the plaintiff on a

motion for judgment on the pleadings where he alleged that his Medicaid budget should be

allocated "to prevent institutionalization" and he sought "to be relocated to 'an independent

living facility'") (adopting report and recommendation); *State of Conn. Office of Prot. &

Advocacy for Pers. with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 274, 289 (D. Conn.

2010) (certifying a class and denying defendants' motion to dismiss an action brought on behalf

of individuals with mental disabilities residing in three nursing facilities and those at risk of

entering those facilities where the allegations were that the defendants "needlessly segregated,

inappropriately warehoused, and left without safeguards to ensure that they are discharged" and

"systematically failed to inform [the class] of their right to community services, and failed to

provide services with reasonable promptness"); *see also Brown v. D.C.*, No. 10-CV-2250, 2017 WL 4081891, at *40 (D.D.C. Sept. 13, 2017) (discussing the effectiveness of the transition assistance for individuals in nursing facilities and applying a six-factor "transition assistance" test that included affirmative obligations on the part of the government such as the "provision of accurate information about available community-based services, assistance in applying and enrolling" and "identification of barriers to transition and assistance in overcoming those barriers to the extent possible[,] e.g. if housing is a barrier, providing assistance in applying for supported housing"); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1029–30 (D. Minn. 2016) (considering services such as "independent housing options; assistance and supervision in developing and maintaining independent living skills and in accessing the community" and "assistance with financial management and budgeting; nutrition and menu planning; healthcare management; and assistance in obtaining and maintaining gainful employment").

In bringing an integration mandate claim, a plaintiff must demonstrate that the defendant's actions pose a serious risk of institutionalization for disabled persons. *See* 28 C.F.R. § 35.130(d); *Davis*, 821 F.3d at 263. A "plaintiff establishes a sufficient risk of institutionalization . . . if a public entity's failure to provide community services . . . will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Davis*, 821 F.3d at 262–63. "[T]he integration mandate . . . requires a state to provide community-based treatment for disabled persons when (1) 'the State's treatment professionals determine that such placement is appropriate,' (2) 'the affected persons do not oppose such treatment,' and (3) 'the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities.'" *Id.* at 262 (second alteration in original) (quoting *Olmstead*, 527 U.S. at 607).

The Court finds that no jury could reasonably find that Defendant denied Plaintiff access to services or programs on the basis of her actual or perceived disability,[10] or that Defendant violated the integration mandate.  As detailed above, APS's decision to pursue Article 81 guardianship for Plaintiff was based on the recommendation of a psychiatrist, Dr. Klein, who evaluated Plaintiff on two separate occasions, as well as the opinions of APS caseworkers who met and spoke with Plaintiff on numerous occasions to attempt to help Plaintiff either avoid or plan for her eviction.  (Def. 56.1 ¶¶ 14, 16–17, 59, 61, 64; *see generally* APS Case File); *see Messier v. Southbury Training School*, 526 F. Supp. 2d 294, 326 (D. Conn. 2008) ("The court . . . must defer to the judgment of the defendants' medical and mental health professionals in determining whether community placement is appropriate . . . ."); *Jenkins v. N.Y.C. Dep't of Homeless Servs.*, 643 F. Supp. 2d 507, 516 (S.D.N.Y. 2009) ("'The State generally may rely on the reasonable assessments of its own professionals in determining whether an individual meets the eligibility requirements' of a specific program." (quoting *Olmstead*, 527 U.S. at 602)).  Defendant's concerns regarding Plaintiff's ability to care for herself were shared by Plaintiff's own treatment provider, who similarly expressed concern about Plaintiff's ability to care for herself.  (*See* APS Case File 33.)  Moreover, APS specifically pursued a community-based guardianship, and not an institutionalized guardianship.  (Art. 81 Referral to OLA 1.)  While Plaintiff was eventually hospitalized against her will for eight days in January of 2014, that occurred only after she checked herself in for medical treatment and then refused to tell her

_____

[10]  Defendant does not dispute that Plaintiff was "a qualified individual with a disability for purposes of the ADA," and thus has satisfied the first element of a Title II claim.  (*See* Def. Mem. 13.)  Plaintiff contends that Defendant "imputed to [her] a mental disability, which [she] did not have."  (Pl. Resp. to Def. 56.1 ¶ 27.)  For purposes of the ADA, a person is considered to have a disability if they are "regarded as having such an impairment."  *Francis v. Hartford Bd. of Educ.*, 760 F. App'x 34, 36 (2d Cir. 2019) (quoting 42 U.S.C. § 12102(a)).

court-appointed guardianship caseworker where she would be staying upon her discharge, despite the extreme temperatures outside. (*See* Def. 56.1 ¶¶ 92–96.) No jury could reasonably find that Plaintiff's hospitalization was due to Defendant's failure to provide appropriate, community-based services.

While Plaintiff argues that APS tried to direct her into guardianship and away from other services, the record demonstrates that APS caseworkers discussed various options, including applying for assisted living, supportive housing, and benefits, which Plaintiff, for various reasons, refused. (*See, e.g.*, APS Case File 4, 7, 9, 11–12, 24, 27.) Instead, Plaintiff insisted on pursuing the EAA grant, despite her APS caseworker explaining to her that she was unlikely to receive it. (*See, e.g.*, *id.* at 4.) While Plaintiff's application was ultimately denied, the record demonstrates that this denial was due to Plaintiff's failure to provide the necessary information, not to her disability.[11] (*See id.* at 10, 29.) Plaintiff's attempt to argue, in her objections to the R&R, that she has now discovered evidence of services that HRA should have provided to her, (Pl. Obj. ¶¶ 2–3), fails to create a triable issue of fact as to whether she was discriminated against on the basis of an actual or perceived disability.

Plaintiff has not shown that Defendant denied her services or otherwise discriminated against her on the basis of her actual or perceived disability, or that Defendant placed her at risk

---

[11] After the HRA was directed by a judge at Plaintiff's fair-hearing to "obtain more information with regard to the viability of Plaintiff's application," Edwards-Jones spoke to a representative from the Fair Hearing Compliance Unit, who informed Edwards-Jones that Plaintiff's "resubmitted application would [likely not be] approved because Plaintiff failed to submit proof of income and other necessary information." (Def. 56.1 ¶¶ 43, 67–68; Pl. Resp. to Def. 56.1 ¶¶ 43, 67–68.) Moreover, the record demonstrates that several attempts were made by the agency facilitating and/or processing Plaintiff's application to obtain the necessary information but "Plaintiff never provided the information." (Def. 56.1 ¶ 39; *but see* Pl. Resp. to Def. 56.1 ¶ 39 (disagreeing and stating that she and an agency employee had "such a wonderful relationship").)

of institutionalization by its failure to provide community services recommended by treatment professionals and unopposed by Plaintiff. Accordingly, the Court grants Defendant's motion as to Plaintiff's ADA claim.[12]

### d. Plaintiff's motion to amend

Defendant argues that the Court should deny Plaintiff's motion to amend the SAC to add (1) "a [section] 1983 claim, (2) a "fraudulent concealment claim," and (3) "a disparate impact claim" because "Plaintiff's proposed new claims fail to meet the 12(b)(6) pleading standard and, thus, ar[e] futile." (Def. Mem. 25–26.)

In her objections to the R&R, Plaintiff states that she "does not . . . so strongly believe that [she] has a disparate impact claim," and that it "is not [her] intention to present a state fraud claim (unless the Court later so requests)," but that her allegations "seem to [her] to best fit a 1983 action . . . and [she] leaves any such construing of such a claim to the Court." (Pl. Obj. ¶¶ 10–11, 13.)

While "[a] *pro se* complaint should not be dismissed without the Court's granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (alterations omitted) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)), "[l]eave to amend may properly be denied if the amendment would be futile," *id.* at 140 (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the

---

[12] Because the Court finds that Plaintiff has not shown that Defendant violated Title II of the ADA, the Court does not address Defendant's argument that Plaintiff is not entitled to the specific relief she requests. (*See* Def. Mem. 24–25.)

Federal Rules of Civil Procedure." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 224–25 (2d Cir. 2017) (citing *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012)); *see also Chunn v. Amtrak*, 916 F.3d 204, 208 (2d Cir. 2019) ("[An] [a]mendment is futile if it fails 'to cure prior deficiencies.'" (citing *Panther Partners Inc.*, 681 F.3d at 119)). "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 386 (2d. Cir 2015). "If the problems with a claim are 'substantive' rather than the result of an 'inadequately or inartfully pleaded' complaint, an opportunity to replead would be 'futile' and 'should be denied.'" *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 510 (S.D.N.Y. 2005) (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).

Plaintiff seeks to add claims based on allegations that she was "steered . . . away from [Department of Homeless Services ('DHS')] homeless prevention services given to others who were initially at risk of homelessness . . . and toward APS . . . psychiatric examinations and guardianship given to others who were initially at risk of institutionalization," and that DHS "had a policy, beginning at the time of [Plaintiff's] institutionalization and lasting two years, which deprived 65[-plus] mentally disabled . . . wards from shelter liberty." (Proposed TAC ¶ 4, Docket Entry No. 48-1.) The Court has twice granted Plaintiff leave to amend her Complaint. (*See* Mem. & Order dated Apr. 21, 2015, Docket Entry No. 8; Mem. & Order dated Feb. 19, 2016, Docket Entry No. 16.) Having reviewed the proposed TAC, the Court determines that amendment would be futile, as Plaintiff's conclusory allegations fail to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and denies Plaintiff's motion to amend.

## IV.  Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment and denies Plaintiff's motion to amend the SAC.  The Clerk of Court is directed to mail a copy of this Memorandum and Order to Carolyn Jane Siino, P.O. Box 170050, Ozone Park, NY 11417, and close this case.

Dated: April 14, 2020
Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge